UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No.  11-10219-mew |
|  | . |  |
|  | . | Chapter 7 |
| KENNETH IRA STARR, | . |  |
|  | . |  |
| Debtor. | . |  |
| . . . . . . . . . . . . . . | . |  |
| ROBERT L. GELTZER, AS CHAPTER 7 | . | Adv. Proc. 14-02395-mew |
| TRUSTEE OF IRA STARR, | . |  |
| STARR & COMPANY, LLC, AND | . |  |
| STARR INVESTMENT ADVISORS, LLC, | . |  |
|  | . |  |
| Plaintiff, | . |  |
| v. | . | One Bowling Green |
|  | . | New York, NY  10004-1408 |
| HAROLD EVANS and TINA BROWN, | . |  |
|  | . | Thursday, October 29, 2015 |
| Defendants. | . | 10:03 a.m. |
| . . . . . . . . . . . . . . | . |  |

TRANSCRIPT OF TRIAL
ADVERSARY PROCEEDING:  14-02395-mew GELTZER V. EVANS ET AL
**BEFORE THE HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Plaintiff:          Tarter Krinsky & Drogin
                            By:  ROBERT A. WOLF, ESQ.
                                 GREGORY J. SKIFF, ESQ.
                            1350 Broadway, 11th Floor
                            New York, NY  10018
                            (212) 216-8000

For the Defendants:         Boies, Schiller & Flexner, LLP
                            By:  SCOTT E. GANT, ESQ.
                            5301 Wisconsin Avenue, N.W.
                            Washington, DC  20015
                            (202) 237-2727

APPEARANCES CONTINUED

Audio Operator:             F. Ferguson, ECRO

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES:

For the Defendants:        Boies, Schiller & Flexner LLP
                           By:  COLLEEN A. HARRISON, ESQ.
                           26 South Main Street
                           Hanover, NH  03755
                           (603) 643-7914

I N D E X
10/29/15

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | |
| Harold Evans | 4 | 45 | 81,117 | 104,122 |
|   By The Court | 123 | | | |
| Tina Brown | 129 | 149 | 155 | 157 |

|  | PAGE |
|---|---|
| CLOSING ARGUMENT BY MR. WOLF | 159 |
| CLOSING ARGUMENT BY MR. GANT | 172 |

| EXHIBIT | ADMITTED |
|---|---|
| PX-41 | 12 |
| PX-42 | 22 |
| PX-46 | 38 |
| DX-D | 72 |
| DX-F | 49 |
| DX-G | 77 |
| DX-I | 57 |
| DX-L | 108 |
| DX-R | 67 |

1        (Proceedings commence at 10:03 a.m.)

2              THE COURT:  Good morning.  Please be seated.

3              MR. WOLF:  Good morning, Your Honor.

4              MR. GANT:  Good morning.

5              THE COURT:  Okay.  Are we ready to continue?

6              MR. WOLF:  We are, Your Honor.

7              At the outset, before I proceed, I'd like to

8    introduce to the Court Mr. Chandan Panigrahi, who is a third-

9    year law student at Northeastern Law School, who, through a

10   program that our firm has with Northeastern, is doing a quarter

11   of his third year as a legal intern with our firm, and he has

12   been helping us with the case as well.

13             THE COURT:  Great.  Welcome.

14             MR. WOLF:  Your Honor, at this time, the plaintiff

15   calls as the next witness Mr. Harold Evans.

16          HAROLD EVANS, PLAINTIFF'S WITNESS, SWORN

17             THE COURT:  Go ahead, Mr. Wolf.

18                      DIRECT EXAMINATION

19   BY MR. WOLF:

20   Q   Mr. Evans, good morning.  Good morning.  Mr. Evans, at the

21   outset, I'm going to bring up to you the first volume of the

22   three volume set of the plaintiff's trial exhibits, because I'm

23   going to start off with some questioning regarding at least one

24   of the exhibits in this volume.

25   A   All right.

Evans - Direct                                          5

1  Q    Mr. Evans, I'd ask you to turn to the first tab in that

2  binder, which is Plaintiff's Exhibit 1 in evidence.

3  A    October the 1st, 2009?

4  Q    Yes, October 1st, 2009.  It is a --

5  A    PX-1?

6  Q    PX-1, it's a five-page letter.

7  A    Okay.

8  Q    My question to you is, do you recall that Elaine Locke

9  (phonetic) of Starr & Company, LLC, which I'll refer to as

10 "Starr Company," prepared for you and your wife each of the

11 2008 federal and state income tax returns that are listed in

12 Plaintiff's Exhibit 1?

13 A    I recognize that.

14 Q    Good.  And you recall that she did prepare those tax

15 returns?

16 A    There's no signature.

17 Q    Yeah, that's not my question.  My question is, with regard

18 to each of the income tax returns that are enumerated in that

19 document, do you recall that Ms. Locke at Starr & Company did,

20 in fact, prepare those tax returns for you and your wife.

21 A    I do, but there's no signature on the --

22 Q    I understand.  And do you recall that in addition to New

23 York State, there were a number of other states in which your

24 wife and you needed to file tax returns?

25 A    We did earn money in other states.

Evans - Direct                                            6

1  Q    Okay.  You earned money in other states through, among

2  other things, you and your wife's various companies.  Is that

3  correct?

4  A    Yes, in -- we -- I have a -- yes, that's correct, yes.

5  Q    Okay.  And at any time during the period January 1, 2009,

6  through the end of May, 2010, did Starr & Company prepare tax

7  returns for any of the companies owned by you and/or your wife?

8  A    Is that in the file here?

9  Q    I'm not getting into a file right now.  I'm just asking

10  you a general question, that I may then ask some questions with

11  regard to particular documents.

12  A    Could you repeat the question?

13  Q    Did -- I'll repeat the question for you.  Okay?  The

14  question is whether during the period of time, January 1, 2009,

15  through the end of May, 2010, did Starr & Company prepare

16  certain tax returns for your and your wife's companies?

17  A    I believe so.

18  Q    Okay.  Are you familiar with an entity known as Harold

19  Evans & Associates, LLC?

20  A    Yes.

21  Q    Okay.  And will -- that company still exists?

22  A    Yes.

23  Q    It existed in 2009 and 2010?

24  A    Yes.

25  Q    And what was the business of the company at that time?

Evans - Direct                                      7

1  A    It received income from my books and any speeches I made.

2  Q    Okay.  And when you say your books, you're talking about

3  books that you had written?

4  A    Yes.

5  Q    Okay.  And do you recall that one or more points during

6  that same period, January 1, 2009, through the end of May,

7  2010, that Starr & Company prepared one or more tax returns on

8  behalf of your company, Harold Evans & Associates, LLC?

9  A    I believe so.

10 Q    Now, are you familiar with an entity known as Middlemarch

11 Media, LLC?

12 A    Middlemarch Media LLC was set up by my wife.

13 Q    By your wife, Tina Brown?

14 A    By my wife Tina Brown, yes.

15 Q    Okay.  And that company existed in 2009 and 2010?

16 A    To the best of my belief.

17 Q    What was the business of that company at that time?

18 A    My wife had been asked by HBO to -- she was then writing a

19 book, and she was asked by HBO to think of productions that

20 might emerge from that book or anything else she might do,

21 television productions.

22 Q    I'm sorry, would you --

23 A    Middlemarch -- it was a literary reference, that she would

24 appreciate -- and she was passionate about that aspect, and she

25 was asked by HBO -- my wife was then writing a book, and she

Evans - Direct                                    8

1  was asked by -- if she'd think about television productions

2  that she might do.

3  Q    Okay.  And during the period, same period again, January

4  1, 2009 to May 31, 2010, did Starr & Company prepare one or

5  more sets of tax returns for Middlemarch Media, LLC?

6  A    To the best of my knowledge.

7  Q    Okay.  Are you familiar, Mr. Evans, with an entity known

8  as Innovators Ventures II, that's the Roman numeral II, LLC?

9  A    I am indeed.

10 Q    Did that company exist during that period, during 2009 and

11 2010?

12 A    That company -- you asked did they exist at that time?

13 Q    I'm sorry, I didn't hear all of that.

14 A    I believe so.  There was a time when it became less

15 active, but yes, I believe it still exists.

16 Q    Okay.  And what was the business of that company at that

17 time?

18 A    It was set up when I was writing the book about the

19 history of innovation, and it was set up to receive the

20 revenues, pay the costs, and work on an educational project

21 with Boston television.

22 Q    Okay.  Was that the book entitled, They Made America?

23 A    Yes.

24 Q    Okay.

25 A    To give it its full title, From The Steam Engine To The

1  <u>Search Engine, 200 Years of Innovators</u>.  I'm pleased to say it

2  was a question on Jeopardy recently.

3  Q    Okay.  And did Starr & Company prepare one or more tax

4  returns for that entity, again, during the same period, the

5  date of January 1, 2009 to May 31, 2010?

6  A    I believe so.

7  Q    Thank you.  I'm going to trade books with you, because I

8  have --

9  A    Oh, yes.

10 Q    -- an exhibit from another volume.

11 A    Do you want me to sign it?

12 Q    Mr. Evans, I'd like to ask you to turn in the volume that

13 you now have in front of you to tab 40.  That's Plaintiff's

14 Exhibit 40, which is in evidence.  You tell me when you've

15 found that.

16 A    The indexes here run from 31 to 38.  Let's find it.

17 Q    I believe it's 31 to 50.

18 A    And 39.  Exhibit 40.

19 Q    Exhibit 40.  You tell me when you're there.

20 A    Is that PX-40?

21 Q    PX-40, yes.

22 A    And not PX-39, no.

23 Q    Correct.  We're just --

24 A    Okay.

25 Q    -- focusing on Plaintiff's Exhibit 40 for the moment.

                              Evans - Direct                        10

1   A    Right.

2   Q    And that exhibit, which is in evidence, consists of two

3   pages.  It's a series of emails between yourself and Betty

4   Greif.  Is that correct?

5   A    Yes.

6   Q    Okay.  And if you look at the very -- I'm sorry.  Yes.

7   The very bottom of the first page of Plaintiff's Exhibit 40,

8   it's the email message dated March 24, 2009 at 10:24 a.m. from

9   Betty Greif at gmail.com  And it starts off, "Harold."  Do you

10  see where I am?  Oops, sorry.  The email starts at the bottom

11  of the first page of the exhibit, right here.  Do you see that?

12  And then you would flip the page, as it continues on the next

13  page, top.

14  A    I'm waiting to see where I might see "Harold."  Where is

15  Harry?

16  Q    It's at the very bottom of the first page.

17  A    Ah.  Small type.

18  Q    Yes.  And then the text of the email continues --

19  A    Yes, certainly, yes.

20  Q    -- at the top of the second page.

21  A    Yes.  I can see the top of the second page.

22  Q    Okay.  And that email, Betty wrote to you in the first

23  sentence, "I owe Starr three months of fees and $2,000 from the

24  contract he brokered."  Do you see that sentence?

25  A    Yes, I see that sentence.

Evans - Direct                                          11

1   Q    What contract was Betty Greif referring to in that email

2   to you?

3   A    He's not -- Kenneth Starr did not do any contracts with me

4   at this time.   And Mister -- it may well have been a contract

5   for my wife.

6   Q    A contract through your wife?

7   A    Tina Brown.

8   Q    Yes.   What contract for your wife?

9   A    I'm not absolutely sure what the contract was.

10  Q    I'm sorry?

11  A    I'm not absolutely sure.   I'm not absolutely sure what

12  contract Ken Starr was doing at this time.   My wife has her own

13  business.

14  Q    Uh-huh.

15  A    But he was not doing anything when he said -- in 2000 from

16  the contract he brokered -- I'm not clear what that contract

17  was.

18  Q    Okay.   But you think it may have had something to do --

19  was something that Mr. Starr was doing on behalf of your wife?

20  A    I believe so.

21  Q    Okay.   Would you turn to the next tab, please?

22  A    41?

23  Q    Plaintiff's Exhibit 41.

24  A    Right.

25  Q    Do you recognize, Mr. Evans, the email dated November 22,

Evans - Direct                                                           12

1  2009, contained in Plaintiff's Exhibit 41, to be an email that

2  you wrote to Betty Greif on that date?

3  A    Yes.

4         MR. WOLF:  Okay.  Your Honor, at this time, I would

5  like to offer Plaintiff's Exhibit 41 in evidence.

6         MR. GANT:  No objections, Your Honor.

7         THE COURT:  Exhibit 41 is received.

8      (Plaintiff's Exhibit 41 admitted into evidence)

9         MR. WOLF:  Thank you, Your Honor.

10  BY MR. WOLF:

11  Q    I'm going to skip over the item numbered 1, and move right

12  to item number 2 in that exhibit.

13  A    Yes.  Okay.

14  Q    Okay.  In item number 2, you stated to Betty Greif in a

15  very complicated transaction, in which Ken Starr is being very

16  helpful, "we are looking at properties downtown."  Do you see

17  that?

18  A    I do.

19  Q    Okay.  What was this complicated transaction that you were

20  referring to in that email to Betty Greif?

21  A    I'd been taking financial advice from other than Ken

22  Starr, but Ken Starr had always thought we ought to change our

23  residence.

24  Q    Change your residence?

25  A    Yeah, because the family was growing up.  The complication

Evans - Direct                                        13

1  was that if -- to sell a house -- my house at -- and move

2  downtown for us was complicated.  The actual move where the

3  children would go, whether it were close to our work, nothing

4  financial about that.  It was complicated question of moving a

5  house, which I've learned, to my cost, is a very painful thing

6  to do.

7  Q    Mr. Evans, could you try to move the microphone a little

8  closer to you?

9  A    Yes, I'm so sorry.

10 Q    Because it's hard to pick up the audio.

11 A    The acoustics are not very good, Your Honor, yesterday,

12 and I missed some things.  So I appreciate your request.  Is

13 that better?

14 Q    That's -- that sounds much better, thank you.

15 A    Yes.  Sorry about that.

16 Q    That's okay.  Okay.  And so when you say it was a

17 complicated transaction, involved the possibility of moving out

18 of your house, are you referring to the co-op apartment you and

19 your wife own on East 57th Street?

20 A    Yes.

21 Q    Okay.  And did you and your wife explore the possibility

22 of purchasing another property to substitute for the 57th

23 Street property as your residence in Manhattan?

24 A    We looked at properties downtown.

25 Q    Okay.  And when you said in which -- this complicated

Evans - Direct                                        14

1  transaction in which Ken Starr is being very helpful, in what

2  way was he being very helpful?

3  A    Well, he was very encouraging, and said you can get over

4  the turmoil of move, and if you want somebody to help you

5  financially, I will be glad to find somebody.

6  Q    When you say to help you financially, are you talking

7  about obtaining financing that might be necessary in order to

8  purchase the new residence?

9  A    Well, we had a mortgage, and -- wait a minute, wait a

10 minute.  I think he was thinking -- what he was thinking of was

11 recommending somebody who would take over our existing

12 properties.  Maybe real estate, or maybe mortgages.  I'm not

13 sure now.

14 Q    Okay.  You started to say that you already had a mortgage.

15 A    We -- excuse me.

16 Q    I'm sorry.

17 A    At this stage, we had paid off our mortgage at Sutton

18 Place.

19 Q    The 57th Street property.

20 A    Yes.

21 Q    Okay.

22 A    We had paid off that mortgage.

23 Q    I just heard what you said, but didn't you have another

24 mortgage on your second home in Quogue?

25 A    We had a small -- smaller -- much smaller mortgage in

Evans - Direct                                    15

1  Quogue.

2  Q    How much was that mortgage at that time?

3  A    Oh, I can't remember precisely.

4  Q    Do you recall --

5  A    We acquired the house when we came to the United States in

6  1983, '84.  The house was acquired for $100,000.  It was a

7  curious situation, because it was on leasehold land, so we

8  didn't own the land, we only owned the house.  And the

9  complication was, you can't sell a house, not unless you meet

10 somebody in experience, without owning the land.  So we had

11 then at that time, when we first came to the United States, we

12 couldn't afford the land, so we took the chance in buying the

13 house in the hope that accumulated, we would be able to buy the

14 land and the house.  A very small house.

15 Q    Did you end up ever buying the land?

16 A    We did.

17 Q    When was that?

18 A    I can't recall the exact date when we bought the land, but

19 it was probably -- 1984 -- it was probably in the '90s, by

20 which time my wife had been very successful.

21 Q    Okay.  So at the time that you wrote this November 22,

22 2009 email to Ms. Greif, you and your wife owned the land and

23 the improvements thereon at the Quogue property.  Is that

24 correct?

25 A    That's my understanding of it, yeah.

Evans - Direct                                16

1   Q    And at that time there was a mortgage on that property,

2   correct?

3   A    Correct.

4   Q    Okay.  And do you recall the approximate amount of that

5   mortgage at that time?

6   A    It -- I can't recall precisely, but it must have been in

7   excess of a million.  Can you hear me?  It must have been in

8   excess of a million dollars, because a hundred thousand on the

9   house -- it was on condition we didn't touch anything inside

10  it, which made things complicated when we came to sell it, if

11  we ever did, because the lady who owned it had set it up for

12  card tables and antiques, and we had to promise never to change

13  anything.  She died later.

14  Q    Who held the mortgage on the house?

15  A    I don't know.  I can't recall.

16  Q    Was it City National Bank?

17  A    At the time we purchased the house --

18  Q    That's not my question.  The question is, during the

19  period January -- well, at this time, November 22, 2009, the

20  date of the email.  Who held the mortgage?

21  A    For -- give me the date again.

22  Q    November 22, 2009.

23  A    City National Bank.

24  Q    Thank you.  And you said it was -- the mortgage at that

25  time was in excess of a million.  Wasn't it actually in excess

Evans - Direct                          17

1  of $2 million?

2  A    It may have been.  I'm not sure.

3          MR. GANT:  Objection, argumentative.  Two is above

4  one.

5          THE COURT:  I'm sorry?

6          MR. GANT:  Argumentative.  He said it was in excess

7  of a million.  Mr. Wolf is saying, wasn't it actually two?

8  Suggesting it was --

9          THE COURT:  Overruled.

10          MR. GANT:  All right.

11          THE WITNESS:  Could counsel speak up a bit please?

12  Closer to the microphone?

13          MR. GANT:  It's okay.  The judge needs to hear me,

14  Harry, that's all.

15          THE WITNESS:  Okay.

16          MR. GANT:  Thank you.

17  BY MR. WOLF:

18  Q    In the next sentence, the next sentence of your November

19  22, 2009 email to Ms. Greif, you stated we don't want to leave

20  447, and it will be two years, but if we go ahead on the right

21  terms, I would shortly be relieved of the monthly squeeze on

22  cash flow.  What monthly squeeze on cash flow were you

23  referring to there?

24  A    That would be the general maintenance on Sutton Place, the

25  education of my children, the remnants, wherever we were with

Evans - Direct                                    18

1  the mortgage or land in Quogue.  Whatever normal things.  We

2  had two accounts, a capital account and a current account.

3  This refers to the current account.

4  Q    I'm sorry.  You had a capital account and a --

5  A    A capital account and a current account.

6  Q    A current account?

7  A    A current account, meaning for regular mortgage, rents,

8  taxes, whatever, and a capital account, which I managed at this

9  period, which consisted of investments.

10 Q    Okay.  Well, with regard to what you call as the current

11 account, and that's the account out of which you and your wife

12 paid daily and monthly expenses.  Is that correct?

13 A    Yes.  Yes, that's right.

14 Q    And at that time, November of 2009, was there more -- was

15 that account running a deficit?

16 A    It depends when -- at what point.  I have to explain to

17 you the nature of my business, which is -- it's different from

18 a regular salary, though I had two regular sources of income.

19 Q    I'm sorry, two what?

20 A    I had two regular sources of income.

21 Q    Yes.

22 A    But the cash -- the current cash situation depended on

23 what stage I was at with writing a book, making a speech,

24 receiving a prize.  All those things made my current account

25 volatile.  So -- and then when necessary, I moved money from

1  the capital account to the current account.  The current

2  account could be under stress when we had to pay a large tax

3  bill.  I would then move money from the capital account, or

4  money will come in from the current account, which would make

5  it -- whatever.  I mean, it's -- the publishing and writing of

6  books is more complicated than being a clerk in an office.  Not

7  that there's anything wrong with being a clerk in an office,

8  but my own situation is absolutely dependent on understanding

9  what it's like being in publishing and writing.

10 Q    Right.  And that's because, is it not, you're not getting

11 a regular salary every week, or two weeks.  It's that you have

12 to wait for certain advances to come on your book, or royalties

13 from the publication of the book, things of that nature.  Is

14 that correct?

15 A    No.

16 Q    No?  You were getting regular advances and royalties all

17 along?

18 A    No.  The answer to the question is that I was -- I had a

19 pension, which was a regular income.

20 Q    Okay.

21 A    I had a contributing editor relationship with U.S. News,

22 which was a regular income.  I was in demand to write articles,

23 and that was fairly regular.  What was -- made my capital

24 account grow was some of those things.  And then I would move

25 money between the capital and the current account.  For

Evans - Direct                                    20

1  instance --

2  Q     Well --

3  A     -- if you're really interested in this situation, when I

4  wrote my book <u>They Made America</u>, there were several proposals

5  to turn it into a television teaching series.  Which meant

6  there was the prospect, not the certainty, of a large amount of

7  money into that.  In the end, it did work, very well.  It was a

8  four-part TV series which brought me income.  I put it in the

9  capital account.  I didn't put it in the current account.

10 Q    I see.  Well, when you said that in this email to Ms.

11 Greif on November 22, 2009, that you would shortly be relieved

12 -- if you got -- you said, if you got ahead on the right terms,

13 I would shortly be relieved of the monthly squeeze on cash

14 flow.  In what way did you see the possibility of being

15 relieved of the monthly squeeze on cash flow happening?

16 A     Well, I thought I would move more money from the capital

17 account to give to Betty Greif, as she managed the current

18 account.

19 Q    I'm sorry, but what did that have to do with the

20 possibility of moving residences?

21 A     It was possible we might make a profit on the sale of our

22 primary residence.

23 Q    When you said in that same sentence, "we've been looking

24 at" -- "we don't want to leave 447, and it will be two years" -

25 - what did you mean by the phrase, "it will be two years"?

1  A    I think I underestimated.  I think I underestimated what

2  it takes to move houses.  To find the right place, to find the

3  right proximity to work with two people working at different

4  locations at different times.  There are many variables.  And

5  also, I was very active in various things and associations with

6  Sutton Place.  I went to regular board meetings.  It was

7  complicated to -- to move.  I thought two years was about --

8  would have been about right.  In the end, we did not decide --

9  we decided against it, because it was too complicated.

10 Q    Would you be good enough to turn two exhibits further in,

11 to Plaintiff's Exhibit 42?

12 A    42, right.

13 Q    Do you recognize Plaintiff's Exhibit 42, Mr. Evans, to be

14 a copy of an email that you sent to Betty Greif on Saturday,

15 December 12, 2009?

16 A    You see, I'm trying to remember this particular one.

17 Q    Okay.  But my question is focused.  I'm simply asking you

18 for the moment whether this is a copy of an email that you

19 wrote to Betty Greif on December 12, 2009?

20 A    Yes, I do.

21 Q    Okay.

22 A    I do recall it now.

23       MR. WOLF:  Your Honor, at this time, I would like to

24 offer Plaintiff's Exhibit 42 in evidence.

25       MR. GANT:  No objections, Your Honor.

1              THE COURT:  42 is received.

2         (Plaintiff's Exhibit 42 admitted into evidence)

3              MR. WOLF:  Thank you, Your Honor.

4    BY MR. WOLF:

5    Q    Okay.  In this email, Mr. Evans, you said, "Betty, I asked

6    Pat on Friday to chase, and need to speak to him Monday."  Who

7    was the Pat you were referring to in that sentence?

8    A    That's Pat Wright.

9    Q    Pat Wright who worked for Starr & Company?

10   A    Yes.

11   Q    Why were you speaking with Pat Wright?

12   A    I was speaking with Pat Wright because if ever I wrote to

13   Ken Starr, I never got an answer.  Never.  To my recollection,

14   I never had a single response to anything whatever that I wrote

15   to Ken Starr.  So I got into the habit of writing to Pat

16   Wright.  She was very responsive.  What was I writing for on

17   this occasion?

18   Q    I'm sorry?

19   A    Are you asking why I was writing to her?

20   Q    Well, you just answered the question, I believe.

21   A    Well, I'm asking you, do you want me to --

22   Q    Well, let me ask the next question.

23   A    Okay.

24   Q    How's that?  Okay.  In the next sentence of the email, you

25   said, "Complicated, but he offered to make a deal that would

Evans - Direct                                        23

1  solve cash flow."  Who was the "he" you were referring to

2  there?

3  A    That's Ken Starr.

4  Q    Okay.  And what offer had Ken Starr made that would solve

5  your cash flow issues?

6  A    What was at issue here were the shareholding I had in

7  BLAMM, B-L-A-M-M.  As you all know, because you're familiar

8  with BLAMM, it was wound up.  There was a residual larger

9  amount of money which was owed to me.  Ken Starr did not send

10  it to me.

11  Q    Well, what was the -- that was the deal that you're

12  referring to here?

13  A    I believe it was, to the best of my recollection.  The --

14  I could --

15  Q    Are you sure you weren't referring to the complicated

16  transaction that you looked at just before?

17  A    The complicated transaction?

18  Q    In your November 22, 2009 email?

19  A    Wait a minute.

20  Q    You were looking at Plaintiff's Exhibit 41 just before.

21  A    On June the 10th?  No.

22  Q    No.  Just before, we were looking at Plaintiff's Exhibit

23  41, Mr. Evans.  And that's item number two.  And you talked

24  about a very complicated transaction --

25  A    Yeah.



Evans - Direct                                     24

1  Q    -- in which Ken Starr was being very helpful.

2  A    Right.

3  Q    Now, in Plaintiff's Exhibit 42, you used the same word,

4  "complicated."  And you talked about a deal.  Ken Starr offered

5  to make a deal that would solve cash flow.  Weren't you

6  referring to this matter of a possibility of purchasing a new

7  residence?

8  A    I can't be absolutely precise, but all of this was

9  occurring at a time when I was due more than $100,000 from Ken

10 Starr.  And that was very important to me.  It would have made

11 a difference about my attitude to the real estate transaction.

12 But I could never get an answer from him.  Ever.

13 Q    Yes, sir.  But again, this email had nothing to do, you're

14 telling us, with the possibility of changing your residence?

15          MR. GANT:  Objection.  Asked and answered.

16          THE COURT:  Overruled.

17          THE WITNESS:  No.  I don't -- I don't recall.

18 BY MR. WOLF:

19 Q    Okay.  Would you be good enough now to turn to Plaintiff's

20 Exhibit 47?  And for the record, that has been admitted into

21 evidence.

22 A    Page 47, hang on a minute.

23 Q    Tell me when you're there.

24 A    Right.

25 Q    Okay.  You've got the email?

Evans - Direct                                    25

1   A    Yes.

2   Q    Okay.  Did Pat Wright submit certain financial information

3   on your and your wife's behalf to UBS in connection with the

4   possibility of obtaining a mortgage on a new property?

5   A    As I recall, Ken Starr said I'd like to introduce you to

6   Mike Paesano, who would be very interested in any future real

7   estate transactions.

8   Q    All right.  And did you and or your wife ever meet with

9   Mr. Paesano?

10  A    I met with Mr. Paesano at -- I don't remember the date.

11  And it was not --

12  Q    Okay --

13  A    That was not about a real estate transaction.  That was

14  about his interest in acquiring properties.  I was then

15  president of Random House, and he was interested in acquiring

16  properties.  Properties, literary properties.

17  Q    But do you recall that Starr & Company was involved in

18  submitting certain information on your and your wife's behalf

19  to UBS in connection with the possibility of obtaining from UBS

20  the mortgage on a new property that you would purchase?

21  A    When Ken Starr recommended that we do our real estate

22  transactions with Paesano, I guess he must have said to Mike

23  Paesano that it sold.

24  Q    I'm sorry, what?

25  A    He must have said something to him, but I don't know -- I

Evans - Direct                                        26

1  don't -- I've never seen this letter from Pat Wright to Michael

2  Paesano.  And I did not meet with Mr. Paesano until much later,

3  in 2010.

4  Q    Did you have any discussions at any time during the first

5  five months of 2010 with Pat Wright about her submitting

6  certain financial information on your and your wife's behalf to

7  UBS?

8  A    All I can recall is I was very happy to deal with Mike

9  Paesano, but I didn't meet him at this stage.  It was only

10 later that I met him, when he'd been supplied this information

11 which no doubt he'd asked Ken Starr for.

12 Q    Okay.  But my question was did you have any communications

13 with Pat Wright about the submission of any such information to

14 UBS?

15 A    I can't recall if she ever asked me anything.

16 Q    Would you please turn now to Plaintiff's Exhibit 48, which

17 is also in evidence?  This is an email from Pat Wright to

18 Justin Winters of UBS.  Are you looking at that email, Mr.

19 Evans?

20 A    Huh?

21 Q    Are you looking at that --

22 A    I'm looking at that, yeah.

23 Q    Okay.  I just wanted to make sure --

24 A    Let me read it.

25 Q    Okay.



Evans - Direct                                           27

1   A    Yes.

2   Q    Okay.  In the second paragraph of the memo or email,

3   Ms. Wright stated to Mr. Winters, "As I mentioned previously,

4   they have identified a house at 34 Perry Street, New York City,

5   and the seller has accepted their offer of $6.1 million."  Did

6   you, you and your wife, make an offer to the owner of 34 Perry

7   Street, to purchase that property for $6.1 million?

8   A    We certainly liked this house.  And we had another

9   financial advisor, and the sum of 6.1 million -- I think -- I'm

10  not absolutely sure about this, whether we actually made a

11  formal offer of 6.1 million, but 6.1 million was about the

12  figure we were advised to have in mind.

13  Q    Was that figure accepted by the owner?

14  A    No.  If -- if we offered it, it wasn't -- no.  Let me get

15  this right.  I don't think we made a formal offer of 6.1.

16  There was an intermediary advising us on the value of

17  properties, not Mr. Paesano, not Mr. Starr, not Pat Wright.

18  And to tell the truth -- his name escapes me, but I can find

19  it.

20  Q    Okay.

21  A    And he -- there were some restrictions on what you could

22  do with the property, about whether you could change the third

23  floor, what the neighbors' attitude was to having out the

24  garden redone, things like that.  So there was quite a period

25  of negotiation and discussion about moving to Perry Street,

1  which we liked enormously.  And the figure of 6.1 million was

2  the figure our expert on this area tells us to offer.

3  Q    Okay.

4  A    Okay.  But if you want to continue, I'm happy to discuss

5  Perry Street.

6  Q    Well, let me ask you this followup question.  In the next

7  sentence of that paragraph we were just looking at in Exhibit

8  48, Pat Wright stated, "They are, however, seeking a loan for

9  $8 million, as this property needs some work."  Was that an

10 accurate statement?

11 A    Yes.  Yes.

12 Q    And from whom were you and your wife seeking this

13 $8 million loan, UBS?

14 A    Mr. Paesano, yes, but I also have a -- another financial

15 backer, whom I'd rather not name.

16 Q    Was it contemplated by you and your wife at this time that

17 if you were going to purchase the property at Perry Street and

18 have to do renovations, that there would be a period of time

19 during which you would be owning both the 57th Street apartment

20 and the Perry Street property?

21 A    That would make it complicated, would it not?

22 Q    Your words, sir.

23 A    Well, I'm just saying it -- when you're moving -- this

24 bridging loan is probably what's there, it needs some --

25 Q    Right.

Evans - Direct                                    29

1   A    -- it depends when we start -- let me put it this way.  To

2   purchase another house and still retain the house you were in,

3   we had the option -- I don't know that these details are of any

4   interest to anybody, but we had an option to go and live in

5   Quogue and sell 447, and then not have the need for a bridging

6   loan of any kind.

7   Q    For a what loan?

8   A    Quogue, if we went to live in Quogue --

9   Q    Quogue, right.

10  A    -- which we owned, and where we did a lot of our work, and

11  sold 57th Street, we could work from Quogue for a year or two,

12  and come in on the Jitney.

13  Q    Right.

14  A    We could have done -- look, the --

15  Q    Right, but I thought -- I was asking, because I couldn't

16  hear what you said, the word you used.  If you did that

17  scenario, you would not have to go ahead and get a --

18  A    Get a bridging loan.

19  Q    -- did you call it an "interim loan" or a "bridge loan"?

20        THE COURT:  A bridging loan, he said.

21        MR. WOLF:  A bridging loan, I'm sorry.

22        THE WITNESS:  A bridging loan, that's the term, Your

23  Honor, thank you.

24        MR. WOLF:  Thank you.

25        THE WITNESS:  Bridging loan.

Evans - Direct                                              30

1  BY MR. WOLF:

2  Q    Right.  Okay.

3  A    Now, in the end we decided not to move.

4  Q    I understand.  But the $8 million loan that was being

5  referred to in Plaintiff's Exhibit 48 was a possible so-called

6  bridge loan.  Is that correct?

7  A    Yes.  I would like -- do you have the attachment about the

8  valuation of 447?  I'd like to know what it --

9  Q    Are you referring to Exhibit 50, which is in evidence,

10 subject to redacting?

11 A    My recollection is that the 447 was represented -- was

12 valued at $10 million.

13 Q    Does that accord with what was stated in Exhibit 50?

14 A    I -- I'm just giving you my recollections, you see.

15 Sorry.  The circumstances were --

16 Q    Right.

17 A    -- that if we realized that large amount of money on 447

18 before we moved to Perry Street, we would not need a bridging

19 loan.

20 Q    Right.  But only if -- the event you decided to stay at

21 447 while renovations were being done at the Perry Street

22 property, that you would require the $8 million bridge loan.

23 A    And if we'd made a formal --

24 Q    Is that right?

25 A    And if we'd made a formal offer.  You have to remember --



Evans - Direct                                    31

1  and if we had made a formal offer.

2  Q    I understand.  Okay.  I want to go on to another topic,

3  Mr. Evans.  Once Ken Starr was arrested in late May of 2010,

4  and Elaine Locke left the employ of Starr & Company, do you

5  recall that she then went to a firm called BCRS?

6  A    I remember BCRS.

7  Q    Right.  And did Ms. Locke, while she was employed at BCRS,

8  prepare the 2009 tax returns for you and your wife, both

9  federal and state?

10 A    I believe Elaine -- I believe Elaine Locke at BCRS did

11 that.

12 Q    Right.  And do you recall whether there were any other

13 services by BCRS other than those tax preparation services that

14 BCRS performed on your and your wife's behalf?

15 A    I don't recall, honestly.

16 Q    Are you saying you don't think there were any other

17 services?

18 A    Huh?

19 Q    Are you saying that you don't think there were any other

20 services?

21 A    I don't recall.  BCRS, I do firmly recall, and one of the

22 reasons I was interested in BCRS was that Elaine Locke was --

23 whom I liked and trusted.  They -- I don't recall any other

24 services, apart from tax.

25 Q    Okay.  They did not perform any investment advisory

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

Evans - Direct                                                    32

1  services for you and your wife?

2  A     No, I was doing that myself.

3  Q     Okay.  And do you recall that you and your wife paid BCRS

4  for whatever services they did render?

5  A     We did indeed.

6  Q     Uh-huh.  And for how long was BCRS your and your wife's

7  tax -- well, let me ask a different way.  For how long a period

8  of time did BCRS do the tax preparation work for you and your

9  wife?

10 A     I'm not sure.  I think about a year.  They -- several

11 people are asking to do our tax.  BCRS -- I met with them, and

12 I liked them, too.

13 Q     Right.  I'm sorry, you're talking about some of Elaine

14 Locke's colleagues at BCRS?

15 A     Pardon?

16 Q     Are you talking about several of Elaine Locke's colleagues

17 at BCRS?

18 A     No.

19 Q     Well, I'm --

20 A     I met the chairman or the chief executive of BCRS with

21 Elaine Locke at my house.

22 Q     And when was that?

23 A     I can't pinpoint the date on it.

24 Q     Okay.  Why were you meeting with them, then?

25 A     (Indiscernible).

Evans - Direct                                      33

1  Q    Why were you meeting with them, then?

2  A    Because they wanted to take over my tax affairs.

3  Q    They wanted to take over your tax --

4  A    Tax -- they wanted to be our tax advisers.   Strictly tax.

5  Q    Okay.

6  A    There was no question at any time of BCRS being investment

7  advice, because I was doing that myself.   Actually, by that

8  time, 2010, I had probably moved to Credit Suisse.

9  Q    Okay.   So this meeting that you're talking about at your

10  apartment with the people at BCRS, did that occur after Elaine

11  Locke had prepared your and your wife's 2009 tax returns?

12  A    To the best of my knowledge, Elaine was in the middle of

13  preparing that, and --

14  Q    Okay.

15  A    -- as to the best of my knowledge.   She would be -- know

16  better than I do.

17  Q    Did you and your wife retain BCRS to also prepare your

18  2010 tax returns?

19  A    I can't recall.   BCRS made a proposal to do all our tax

20  work.   At the same time, Marks Paneth were making a proposal to

21  do all our tax work.   And that was the third company offering

22  to do it.

23  Q    When you say all of your tax work, are you talking about

24  BCRS proposing to do more than just the preparation of your and

25  your wife's income tax returns?

Evans - Direct                                             34

1   A    Well, any tax -- whatever tax -- BCRS was saying they'd

2   take over -- willing to take over, would like to take over,

3   excuse me, all our tax obligations, whether it would be in

4   Minnesota or New York or whatever.  To keep track of the flow

5   of the tax obligations.

6   Q    Okay.  Somewhat akin to what Starr & Company had once done

7   for you and your wife?  Is that correct?

8   A    So far as tax goes, yes, I would --

9   Q    Okay.  But let me ask you -- but do I take it that

10  ultimately you did -- you and your wife did not retain BCRS to

11  perform all of those tax services.  Is that correct?

12  A    Yes.

13  Q    So do I understand correctly then from your testimony that

14  what BCRS did when Starr & Company closed up shop was to simply

15  prepare your and your wife's 2009 income tax returns.  Is that

16  correct?

17  A    To the best of my knowledge.  They did quite a lot of work

18  at BCRS on the tax.

19  Q    On the income tax returns?

20  A    Yes.

21  Q    Okay.  So you -- am I correct that ultimately you did not

22  -- while you liked BCRS, you decided, you and your wife, not to

23  retain them to continue providing services on your behalf.  Is

24  that correct?

25  A    That is correct.

Evans - Direct                                    35

1   Q    And why was that?

2   A    When?

3   Q    No, why was that?  Why did you decide not to retain them

4   for a longer period of time?

5   A    Well, it became a very competitive situation.  Marks

6   Paneth, an accountancy firm in -- knew the -- the person

7   approaching us had worked at Ken Starr & Company and had

8   resigned for various reasons.  And he, knowing that we'd left

9   Starr, said Marks Paneth could do your tax.  To which I said,

10  I'm with BCRS.  And then he said, will you meet with Marks

11  Paneth?  And I said yes, so several people came round,

12  coterminous with discussions with BCRS.  And both made formal

13  proposals about doing our work.

14  Q    And the BCRS proposal included a dollar amount?

15  A    I can't remember the dollar amount, but it must have had

16  some financial estimate of monthly costs, and their month -- I

17  know precisely the monthly costs of Marks Paneth's proposal,

18  because I'm paying it now.

19  Q    And what is that amount?

20  A    It is all right to reveal it?  Because it's confidential

21  for them.  I'm just asking.  Guide me, because I don't want to

22  betray a commercial secret.  Somebody else may be breaking

23  faith --

24  Q    Well, I don't think it's a commercial secret for Marks

25  Paneth, and I'm not your lawyer, so I can't give you advice.

1          MR. GANT:  Your Honor, I'd object to the question

2   about the current payments on relevance grounds.

3          THE COURT:  Overruled.

4          THE WITNESS:  I didn't hear Your Honor.

5          THE COURT:  I overruled the objection.

6          THE WITNESS:  Okay.  Thank you, Your Honor.  I'm

7   sorry.  The acoustics are not great for me.  I have a hearing

8   aid in here.

9          THE COURT:  It's quite all right.  I understand.

10          THE WITNESS:  And if I mishear occasionally, I

11   apologize to the Court.

12          THE COURT:  I understand.

13   BY MR. WOLF:

14   Q    It's okay.  So the question pending is how much you and

15   your wife have been paying Marks Paneth for their services.

16   A    I can answer it in this way.  I'm satisfied with the

17   service they're providing for the fee they're charging.

18   Q    But the question is, how much are they charging?

19   A    That's what I'm not going to tell you.  Is that right?  Am

20   I allowed to say -- they said -- well, I thought the objection

21   had been sustained.

22          MR. GANT:  Your Honor, may I -- of course, you can

23   tell him, but --

24          THE WITNESS:  If the judge orders me to say it, I

25   will --

Evans - Direct                                    37

1            MR. GANT:  Yes --

2            THE COURT:  There has been no objection to the --

3   other than relevance, and I overruled the objection.  So yes,

4   you can answer.

5            THE WITNESS:  So you want -- so Your Honor would like

6   the figure.

7            THE COURT:  Yes.

8            THE WITNESS:  Okay.  Thirty-five hundred a month.

9   BY MR. WOLF:

10  Q    And for how long have you been paying that amount to them?

11  A    Oh, ever since -- probably seven or eight years by now.

12  Q    Okay.  Thank you.

13           THE WITNESS:  Your Honor, could we take a break?

14           THE COURT:  Yes, of course.

15           THE WITNESS:  Thank you.

16           THE COURT:  Of course.  Any time you need a break,

17  just say so.

18           THE WITNESS:  Thank you.

19       (Recess taken at 11 a.m.)

20       (Proceedings resume at 11:22 a.m.)

21           THE COURT:  Please be seated.

22           Okay, Mr. Wolf, please continue.

23           MR. WOLF:  Thank you, Your Honor.

24  BY MR. WOLF:

25  Q    Mr. Evans, would you please turn in your witness binder to



Evans - Direct                                          38

1  Plaintiff's Exhibit 46?

2  A     46?

3  Q     46.

4  A     Right.

5  Q     And please let me know when you're ready for me to ask you

6  a few questions about that document.

7  A     Yes, I've read that.

8  Q     Thank you.  Mr. Evans, is Plaintiff's Exhibit 46 a copy of

9  a letter that you wrote and sent to Elaine Locke on or about

10  September 7th, 2010?

11  A     It is.

12         MR. WOLF:  Okay.  Your Honor, I would move to admit

13  that Exhibit 46 in evidence.

14         MR. GANT:  No objection, Your Honor.

15         THE COURT:  46 is received.

16     (Plaintiff's Exhibit 46 admitted into evidence)

17         MR. WOLF:  Thank you, Your Honor.

18  BY MR. WOLF:

19  Q     Now, in the first paragraph here to Ms. Locke, you stated,

20  Mr. Evans, "I found your new colleagues impressive and

21  charming, but their estimated charges for their services were

22  beyond my capacity, and we have regretfully decided to work

23  with Marks Paneth and Tron, LLP."  That's what you stated

24  there, correct?

25  A     Yes.

Evans - Direct                                           39

1   Q    Right.   And the colleagues that you were talking about in

2   that sentence were Ms. Locke's colleagues at BCRS Associates,

3   correct?

4   A    Yes.

5   Q    Okay.   And do you -- does this letter now refresh your

6   recollection as to the approximate amount of the charges that

7   BCRS estimated they would charge you for services to be

8   rendered on your and your wife's behalf going forward?

9   A    I cannot remember.   I may have been making an excuse, I

10  can't remember.

11  Q    Okay.   Was it more than the $3,500 per month amount that

12  you testified before that Marks Paneth has been charging you?

13  A    Well, I wouldn't knowingly lie to her, but I may have been

14  putting a gloss on it, but I can't remember the fee at BCRS.   I

15  can find out, but I don't know it at this moment.

16  Q    Would you now please turn in your binder back to

17  Plaintiff's Exhibit 39, which is already in evidence?

18  A    39?

19  Q    39, three nine.

20  A    I have 39, it's a QuickBook.

21  Q    Okay.   It's a QuickBook spreadsheet?

22  A    Yes.

23  Q    You've seen it before?

24  A    Recently.

25  Q    Okay.   How recently?

Evans - Direct                                              40

1  A     Huh?

2  Q     How recently?

3  A     A week ago, probably.

4  Q     Okay.  Had you seen it at any time prior to that?

5  A     Yes, I -- occasionally I would -- very occasionally, Betty

6  would give me a Quicksheet.  I didn't see it regularly, but --

7  Q     Okay.  You said that Betty Greif would periodically show

8  you this statement to show what payments had been made on your

9  and your wife's behalf at Starr & Company?

10 A     The -- when a new bookkeeper came on board, she --

11 Q     I'm sorry?

12 A     A new bookkeeper came to us, she said she would show me

13 the QuickBooks, to show me where we were.  A new bookkeeper

14 came on board at our house.

15 Q     Thank you.  Was that sometime in or about 2014?

16 A     No, I would say it was about 2012.

17 Q     Okay.  Did you hear Ms. Greif's testimony here yesterday

18 that the payment, the top payment on Exhibit 39, on the first

19 page, was the date of May -- I'm sorry, March 27th, 2009, in

20 the amount of $6,282.30.

21 A     I don't see May.

22 Q     No, I misspoke.  I meant March.

23 A     Oh, sorry.

24 Q     March 27th, 2009.  Do you see that entry?

25 A     The 27th of March, yes.

1  Q    Yes.  Were you present here in the courtroom yesterday

2  when Ms. Greif -- to hear Ms. Greif testify that that $6,282.30

3  payment made on that date, March 27th, 2009, to Starr was in

4  payment of the January 1, 2009, invoice for services rendered

5  in December, 2008?

6  A    I've seen that.  I have to say that when I saw this

7  QuickBook sheets, I didn't real -- I thought we were paid up

8  completely.

9  Q    I'm sorry, you thought you --

10 A    I didn't know there was any balance left on this account.

11 Q    As of what date?

12 A    As of March, 2009, when I told Betty Greif to pay Ken

13 Starr's bill, because my recollection is she said, we've fallen

14 behind.  She --

15 Q    I'm sorry.  You did what?

16 A    We have fallen behind with Ken Starr.  She ran the current

17 account.  She was a very, very excellent person, and I gave her

18 freedom to decide when and how we pay people.  And in March,

19 2009, she said we've fallen behind.  I said, well, there's

20 money in the account, pay him.  Right?  And when I looked at

21 these QuickBook sheets, when this whole question came up, I

22 made a mistake, and I thought that we'd paid up completely, and

23 I see that this is a balance -- is there any balance on this?

24 Q    Well, my question is, is it your understanding that the

25 payment of March 27th, 2009, is the last payment made to Starr

Evans - Direct                                                42

1 | & Company on your and your wife's behalf?

2 | A    Yes, my understanding is it's the last payment, and it was

3 | the final payment.

4 | Q    All right.  At some point in time after she left the

5 | employ of Starr & Company, did you have a meeting at your

6 | apartment with Elaine Locke?  Just with her?

7 | A    I had an appointment after Ken Starr's arrest.

8 | Q    Do you recall when that meeting with Ms. Locke took place?

9 | A    I'm sorry, I can't recall it.

10 | Q    It took place at your apartment on 57th Street?

11 | A    Yes.

12 | Q    What were the circumstances that led to that meeting?

13 | A    Well, I'd been given to understand she was about to leave,

14 | or had left BCRS.

15 | Q    Okay.  Were you looking to retain her?

16 | A    I thought she was a very nice and warm person, and that

17 | was a possibility.

18 | Q    Uh-huh.  Did you discuss that possibility with her at that

19 | meeting at your apartment?

20 | A    I wanted to see how she was, in getting on, because I

21 | still felt that she'd been a good tax adviser to us, and I felt

22 | regretful, so, you know, that when she went to BCRS, maybe it

23 | was disappointing to her that she didn't -- the business didn't

24 | follow her.

25 | Q    When you met on this occasion with Ms. Locke, you -- Marks

Evans - Direct                                                  43

1  Paneth was performing services on your and your wife's behalf.

2  Is that correct?

3  A    It was one of the things at the back of my mind, because

4  I'd been told she was leaving, or had left BCRS.  And she knew

5  about Marks Paneth.

6  Q    Okay.  But my question is when you did meet with her --

7  A    Yes.

8  Q    -- Marks Paneth was rendering services on your and your

9  wife's behalf.  Is that correct?

10  A    I don't know -- that date doesn't ring a bell with me.

11  Q    Well, I didn't mention a date.

12  A    Huh?

13  Q    I didn't mention a date, because you didn't mention a date

14  for this meeting.  What -- whenever that meeting occurred with

15  Ms. Locke at your apartment --

16  A    Right.

17  Q    -- as of that moment in time, was Marks Paneth providing

18  the accounting and tax preparation services on your and your

19  wife's behalf?

20  A    That's correct.

21  Q    Okay.  Did you indicate to Ms. Locke at that meeting that

22  -- in words or in substance, that the Marks Paneth was charging

23  you and your wife a lot of money for their services?

24  A    I don't recall ever saying that.

25  Q    Okay.  Were you looking to the possibility of retaining

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Direct                                    44

1  Ms. Locke in lieu of keeping Marks Paneth as your tax preparer

2  and accountant?

3  A    Yes, possibly, I think.  Yeah.  I was also interested in

4  maybe finding somebody who could handle other financial matters

5  for me.  Apart from tax.

6  Q    That Ms. Locke would handle such?

7  A    Well, I just want -- I'd not met Ms. Locke for a long

8  time.  Then I heard that she -- met her at the BCRS meeting in

9  our house, and I've never actually seen her since I said we're

10  not going to go with you.  So when I heard that she was

11  possibly leaving BCRS, I thought I should meet her.

12  Q    Did you offer her the job of being her -- being your

13  accountant?

14  A    No, I did not offer her anything at all.  It was a social

15  occasion, really.

16  Q    Okay.  Did you ever meet with her again?

17  A    No.

18          MR. WOLF:  Your Honor, I have no further questions on

19  direct.

20          THE COURT:  Okay.  Cross-examination?

21          MR. GANT:  Your Honor, with the Court's indulgence,

22  could I have five minutes to just organize myself to try and

23  streamline the examination?

24          THE COURT:  Okay.

25          MR. GANT:  Thank you very much.

                                    Evans - Cross                              45

1            THE COURT:  We'll take five minutes.

2       (Recess taken at 11:33 a.m.)

3       (Proceedings resume at 11:49 p.m.)

4            MR. GANT:  Thank you for the few minutes, Your Honor.

5            THE COURT:  You're welcome.

6                           CROSS-EXAMINATION

7  BY MR. GANT:

8  Q    Mr. Evans, are you ready to resume?

9  A    Yes, just make sure you speak up.  Okay?  Sorry.

10 Q    This is a perpetual complaint to us attorneys.  I will do
11 my best to speak up.

12 A    Very good.

13 Q    What is your profession?

14 A    Editor and writer.

15 Q    For how long have you been an editor and writer?

16 A    Seventy years.

17 Q    Did you enter the profession of editing, writing, and
18 journalism shortly after a career in the military?

19 A    I was in the Royal Air Force, and no, I joined -- I had
20 joined a newspaper when I was 16, and joined the Royal Air
21 Force when I was 18.

22 Q    Have you received any honors for your career in
23 journalism, writing, and editing?

24 A    Yes.

25 Q    I won't take up everyone's time with a long list, but

Evans - Cross                                          46

1   could you give me the two or three honors you've received for

2   your professional work that you're most proud of?

3   A    Well, I was very lucky to be put in charge of a great

4   newspaper with a wonderful proprietor called The Sunday Times

5   of London.  I had a great staff.  I got angry about the

6   injustice of the thalidomide children, who were being denied

7   compensation for most appalling injuries, and I investigated

8   and ran a campaign -- British press laws are not as free as the

9   United States, so I ran the risk of being -- and in fact was,

10  worn.  We went through three trials.  We lost in the House of

11  Lords.

12       I then decided to appeal to the European Court of Human

13  Rights, and I won a victory there which liberated the entire

14  British press, and gave them somewhat more freedom.  Not as

15  much as the United States, but -- so that's the thing -- I

16  mean, I did a lot of that kind of thing.  I mean, I was

17  outraged by the fact that it was possible in --

18  Q    Mr. Evans, I'm asking about -- I don't mean to interrupt

19  --

20  A    I don't need -- there's no bother for these honors, can we

21  -- I mean, I was head of a large team of people.  If I hadn't

22  done a significant work, I should have been thrown into prison.

23  Q    Did you receive an honor from the Queen of England for --

24  A    Yes.

25  Q    -- your contributions to journalism?

 1  A     I received a knighthood from -- which I accepted on -- as

 2  I said at the time, on behalf of all my colleagues.

 3  Q     And are you also a recipient of the European Gold Medal of

 4  the Institute of Journalists?

 5  A     Yes.

 6  Q     Are you currently employed by Reuters?

 7  A     Yes.

 8  Q     In what capacity?

 9  A     Editor at large.

10  Q     Since when have you been an editor at large at Reuters?

11  A     For four years.

12  Q     Four years.  So from four years ago to the present?

13  A     Huh?

14  Q     From four years ago to the present?

15  A     Yes.  Yes, I'm employed by the -- them, and so long as

16  they tolerate me, I'll be there until I pass away.

17  Q     And did you write a memoir entitled My Paper Chase?

18  A     Yes, I did.

19  Q     In what year did you complete writing that memoir?

20  A     My Paper Chase?  I finished writing it in early 2009,

21  around -- yeah, 2009, early in 2009.  Yeah.

22  Q     I just handed you an exhibit which has been marked for

23  identification as DX-F, as in "Frank."  It's a one page letter

24  --

25  A     December 23rd, 2008, I've got it.

Evans - Cross                                    48

1  Q    Yes.  December 23rd, 2008.  A letter, and then there's a

2  second page.

3  A    Second page.

4  Q    That is an image of the letter, along with some

5  information from the computer from which this letter was

6  pulled.

7  A    Yes.

8  Q    At your home.

9  A    Right.

10  Q    Let me ask you about the cover page, the letter itself.

11  A    The one on the right-hand side.

12  Q    Yes.  Do you recall who Gail Weiner is?

13  A    Yes, I do.  She's the managing director for the company

14  that manages the co-op at 447 857.

15  Q    Do you believe that you typed this letter, or dictated

16  this letter to Ms. Weiner?

17  A    Yes, I do.

18  Q    Do you remember whether you typed it yourself or whether

19  you dictated it?

20  A    I think, 2008, I would probably type it up roughly and

21  send it to Betty Greif or my -- no, I should probably send it

22  to Cindy Cunanan (phonetic) my secretary, to make sure it got

23  very -- no typos, you know.

24  Q    Do you believe that you signed and had mailed a copy of

25  this letter?

1  A    Yes.

2           MR. GANT:  I move for the admission into evidence of

3  --

4           THE WITNESS:  What?

5           MR. GANT:  I'm speaking -- this is for the judge.

6           THE WITNESS:  Oh, sorry.

7           MR. GANT:  But I will speak up.  I move for the

8  admission of DX-F into evidence, Your Honor.

9           MR. WOLF:  No objection, Your Honor.

10          THE COURT:  Okay.  F is admitted.

11       (Defendants' Exhibit F admitted into evidence)

12  BY MR. GANT:

13  Q    The first line of the letter says, "I am changing my

14  financial advisors."  Do you see that?

15  A    Yes, I do.

16  Q    Do you recall what you were referring to when you wrote

17  that to Ms. Weiner in December of 2008?

18  A    Yes.

19  Q    Can you explain what you were referring to --

20  A    I remember writing that letter.

21  Q    Can you explain what you were referring to?

22  A    Well, in 2008, throughout 2008, I'd been get -- even

23  earlier, I'd begun to get worried about Ken Starr.  My wife was

24  particularly worried.  And I felt more confident than I should

25  have been.  So in 2008 she asked a very well known financial

Evans - Cross                                    50

1   person in the city, and he recommended two people working

2   together.  And we went to see them in 2008, because I was

3   thinking, as I say here, of leaving Ken Starr.

4   Q    You were thinking of leaving Ken Starr as a financial and

5   investment advisor as early as some point in 2008?

6   A    Yes, actually.  I go back to 2007 when there were a series

7   of discrepancies.  And I invited a specialist manage -- Wall

8   Street -- Wall -- Wall Management, Rebecca Harvey, to go

9   through the investments and explain to me why I couldn't

10  understand certain things.

11  Q    Okay.  What were you told by Ms. Wall?  What were you

12  informed by Ms. Wall after you requested --

13  A    Well, she -- she said she --

14          MR. WOLF:  Objection, Your Honor.  Forgive me, but

15  this sounds like hearsay.

16          THE COURT:  It does.  What is the purpose of offering

17  this?

18          MR. GANT:  I'll withdraw that question, Your Honor.

19          THE COURT:  Okay.

20  BY MR. GANT:

21  Q    Was it your understanding that your wife was also having

22  concerns about Mr. Starr as an investment and financial adviser

23  as early as some point in 2008?

24  A    She was very concerned.

25  Q    As early as some point in 2008?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1  A      She was probably concerned before that, because she -- she

2  got irritated, because every time we went to see him about the

3  investments, he was always talking about celebrities, and she

4  hates talk about celebrities.  So she said, why are we staying

5  with this man, he never discusses the investments.  And I said,

6  give him a break, he's -- you know, he's done some good work.

7  But I'd got -- by 2008, I really could see that we weren't

8  spending any time with Ken Starr on investments, and this was a

9  difference, rather.  If -- he always was interested in

10 celebrities and gossip and the social world, but in the early

11 days of our association, he was much more attentive, and would

12 let us know, I was just thinking of doing this, and so on.

13 Q      If you could turn your attention to a different exhibit?

14 PX-40, which Mr. Wolf showed you earlier.  It's in the

15 notebook.

16 A      Yes.

17 Q      Please let me know when you have it out.

18 A      Okay.  Yes.  I have it here.  Exhibit 40.

19 Q      You described to Mr. Wolf that this was an email exchange

20 that you had with Betty Greif on March 23, 2009, and March 24,

21 2009, correct?

22 A      Correct.

23 Q      Following this email exchange, the last one of which is --

24 email is March 24, 2009, at 11:01 a.m.  Shortly after that

25 March 24, 2009, did you attempt to contact Ken Starr?

1   A    Yes.

2   Q    Did you in fact contact or reach Mr. Starr soon after

3   March 24, 2009?

4   A    Yes.

5   Q    Okay.  And what did you discuss with Mr. Starr during that

6   conversation?

7   A    By this time, at 2009, we had firmly decided not to

8   continue with Ken Starr as investment advisor.

9   Q    Okay.  Had you also decided therefore to leave Starr &

10  Company altogether by that point in time?

11  A    Yes.

12  Q    And when you reached Mr. Starr, was this an in-person

13  discussion, or by telephone?

14  A    Yes, my secretary, Cindy Cunanan put me through to Ken

15  Starr.  And I said -- do you want to know what I said?

16  Q    Yes, please.

17  A    I said, Ken, I've finished My Paper Chase, the book I --

18  he was very interested in books.  And I'm going to have more

19  time, and I want to take over my investments myself.

20  Q    Did you communicate to Mr. Starr during that discussion

21  that you wanted to leave Starr & Company?

22  A    Yes.  I said this, I -- we had some very good times, but

23  I've now more time, and I want to leave Starr & Company.

24  Q    Thank you.  And what did Mr. Starr say, if anything, in

25  response to your communicating to him that you wanted to leave

Evans - Cross                                    53

1  Starr & Company?

2  A    Well, I thought he was very angry, frankly.  I was kind of

3  surprised.  He said, don't leave us.  Don't leave us.  I said,

4  I really want to handle these investments myself.  He said, of

5  course, of course.  He said, leave the rest to us.  Leave the

6  rest to us, we'll do the rest.  And then he -- I said -- he --

7  I said, yeah, I really want to take over these investments.

8  Will you send me the portfolio and the papers.  And he said,

9  yes.  And he said, well, leave the rest to us, it'll be on the

10 house.  Now there's some phrases which live in my mind forever.

11 It's not a phrase I use myself, but that was burnt into my

12 consciousness.  I was -- I was grateful, I said, that's very

13 generous of you.  And he was very charming, and he said, look,

14 you've been very good for me.  You've been very good to me.

15 And I was actually a little bit sorrowful, actually, but I'd --

16 I was determined to do it, and I said, well, you can send me

17 the papers, and we'll meet again, and so on.  And so he said,

18 well, it's just -- leave the rest to us.  Leave the rest to us.

19 We'll take care of it.  We'll take care of it.

20 Q    At the conclusion of that conversation, when you hung up

21 the telephone, was it your belief and understanding that any

22 future services provided by Starr & Company would be free?

23 A    It was my understanding that it would be on the house.

24 Free.  Yes.

25 Q    Was it your understanding that Mr. Starr's on-the-house

Evans - Cross                                    54

1  offer was a deferred payment arrangement?

2  A    No.  Absolutely not.  I would have left the entire house.

3  Q    Did you rely on the on-the-house offer that Mr. Starr

4  conveyed to you during that phone conversation you just

5  testified about?

6  A    I did.

7  Q    And it was on the basis of the offer to provide services

8  for free on the house that you and your wife decided to

9  continue using the services of Starr & Company?

10 A    I do --

11        MR. WOLF:  Overly leading, Your Honor, objection.

12        THE COURT:  That's sustained.  I think, you know,

13 leading questions on matters that are not disputed, or that are

14 preliminary, are just fine.  But in this particular area, no.

15        MR. GANT:  I understand, Your Honor.

16        THE WITNESS:  I didn't quite catch that.

17        MR. GANT:  That's for me.

18        THE WITNESS:  Okay.  Okay.

19 BY MR. GANT:

20 Q    Would you have continued to accept services from Starr &

21 Company after the on-the-house telephone discussion, had Mr.

22 Starr not offered to provide services for free?

23 A    If Mr. Starr had not accepted that I was going to take

24 over my investments, I would have left the house entirely.

25 Q    You would have left Starr & Company entirely?

Evans - Cross                                                    55

1  A    Yes.  By this time, if I might just add, I had already

2  conversations with this other house that was ready to take over

3  from us, and I wanted the portfolio so I could send it over to

4  them, to discuss the next stages.  Because when I said I'd take

5  it over myself, I meant the guidance of it.  I didn't want to

6  get involved with the details.

7  Q    Following the telephone conversation soon after March 24,

8  2009, in which Mr. Starr offered to provide Starr & Company

9  services on the house, did you communicate the results of that

10 phone conversation to your wife at some point in time?

11 A    I did.  Immediately.

12 Q    Did you also communicate the results of that conversation

13 to Betty Greif, your personal assistant?

14 A    The next day, I said to her, I've made an understanding

15 with Ken Starr, you won't be getting any more demands.

16 Q    You instructed -- strike that.

17      Did you instruct Ms. Greif that you and your wife were no

18 longer obligated to make --

19 A    Yes.

20 Q    -- payments to Starr & Company?

21          MR. WOLF:  Objection, Your Honor.  Legal conclusion.

22          THE COURT:  Well, it's a question of what he said to

23 his wife, not --

24          MR. WOLF:  I didn't understand him to be asking that.

25          THE COURT:  -- not for the truth of the --

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Cross                                    56

1          MR. GANT:  I believe that was my question.

2          THE COURT:  Yeah.  He said, did you tell your wife

3   that you had no more legal obligation?

4          THE WITNESS:  Thank you.

5   BY MR. GANT:

6   Q    I've handed you a two-page exhibit marked as DX-I.  Can

7   you please look through it and tell me when you're ready for a

8   question?

9   A    Yes.  Wait a moment.  Yes.

10  Q    Do you recognize this letter?

11  A    Yes.

12  Q    Do you believe that you wrote this letter?

13  A    Yes.

14  Q    Do you believe that you typed it yourself, or did you have

15  someone else type it up for you?

16  A    I probably had Cindy Cunanan type it up.

17  Q    You dictated the content, the substance of the letter.

18  A    Yes.  Yes.

19  Q    Do you believe that you signed the letter, and had it

20  transmitted to Mr. Starr?

21  A    Yes, I did.

22          MR. GANT:  I move for the admission into evidence of

23  Exhibit DX-I, Your Honor.

24          MR. WOLF:  I have no objection except as to one

25  phrase that appears in the second full paragraph of the letter,

Evans - Cross                                    57

1  where the phrase, "on the house" is in quotes.  I believe that

2  is barred by the hearsay rule, because here's a letter that Mr.

3  Evans is sending to Mr. Starr quoting -- allegedly quoting an

4  out-of-court statement by Mr. Starr.

5              THE COURT:  I don't see anything in the letter that

6  purports to attribute that as a quoted phrase to anybody in

7  particular, or that purports to quote anybody.

8              MR. WOLF:  It's -- the letter is addressed to

9  Mr. Starr.

10              THE COURT:  Right.

11              MR. WOLF:  Yeah.

12              THE COURT:  It doesn't say, you told me you would do

13  this on the house.  It says, "I feel uncomfortable having our

14  taxes prepared on the house by your terrific" --

15              MR. WOLF:  I'll accept that interpretation, Your

16  Honor.  Thank you.

17              THE COURT:  That's what it says.  So your objection's

18  overruled.  And no other objections to Exhibit I?

19              MR. WOLF:  I have no other objection, Your Honor.

20              THE COURT:  Okay.  Exhibit I is in evidence.

21        (Defendants' Exhibit I admitted into evidence)

22              MR. GANT:  Thank you, Your Honor.

23  BY MR. GANT:

24  Q    And you can put that one aside, Mr. Evans.  I'm going to

25  hand you another exhibit.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Cross                                          58

1  A     Okay.

2  Q     I have handed you what has been marked as DX-UU.

3  A     Yes.  Right.

4         MR. GANT:  I believe, Your Honor, this has already

5  been admitted into evidence?

6         THE COURT:  Yes, it was.

7         MR. GANT:  Thank you.

8  BY MR. GANT:

9  Q     Now for purposes of my question, you can ignore the top of

10 the document, which says, Greg Skiff, which is the name of one

11 of the attorneys for the trustee.  He forwarded the bottom

12 email.

13 A     Yes, I understand that.

14 Q     So let's just focus on -- thank you.

15 A     I see that I made it -- I typed this because of the

16 typographical error in it.

17 Q     You typed the email dated September 2nd, 2009?

18 A     Wait a minute.

19 Q     And sent it to Betty Greif.  Is that correct?

20 A     September 2nd, 2009.  Yes.

21 Q     You typed this email?

22 A     Yes.

23 Q     Do you remember typing it?

24 A     Remember?

25 Q     Do you remember typing it?



Evans - Cross                                                    59

1  A    Yes, I do.  That's why I say, it's Betty, there's no space

2  between "you," so it must be my bad handiwork.

3  Q    The first clause says, "Betty, you alarmed me with the

4  info that Ken Starr was still invoicing us."  What is your

5  recollection of why you were alarmed?

6  A    I was astounded.  She didn't tell me.  After my March

7  conversation with Ken Starr, I was expecting him to do two

8  things.  One, importantly, send me the portfolio, and two,

9  honor his suggestion that everything was on the house.  And I

10 was very surprised that Betty had not told me, because she'd

11 been handling the current account all these years, and as I

12 say, very well.  And any time there was a need for a capital

13 infusion, she told me.

14      But now she apparently had known for some time that Ken

15 Starr had continued sending invoices, despite his offer, and

16 promise in fact.  So I was absolutely astounded, and remain

17 astounded to this day.

18 Q    The next clause says "wish you'd told me."  What were you

19 referring to?

20 A    Well, I wish you'd come up from downstairs and said,

21 Harry, Ken Starr's sending us invoices still.  But she didn't.

22 This was -- this day was the first time, Your Honor, that she

23 actually told me that we were in arrears.  This was the first

24 time -- because it was all behind us.  The March conversation

25 had dealt with that situation, and now here's Betty telling me

Evans - Cross                                                        60

1   -- let me just -- can I just dilate a moment?  I've -- in this

2   period, when I'm thinking of moving to the other financial

3   people for investment and everything.  I'm already handling the

4   investment.  I have called Pat Wright, and asked when am I

5   going to get my portfolio, which hadn't arrived.  My portfolio

6   of investments, which was absolutely essential for me, and

7   which the other people were wanting to see.

8         And so suddenly, in this -- long delays in getting the

9   portfolio, not only did we have the long delays in getting the

10  portfolio, I think I say here, I asked him to send all our

11  papers and pick it up, but he didn't, even then.  So -- sorry,

12  I'm sorry, I just get carried away.

13  Q    Between the time of the discussion in which Mr. Starr

14  initially offered to provide services on the house, and this

15  email of September 2nd, 2009, were you aware at any point in

16  time that Ms. Greif had received invoices from Starr & Company

17  for services provided during that period?

18  A    I was not aware at any point in time in this period that

19  Ms. Greif had received invoices.  That was why I was astounded.

20  Q    Is that why you said, wish you told me?

21  A    Absolutely.  I mean, she was very good, Betty was, and

22  occasionally, she slipped up.  And this was a major slip-up.

23  Q    Now did you soon after this exchange with Ms. Greif on

24  September 2nd, 2009, attempt to reach Mr. Starr?

25  A    Yes, I was determined to.

Evans - Cross                                             61

1  Q    You were determined to?  Do you recall the date on which

2  you reached Mr. Starr?

3  A    The very next day.

4  Q    September 3rd, 2009.

5  A    Yes.

6  Q    Can you tell me -- strike that.

7       Did you have -- you had a communication with Mr. Starr on

8  September 3rd, 2009?

9  A    I asked Cindy or Betty to get him on the phone.  And I

10  asked Betty to stay on the phone, because I wanted to let her

11  hear what the situation was.  And she'd handled all these

12  current accounts so well.  I still find it baffling that on

13  this occasion she did not tell me.

14  Q    I've handed you what's been marked as Exhibit DX-M as in

15  "Mary."

16           MR. GANT:  Your Honor, my understanding was this was

17  provisionally admitted yesterday.

18           THE COURT:  I believe that's right.

19  BY MR. GANT:

20  Q    The bottom email says -- strike that, Your --

21           MR. GANT:  May I read from it, since it's

22  provisionally admitted?

23           THE COURT:  Yes.

24           MR. GANT:  Thank you.

25  BY MR. GANT:

Evans - Cross                                    62

1  Q    The bottom email says, "Harry, as per your request, I

2  listened in on a telephone conversation you had with Ken Starr

3  on September 3rd, 2009.  During that conversation, Ken Starr

4  reaffirmed that you didn't have to pay him the monthly fee his

5  firm had been billing you."  Did -- do you recall receiving

6  that email from Ms. Greif?

7  A    Yes, indeed.

8  Q    Did you ask Ms. Greif to send you this email on or around

9  June 21, 2010?

10  A    Yes, I did.

11  Q    Did you ask Ms. Greif to say anything untruthful when

12  instructing her to send you this email?

13  A    Yes, she's a truthful person.  She is.

14  Q    She's a truthful person?

15  A    She maybe have the odd memory lapse, but she's truthful.

16  Q    I just want to make sure the question and answer were

17  clear.  Did you ask Ms. Greif to say anything untruthful,

18  untruthful --

19  A    No, not at all.  I wouldn't dream of it.

20  Q    You wanted her to -- strike that.

21       Did you want Ms. Greif to send you an email confirming

22  what she believed she actually heard on the September 3rd, 2009

23  phone call?

24  A    She did hear it, and I did ask her if I can -- can I

25  continue?



ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Cross                                        63

1   Q    With the judge's permission.

2   A    I said give me a note of it.  And the next day I had a --

3   not a computer -- it may have been a computer printout, a note

4   written on these same lines from Betty.

5   Q    If you notice, on the second line of the email to you

6   Ms. Greif wrote, "During that conversation, Ken Starr

7   reaffirmed that you didn't have to pay him the monthly fee."

8   What --

9          THE COURT:  I'm sorry, what?  I'm -- apologize -- I

10  did not hear the beginning of counsel's question.

11         MR. GANT:  I'm happy to start --

12         THE COURT:  I'm sorry, Mr. Gant.

13         MR. GANT:  -- start over.

14  BY MR. GANT:

15  Q    In the second line of the email we've just been discussing

16  in Exhibit DX-M, Ms. Greif wrote, "During that conversation,

17  Ken Starr reaffirmed that you didn't have to pay him the

18  monthly fee his firm had been billing you."  My question is,

19  what did you understand Ms. Greif to mean when she wrote to you

20  that Mr. Starr reaffirmed that you didn't have to pay him the

21  monthly fee?

22  A    On September the 3rd, when I rang him with Betty Greif, I

23  said, Ken, what's happening?  We had this understanding I

24  appreciated, it was all on the house, but Betty tells me you've

25  still been sending invoices, your office.  And he said, it's an

Evans - Cross                                               64

1  oversight.  It's an oversight.  I'm sorry, I'm sorry.  And

2  that's what Betty heard, and that's what I heard.  This is

3  (indiscernible) this conversation is so important to me.  I've

4  never forgotten it.  Never.

5  Q    It was your -- strike that.

6       Was it your understanding from the September 3rd, 2009

7  phone call with Mr. Starr, that Mr. Starr was -- had confirmed

8  that the services provided by Starr & Company were and would be

9  free, on the house?

10           THE COURT:  How about you just ask what Mr. Starr

11 said?

12           MR. GANT:  Sure.  Well, I think -- I thought he had

13 testified to that.

14           THE COURT:  Ask him if he said anything else.  I --

15           MR. GANT:  Very well, Your Honor.

16           THE COURT:  This is too important a conversation to

17 have you have him testify to by conclusory remarks.

18           MR. GANT:  Fair enough, Your Honor.

19 BY MR. GANT:

20 Q    Do you remember anything else about the specifics of the

21 phone conversation with Mr. Starr on September 3rd, 2009?

22 A    It was mainly a very short conversation.  I was kind of

23 mad with him.  It may have been a bit of social banter in

24 there, he was always interested in that.  I said, Ken, I -- you

25 know, we -- I don't understand what's happening.  And that's

Evans - Cross                                      65

1 when he immediately said, it's an oversight, I'm sorry.

2 Q    He said, it's an oversight, I'm sorry?

3 A    On his part.  Oversight on his office, you know, the way

4 things go.  That -- and Betty heard it, and that's why I asked

5 her to send the note.  This conversation is -- it will never

6 leave me, because I've gone through the March conversation with

7 him.  I've got liberated so far as investment goes, and then

8 suddenly, Betty did not tell me that he's broken the

9 understanding by sending invoices.

10         MR. GANT:  Your Honor, I move for the admission of

11 DX-M into evidence.

12         THE COURT:  Well, I think it's still in

13 provisionally, and I suspect it will be in.

14         MR. GANT:  Okay.  No change in status, Your Honor, is

15 your ruling?

16         THE COURT:  Correct.

17         MR. GANT:  Okay.  I just renewed my request that it

18 be admitted.

19         THE COURT:  Yeah, if the trustee stands up at closing

20 argument and says that the conversation happened exactly the

21 way Mr. Evans recalls it, then it would probably be admissible,

22 but I don't think that's what the trustee's going to say.

23         MR. GANT:  This next question is about his

24 understanding, Your Honor, not what was said.

25 BY MR. GANT:



1  Q    Was it your belief and understanding that you remained

2  having no obligation to pay for services provided by Starr &

3  Company?

4  A    Yes.

5         MR. WOLF:  Objection, Your Honor.  Again, it calls

6  for a legal conclusion.

7         THE COURT:  I'll accept.  That's okay.

8         MR. GANT:  I'm sorry?

9         THE COURT:  The question was okay.

10        MR. GANT:  Thank you.

11 BY MR. GANT:

12 Q    I'm handing you what's been marked for identification as

13 Exhibit DX-R.  Please take a look at it and let me know when

14 you're ready for --

15 A    Yeah, just a second on this, it's --

16 Q    Take your time.

17 A    Yes.  I've read it.

18 Q    The bottom email indicates it's dated March -- excuse me.

19 September 23, 2010, at approximately 11:55 a.m. from Betty

20 Greif at gmail.com.  Do you remember receiving this email from

21 Ms. Greif?

22 A    Her answer.

23 Q    The bottom email --

24 A    Yes, I see that.  Yes, I do remember seeing it.

25 Q    And the next email in chronological order is the one at

Evans - Cross                                          67

1  the top of the page, which is --

2  A    Right.

3  Q    -- dated September 23rd, 2010, at 12:07 p.m.  Is that an

4  email that you sent to Ms. Greif?

5  A    Yes.

6         MR. GANT:  Your Honor, I move for the admission of

7  DX-R into evidence.

8         MR. WOLF:  No objection, Your Honor.

9         THE COURT:  Okay.  R is admitted.

10     (Defendants' Exhibit R admitted into evidence)

11  BY MR. GANT:

12  Q    If you look at the top email, the one from 12:07 p.m.,

13  that was an email from you to Ms. Greif, correct?

14  A    Yes.

15  Q    On the second line, you used the term "confirming

16  conversation."  Do you see that?

17  A    Yes.  Yes.

18  Q    What conversation were you referring to as the confirming

19  conversation?

20  A    Oh, the date of the confirming conversation was September

21  the 3rd, the one we've just been describing.

22  Q    September 3rd, 2009?

23  A    September 3rd, 2009, yes.

24  Q    The conversation between you and Mr. Starr?

25  A    And when I asked Betty to listen in on the conversation,

1  and give me a note of it.

2  Q    The top line uses the phrase "canceling him."  Do you see

3  that?

4  A    Re: Starr.  If it's from me to Betty --

5  Q    The first line of the text of the top email.

6  A    "When you get a minute"?

7  Q    Right.  "When you get a minute, what did I save on

8  canceling him from that date to the date of his arrest?"  Do

9  you see that?

10 A    Yes.

11 Q    What were you referring to by canceling him?

12 A    Now that's --

13 Q    Was that the on the house agreement?

14 A    I was trying to -- I'm asking her, what did I save in

15 monthly fees from him from the date when I called him up in

16 March and said I wanted to leave, and he said don't leave us,

17 you've been good to me, and send him the portfolio, I said.  So

18 I wanted to know what I'd saved in the $6,000 a month to Ken

19 Starr from that date in March to September, 2010, so I could

20 assess the costs of the other services which I'd been

21 investigating.

22 Q    Thank you.  You can put that aside for the moment.  We're

23 finished with this one for the moment.  You can put it aside.

24 We're going to turn to a new exhibit.  Thank you.

25 A    Thank you.

Evans - Cross                                        69

1  Q    Mr. Evans, I've handed you Exhibit DX-FF.  Which I --

2  A    F.

3  Q    -- believe has been admitted into evidence.

4  A    Yes.

5  Q    If you could take a moment to look through it?

6        MR. GANT:  May I make a representation about what it

7  is to try and speed things, up, Your Honor?

8        THE WITNESS:  Yes, yes, yes.

9        THE COURT:  Go ahead.

10 BY MR. GANT:

11 Q    Mr. Evans, this is a compilation of invoices for services

12 performed during the period at issue in this litigation.

13 A    Yes.

14 Q    And my question, Mr. Evans, is do you believe that you

15 ever saw any of the invoices set out in Exhibit DX-FF before

16 the end of the year, 2010?

17 A    No.

18 Q    You can put that aside, thank you.

19 A    I did not.  Betty Greif dealt with all the invoices.

20 Q    Okay.  You can put it aside.  Thank you.

21 A    Okay.

22 Q    Do you recall the year in which you and your wife started

23 using the services of Starr & Company?

24 A    1999, my wife made a different arrangement what she was

25 going to do, and I'm pretty sure we first -- I first met him

Evans - Cross                                        70

1  with her in the year 2000.

2  Q    Do you think it was around 2009?

3  A    Yes -- but --

4  Q    You think -- excuse me, my mistake.

5  A    Not 2009.

6  Q    1999.

7  A    1999 to 2000.

8          MR. GANT:  May I show a document to refresh the

9  witness's recollection about the date, Your Honor?

10          THE COURT:  Yes, you don't need my permission to do

11  that.

12          MR. GANT:  Okay.

13          THE WITNESS:  Thank you.

14          MR. GANT:  I'm happy to provide Mr. Wolf with a copy

15  if he'd like one.

16          THE WITNESS:  Oh, it was 1998 here, wasn't it?

17  BY MR. GANT:

18  Q    You're jumping ahead of me, Mr. Evans.

19  A    Okay.  I'm sorry.

20  Q    Does the document I just put in front of you refresh your

21  recollection about when you and your wife began using the

22  services of Starr & Company?

23  A    Yes, we must have begun getting services in 2000 -- 1998.

24  I thought it was 2000 -- 1999, but I may be out on that.

25  Q    And do you recall the amount in monthly fees you were

Evans - Cross                                                      71

1   paying to Starr & Company -- I'll start again, in case you

2   didn't hear me.

3       Do you recall the monthly fee that you were paying

4   initially to Starr & Company for its services?

5   A    I do, because it was 5,000.

6   Q    And was that $5,000 to cover any and all services provided

7   by Starr & Company?

8   A    Yes.  And it was at the very end of 1998, and that's why I

9   probably thought it was '99.  Thank you.

10  Q    I've handed you what has been marked as Exhibit DX-D for

11  identification purposes.  I believe you testified in response

12  to a question from Mr. Wolf about Harold Evans & Associates,

13  LLC?

14  A    Yes.

15  Q    Is that the entity from which you and your wife made

16  payments to Starr & Company?

17  A    Yes.

18  Q    Was it your understanding that Ms. Greif maintained some

19  records of payments to Starr & Company in her computer at your

20  home?

21  A    Records at her home.

22  Q    Was it your understanding that Ms. Greif maintained a

23  record of payments to Starr & Company, which she maintained --

24  A    On her --

25  Q    -- on her computer in your home?

1  A    Yes.  And she maintained them, I think, at 447.

2  Q    Have you had an opportunity to look at Exhibit DX --

3  excuse me.  DX-D?

4  A    DX-D?

5  Q    Yes.  The one in front of you.  Yes.

6  A    Yes.

7  Q    Do you believe that this is a printout reflecting payments

8  to Starr & Company made on behalf of Harold Evans & Associates?

9  A    Yes.  Yes.  This is a --

10            MR. GANT:  Your Honor, I --

11            THE WITNESS:  -- not a complete list of payments.  It

12  doesn't matter.

13  BY MR. GANT:

14  Q    You say it's not a complete list --

15  A    Well, I -- it goes from 2000 to 2009 --

16  Q    You're anticipating a few questions ahead.

17  A    Oh, sorry.  I'm sorry.

18            MR. GANT:  Your Honor, I move for the admission of

19  DX-D into evidence.

20            MR. WOLF:  No objection, Your Honor.

21            THE COURT:  D is in evidence.

22       (Defendants' Exhibit D admitted into evidence)

23            MR. GANT:  Thank you.

24  BY MR. GANT:

25  Q    We'll get in a moment to the question of whether there



Evans - Cross                                    73

1  were other payments.

2  A    Okay.

3  Q    For the -- if you look at the back page of the exhibit, do

4  you see that the first entry in the date column is April 7,

5  2000?

6  A    Yes.

7  Q    Okay.  And if you move across to the memo column, it says

8  this payment was for fees for January and February, 2000.  Is

9  that right?

10 A    Yes.

11 Q    Now, Exhibit DX-D covers payments for the period April,

12 2000 through March, 2009, correct?

13 A    Yes.

14 Q    And during that time, did Harold Evans & Associates pay

15 Starr & Company approximately $561,000?

16 A    Five hundred sixty-one thousand, yes.  Yes.

17 Q    Now, a moment ago, you also looked at a document that

18 refreshed your recollection that you started using services of

19 Starr & Company in October, 2008, correct?

20 A    Yes.

21 Q    At an amount of approximately $5,000 per month, correct?

22 A    Yes.

23 Q    So there was a period of time when you and your wife were

24 making payments to Starr & Company that preceded April, 2000,

25 correct?



1  A    Yes.

2  Q    Okay.  Would you agree with me, based on the $5,000-per-

3  month figure from October 2000 -- strike that.

4       Is it your belief that you made monthly payments to Starr

5  & Company for the period -- services performed from October,

6  2008 through March of 2000?

7  A    Wait a minute.

8          MR. WOLF: I'm sorry.  Unless I misheard, I think

9  counsel misstated a date.  I thought he said some month in 2008

10 --

11         MR. GANT:  I did.

12         MR. WOLF:  -- through 2000.

13         MR. GANT:  The first date was wrong.  I apologize.

14         MR. WOLF:  Okay.  Try it again.

15 BY MR. GANT:

16 Q    Okay.  Is it your belief that payments were made on your

17 behalf to Starr & Company for the period October 1998 through

18 March, 2000?

19 A    Yes.  Yes, thank you, Mr. Wolf.

20         MR. GANT:  Thank you, Mr. Wolf.

21         MR. WOLF:  You're welcome.

22 BY MR. GANT:

23 Q    And is it your belief that those payments were

24 approximately $5,000 per month?

25 A    Yes.  There were some payments that got higher, but --

Evans - Cross                                      75

1  Q    This may require a little bit of addition, but would you

2  agree with me that accounting for the $561,000 paid reflected

3  on Exhibit DX-D, plus the prior payments of approximately

4  $5,000 a month --

5  A    Right.

6  Q    -- you made payments well in excess of $600,000 to Starr &

7  Company --

8  A    Oh, yes.

9  Q    -- for the period October, 1998, through December, 2008?

10 A    Yes, indeed.  More than $600,000 it was.

11 Q    Did you readily make payments to Starr & Company during

12 the period of time when you believed you owed Starr & Company

13 money?

14          MR. WOLF:  Objection, Your Honor, to the use of the

15 word "readily."

16          THE COURT:  Sustained.

17 BY MR. GANT:

18 Q    Did you make payments to Starr & Company for the periods

19 of time that you believed you owed money?

20 A    I did not quite get that.  For the period where?

21 Q    I'll start again and try and be clearer and louder.

22 A    Yes.

23 Q    Did you make payments to Starr & Company for the periods

24 of time when you understood that you owed Starr & Company

25 money?



Evans - Cross                                         76

1  A    I'm sorry, I'm still not getting it.

2  Q    Okay.  I'll withdraw the question.  We'll move on to

3  something else.

4  A    Thank you.  Right.  Yes.

5  Q    Now, I've handed you what's been marked for identification

6  as Exhibit DX-G.  Two pages.  Do you see on the first page,

7  there's an image of a check, which says "Harold Evans, LLC"?

8  A    Yes.

9  Q    And it says "pay to the order of Starr & Company"?  Is

10 that correct?

11 A    Yes.

12 Q    And on the memo line, it says, "fee December, 2008, plus

13 $1,000 IACI contract."  Is that right?

14 A    This is a payment of -- is it six or 8,000?  282?

15 Q    It's hard to read, but I'll represent it says six.

16 A    It probably --

17 Q    The first number --

18 A    -- I think it's six.

19 Q    Yes.  Yeah.  Is it your belief that this is a check that

20 you directed to be sent to Starr & Company for fees for the

21 period, December, 2008, plus $1,000 for purported work for an

22 IACI contract?

23 A    This check is dated 27th of March, 2009.  It's in the sum

24 of 6,282.30.  I signed it.

25 Q    Do you have any reason to doubt this check was sent to

Evans - Cross                           77

1  Starr & Company as payment?

2  A    No.  No, it was.

3          MR. GANT:  I move for the admission of DX-G into

4  evidence, Your Honor.

5          THE WITNESS:  You might notice, it says contract for

6  something.

7          THE COURT:  Any objection?

8          MR. WOLF:  No objection, Your Honor.

9          THE COURT:  Okay, G is in evidence.

10      (Defendants' Exhibit G admitted into evidence)

11          MR. GANT:  Thank you, Your Honor.

12  BY MR. GANT:

13  Q    If you could turn back to Exhibit PX-42, which Mr. Wolf

14  asked you about.  If I may come help you --

15  A    If you might -- if you don't mind.

16          MR. GANT:  May I, Your Honor?

17          THE WITNESS:  PX-42.  Is it -- is that it, 42?

18          MR. GANT:  Yes.

19  BY MR. GANT:

20  Q    Do you have it in front of you?

21  A    Yes.

22  Q    Okay.  Do you recall -- I'm not asking you about what you

23  discussed.  Do you recall that Mr. Wolf asked you some

24  questions about this document a few minutes ago?

25  A    Yes.



1  Q    Do you recall that Mr. Wolf directed your attention to the

2  word "deal" that appears in the email?

3  A    Yes.

4  Q    Was it your understanding that any possible contemplated

5  deal would involve Mr. Starr as a party to the transaction?

6  A    The circumstances of chasing Pat about the bland money --

7  maybe?  I can't absolutely remember, entirely, actually.

8  Whether he was offering to pay some advance on the money he

9  owed me.  I can't remember.

10 Q    Putting aside Mr. Starr paying you any money that you

11 believed that he owed you --

12 A    Yes.

13 Q    -- are you aware of any time in which you contemplated a

14 deal or transaction in which Mr. Starr himself would actually

15 be a party?

16 A    Well, I -- in 2000 -- 2009, we already have had our

17 conversation about on the house.  I can't think what this could

18 be.

19 Q    My question is, do you remember any proposed or

20 contemplated transaction or deal where Mr. Starr himself was

21 going to be involved as a party to the transaction?

22 A    I can't remember any.

23 Q    When Mr. Wolf asked you some questions about this exhibit,

24 you initially referenced something called BLAMM?

25 A    Yeah, Black (indiscernible).

Evans - Cross                                    79

1  Q    Okay, was BLAMM some kind of investment that Mr. Starr

2  recommended and involved you in?

3  A    Yes.

4  Q    And was Mr. Starr -- okay.  An intermediary in your

5  pulling money out of the BLAMM investment?

6  A    No.  The BLAMM fund had been wound up, and the Allen fund

7  I think was shortly afterwards.  And I -- a number of times in

8  which I called Pat Wright, asking where's the BLAMM money, it

9  was incredible.  And every time, there was an excuse.  Well,

10 Ron's dealing with that, and he's away.  Oh, well, can I speak

11 to Ken?  Well, Ken's in another meeting.  I said, Pat, I'd like

12 to get -- so I'm chased -- I asked Pat for Frank to chase --

13 I'm talking here about the BLAMM money in which I was owed

14 residue of, and need to speak to him Monday.

15 Q    And I believe you testified, and I just want to confirm,

16 you're not sure one way or another whether, when you referred

17 to a deal in PX-42, you were referring to receiving some BLAMM

18 money from Mr. Starr?

19 A    Well, yes.  I can't quite remember.  I was consumed with

20 irritation about the amount of time and the various excuses I

21 was getting about not having had my money transferred into my

22 account.  It was absolutely -- I mean -- this is only, of

23 course -- you realize this is December of 2009.  We're a few

24 months from Ken Starr's arrest.

25 Q    If you could turn your attention to Exhibit PX-41, which

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  is another one that Mr. Wolf asked you about.

2  A    Yes.

3  Q    In connection with this exhibit, and I believe more

4  generally, Mr. Wolf asked you about quote/unquote, "cash flow

5  issues."

6  A    Right.

7  Q    Was there any point in time between the beginning of 2008

8  and the end of 2010 that you believe that you were unable to

9  pay any of your bills?

10 A    No.

11 Q    Was it your belief -- strike that.

12      You referred to a capital account and a current account

13 earlier?

14 A    Yes.

15 Q    When there was an anticipated shortfall in the current

16 account --

17 A    Right.

18 Q    -- was it your belief and understanding that that

19 shortfall could always be made up by moving money from your

20 capital account?

21 A    Yes.  I had a line of credit, a big one, a very big line

22 of credit which I controlled in the capital account.

23 Q    Is it --

24 A    As well as the investments both in the United Kingdom and

25 in the United States.

1  Q    As far as you believed and were aware, you were always

2  able to pay your bills?

3  A    Absolutely, yes.  I mean, this -- absolutely so.

4          MR. GANT:  I have no further questions at this time,

5  Your Honor.  Thank you.

6                  REDIRECT EXAMINATION

7  BY MR. WOLF:

8  Q    Mr. Evans?

9  A    Yes, sir.

10 Q    The conversation that you were testifying to, pursuant to

11 --

12 A    September 3rd?

13 Q    -- pursuant to Mr. Gant's questioning, that you had with

14 Mr. Starr, in which you say Mr. Starr said the services were

15 going to be on the house.  On what date did that conversation

16 take place?

17 A    The best of my recollection, March the 24th.

18 Q    On March 24?

19 A    Best of my recollection.

20 Q    March 24, 2009.  Is that correct?

21 A    Yes.

22 Q    Do you recall describing a different time that that

23 conversation took place when your deposition was conducted in

24 this adversary proceeding?

25 A    I don't recall, but it's probably -- I was less sure,

Evans - Redirect                                        82

1  probably, at the time, of the actual date --

2  Q    Do you recall --

3  A    -- the conversation took place, certainly.

4  Q    Do you recall being asked by me in questioning at your

5  deposition, when that conversation took place?

6  A    I have a rough idea, yes.

7  Q    Okay.  Do you recall what you said in response to my

8  questioning on that subject?

9  A    The date -- I can be more precise about the date because

10 I've refreshed my -- of my diaries.

11          MR. WOLF:  Well, I'd like to hand to the witness a

12 binder that contains deposition transcripts, because I have

13 some questions that go to Mr. --

14          THE COURT:  Okay.

15          MR. WOLF: -- Evans' deposition testimony.

16 BY MR. WOLF:

17 Q    Your deposition testimony, Mr. Evans, appears under tab 4,

18 and I'm opening the binder to the spot of that deposition.

19          MR. WOLF:  Your Honor, I have a set for Your Honor

20 also.

21          THE COURT:  Are you offering it into evidence?

22          MR. WOLF:  I am going to offer certain portions into

23 evidence.  I have some questions now --

24          THE COURT:  I don't want the whole thing unless it's

25 in evidence, so --

                        Evans - Redirect                        83

1  BY MR. WOLF:

2  Q    Mr. Evans, would you please turn to page 89 in the

3  transcript of your deposition?  By the way, do you recall that

4  your deposition was conducted in this adversary proceeding on

5  May 27, 2015?

6  A    I'll have to look at that.

7  Q    I'm sorry?

8  A    I'm going to look into it now.  So we're looking at May

9  the 27th, 2015, page -- which page?

10 Q    Well, the very -- the cover page under Exhibit 4, under

11 tab 4.

12 A    Wait a minute.  The cover page is May the 27th, 2015.

13 Right.

14 Q    And do you recall that being --

15 A    I have it here, yes.

16 Q    Yes.  Do you recall that was the date that your deposition

17 was taken?

18 A    You tell me it was, no.

19 Q    I'm sorry?

20 A    I've forgotten what date the deposition was.

21 Q    Okay.  Do you have any reason to dispute --

22 A    No, not at all.

23 Q    Okay.  Thank you.  Please turn to page 89.

24 A    There you are.

25 Q    Would you -- line 17, I asked you the following question.



Evans - Redirect                                        84

1           MR. GANT:  I'm sorry.  What page are we on?

2           MR. WOLF:  Page 89, starting at line 17.

3           MR. GANT:  Thank you.

4    BY MR. WOLF:

5    Q    My question to you was,

6    "When you say you severed the relationship, are you talking

7    about severing the relationship with Ken Starr in connection

8    with financial advice and investment advice?"

9    A    Which line is this?

10   Q    I just read my question that goes from line 17 to line 20.

11   A    Wait a minute.  One seven -- 17?  Is this the right page?

12   Q    I'm sorry, you're on the wrong page.  Page 89, which I'm

13   turning to.  Starting at line 17.

14   A    Okay.  Okay.

15   Q    Okay?  I'll repeat it again.  My question to you, starting

16   on that line, was:

17   "When you say you severed the relationship, are you talking

18   about severing the relationship with Ken Starr in connection

19   with financial advice and investment advice?"

20        And starting at line 22, what answer did you give to that

21   question?  Would you read it, please?

22   A    I said:

23   "I don't know what the period was, but we ceased the

24   relationship in" --

25   Q    I'm sorry.  Where are you reading from?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Evans - Redirect                                        85

1  A     I'm reading from part -- line 11.

2  Q     Okay.

3  A     And we ceased the relationship --

4  Q     No, Mister -- Mister --

5  A     -- and the best --

6  Q     I'm sorry, Mr. Evans.  You're not following the sequence.

7  I just read for you my question from lines 17 to 20.  You're on

8  --

9  A     Wait a minute.  When you say one seven --

10  Q     Let me expedite this.  I'll read it into --

11          THE COURT:  Why don't you read the answer and ask him

12  if that's what he said?

13          MR. WOLF:  That's fine, Your Honor.  Thank you.

14  BY MR. WOLF:

15  Q     Starting at line 22.

16  A     Line 22.

17  Q     Line 22 of the transcript has the following --

18  A     This is line 22 on page --

19  Q     Yes, sir.  I'm going to read it to you, and then ask you a

20  question.

21  A     Okay.

22  Q     The answer was, in response to my question:

23  "The actual conversation took place in 2008 between me and Ken

24  Starr, when I said I was going to manage my own investments,

25  and he said, I would like to continue doing the tax, on the

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Evans - Redirect                                      86

1  house."

2  A     Right.

3  Q     You were under oath when you gave the answer to these

4  questions at the deposition.

5  A     Yeah, I probably -- I got the date wrong.

6  Q     Is that correct?

7  A     I got the year wrong.

8  Q     You got the year wrong?

9  A     Yeah, it was -- it's -- obviously now, it's 2009.

10  Q     Well, did you correct yourself at any point during the

11  course of the deposition?

12        MR. GANT:  Objection, Your Honor.  He's asking if he

13  corrected himself in the deposition without having an

14  opportunity to read the transcript.

15        MR. WOLF:  Well --

16        MR. GANT:  He can ask him if he remembers stating --

17        MR. WOLF:  -- Your Honor, for the record, a letter

18  with the transcript was sent to defendant's counsel, asking

19  them to have the witness read the transcript and make any

20  corrections that he thought were appropriate.  I have a copy of

21  that letter, Your Honor, that was sent via email to Mr. Gant on

22  June 8th of 2015.  To my knowledge, there was never a

23  transcript signed by Mr. Evans returned to us with any errata

24  sheet making any corrections to this transcript.  And I have a

25  copy of that letter here for Your Honor, and I would like to

Evans - Redirect                                87

1  offer it into admission as evidence.

2          MR. GANT:  I object to the admission of that as -- on

3  relevance grounds.  I'm not aware of any obligation that a

4  witness is required to submit an errata sheet, which I think is

5  the implication of Mr. Wolf's argument.

6          MR. WOLF:  Well, there's a consequence of not

7  submitting the errata sheet, or changing any testimony that was

8  given under oath.  There were no corrections.  It therefore

9  constitutes the witness's deposition testimony.

10          THE COURT:  I take it the parties can stipulate that

11  there was no errata sheet and there were no corrections?

12          MR. GANT:  I do not believe there was an errata sheet

13  submitted, Your Honor.

14          THE COURT:  Okay.  I don't see what the letter adds

15  to what's in front of me.

16          MR. WOLF:  I'm sorry?

17          THE COURT:  He didn't correct his statements, as you

18  say, there's -- that means he adopts them.  So I don't see what

19  a letter saying you have the opportunity or telling his counsel

20  he has the opportunity, I don't see what that adds.

21  BY MR. WOLF:

22  Q    Did you, Mr. Evans, prior to the start of this trial, have

23  occasion to read your deposition transcript?

24  A    Yes.

25  Q    I'm sorry.

Evans - Redirect                                     88

1  A     I did.  I did.

2  Q     Okay.  Did you ever send a writing, or have your counsel

3  send a writing, to my firm, to my office, indicating that you

4  wished to change the date to which you ascribed the

5  conversation with Mr. Starr?

6  A     I did not, because I said in the testimony, to the best of

7  my recollection --

8  Q     You've answered the question.

9          MR. WOLF:  I move to strike anything beyond the fact

10  that he did not.

11          THE COURT:  All right.  I will strike it, but his

12  counsel will have a chance to ask him to explain, so --

13          MR. WOLF:  Okay.

14          THE COURT:  That's fine.

15  BY MR. WOLF:

16  Q     I then asked you on page 90, Mr. Evans, starting at line

17  11, I asked you:

18  "What did you say about his company continuing to render tax

19  services on you and your wife's behalf?"

20      And starting at line 15, you gave the following answer,

21  under this transcript:

22  "In the course of the conversation, the conversation goes like

23  this.  Ken, I want to manage my own investments from now on.

24  And this was 2008.  And he was very cordial, very cordial, and

25  he said he would like to continue doing your taxes on the house

1  as a gesture.  You've been a very good customer, and on the

2  house is what he said.  The actual phrase he said was 'on the

3  house,' and I said, as soon as you can give me the paperwork, I

4  would appreciate the fact that you are offering to do that.  If

5  you give me the paperwork, I can continue the financial

6  investment that I need to do.  I thought I could manage on my

7  own."

8  Q     You said again the year 2008 there, correct, Mr. Evans?

9  A     Yeah.

10  Q     Okay.  Would you now take a look at page 92, starting at

11  line 3?  My question to you:

12  "Respectfully, this conversation that you related

13  now, when did that conversation take place?

14  "A   In 2008."

15  A     Forgive me, that's a misreading of the transcript.

16             MR. GANT:   Your Honor, hold on.  Hold on.  It is,

17  and that's not my objection -- yeah.

18             THE COURT:  Hang on, hang on.  First, we have a

19  question, and we have an objection.

20             MR. GANT:  I have an objection for the same reason

21  Mr. Evans started to identify.  He has misread the transcript.

22  What the answer actually says, in completion, is, quote, "I

23  think" --

24             MR. WOLF:  I'm getting to that.

25             MR. GANT:  -- "it was sometime towards the end of

Evans - Redirect                                90

1 2008."  Mr. Wolf omitted the words "I think" --

2           MR. WOLF:  I was --

3           MR. GANT:  -- when characterizing or when according

4 to quote.

5           THE COURT:  Okay.  Start over.

6           MR. WOLF:  I'll read the whole thing.  It was my next

7 line, and I was going to read it into the record.

8 BY MR. WOLF:

9 Q    I'll read the two questions and answers, starting at line

10 three:

11 "Q   Respectfully, this conversation that you've related now,

12 when did that conversation take place?

13 "A   In 2008.

14 "Q   Do you recall what month?

15 "A   I think it was sometime towards the end of 2008."

16      That was your testimony in response to those two

17 questions.  Is that correct?

18 A    You have to bear in mind this, when I was --

19 Q    Mr. Evans, my question is, did you not say in response to

20 both of those questions, that the conversation took place in

21 2008?

22 A    Counsel and Judge, with due respect, I had preceded all of

23 these statements about dates with "the best of my

24 recollection."  It's seven years ago.

25           THE COURT:  Mr. Evans, your own counsel will have a

1   chance to follow up and ask questions to elicit explanations

2   that you may have.

3              THE WITNESS:  Right.

4              THE COURT:  But for the purposes of Mr. Wolf's

5   examination, you need to ask the question -- answer the

6   question that he has asked.

7              THE WITNESS:  Okay.

8              THE COURT:  If he asks you for an explanation, then

9   you can offer an explanation.  But if his only question to you

10  is whether that is in fact what you said at your deposition,

11  then you should say yes, and if there's --

12             THE WITNESS:  The --

13             THE COURT:  -- needs to be follow up, wait and rely

14  on your counsel --

15             THE WITNESS:  Thank you for the guidance.

16             THE COURT:  -- your counsel's own --

17             THE WITNESS:  The answer is yes.

18             MR. WOLF:  Thank you.  Thank you, Your Honor, and

19  thank you, Mr. Evans.

20  BY MR. WOLF:

21  Q    Starting then -- still on page 92 --

22  A    Which one?

23  Q    Page 92, I'm still on.

24  A    Got it.

25  Q    One of my follow up questions, starting at line 20:

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Redirect                                          92

1  "Q   Where were you when you made that call?

2  "A   I was in my office at 447 when I made that call.

3  "Q   Your office within your apartment?

4  "A   Yeah.  I was in the office in my apartment when I made a

5  call to Ken Starr sometime towards the end of 2008."

6       Once again there, you said 2008.  Is that correct?

7  A    Uh-huh.  Yes.

8  Q    Mr. Evans, did you ever take -- well, let me rephrase.

9  Did you take any notes of the conversation that you had with

10 Mr. Starr in which you say he said on the house at the time --

11 while the conversation was going on?

12 A    I wrote a shorthand note, "on the house."

13 Q    You wrote a shorthand note?

14 A    Yes.

15 Q    Okay.  Does that note still exist?

16 A    I don't know, frankly, whether it still exists or not, but

17 it's a vast amount of traffic.  It's quite interesting that I

18 still use shorthand a bit.  It probably does not still exist.

19 Q    It probably what?

20 A    It probably still does not exist, but I can remember the

21 outline I wrote "on the house."

22 Q    Well, what -- do you recall the last time you wrote those

23 words in shorthand?

24 A    Not those words.  I wrote quite -- I write quite a few

25 words in shorthand.



ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Evans - Redirect                                    93

1  Q    About the conversation?

2  A    No, about general conversations.

3  Q    No, I'm talking about the conversation.  You indicated

4  just before you wrote in shorthand, the words "on the house."

5  A    Yes.

6  Q    When did you last see that note?  When did you last see

7  it?

8  A    Oh, years ago.

9  Q    Years ago.  Do you recall whether that note had a date on

10 it?

11 A    No.

12 Q    Now in the conversation in which you say Mr. Starr said,

13 it's on the house --

14 A    Right.

15 Q    -- is that when you told him you were no longer going to

16 be using him and his office as financial advisers?

17 A    The "on the house" referred to all the services.

18 Q    Right.  That was the first time you were telling him, I'm

19 no longer going to use your services.  Is that correct?

20 A    Yes.  I should say that he was aware of my unease during

21 2008, because I'd raised various questions which he was unable

22 to answer.

23 Q    Right.  But this was the first time you actually told him,

24 we're no longer going to use your services.  Is that correct?

25 A    To the best of my recollection.  I may have hinted at

Evans - Redirect                                          94

1  something earlier, but this was the first time I took the bull

2  by the horns and called him up on March the 24th, 2009.

3  Q    I'm putting in front of you, Mr. Evans, a volume of

4  defendants' exhibits, and I'd like you to take a look at

5  Defendants' Exhibit F.  I'll take this out of your way.  And

6  move it over here.  There you are.

7       Defense Exhibit F is now in evidence.  Mr. Gant was asking

8  you some questions about it.  This Exhibit F is your letter to

9  Gail Wiener of December 23, 2008.  Is that correct?

10  A    Yes.

11  Q    And the first line of that letter, you told her you are

12  changing your financial advisors, right?

13  A    Yes.

14  Q    You knew you were changing your financial advisors, so

15  that Starr & Company was no longer going to be serving as your

16  financial advisors, correct?

17  A    I am changing -- I was at that point talking to this other

18  company about leaving Ken Starr.

19  Q    Uh-huh.  I'm going to need to put a different exhibit in

20  front of you.  Would you turn please -- can you hear me?

21           UNIDENTIFIED SPEAKER:  Yes.

22  BY MR. WOLF:

23  Q    Plaintiff's Exhibit 40?

24  A    Yes.

25  Q    Which is in evidence.  That's the March 23 to March 24,

Evans - Redirect                                    95

1  2009 email exchange between you and Ms. Evans.  Ms. Greif,

2  sorry.

3           MR. GANT:  Sorry, what exhibit number?

4           MR. WOLF:  40.

5           THE COURT:  Yeah, it's 40.

6  BY MR. WOLF:

7  Q    Mr. Evans, you did not -- you were not shown a copy of

8  this, Plaintiff's Exhibit 40, this email exchange, at your

9  deposition, were you?

10 A    I can't recall.

11 Q    Okay.  Well, do you notice that at the top of the first

12 page of the exhibit, there's a sort of a cover email from Betty

13 Greif to myself, dated June 10, 2015?

14 A    I do.

15 Q    Uh-huh.  I'll represent to you that Ms. Betty Greif had

16 emailed me this March 23rd, March 24 email exchange --

17 A    Wait a minute, wait a minute.

18 Q    -- pursuant to a deposition subpoena we served on her in

19 connection with this adversary proceeding.  In preparation for

20 your deposition, had you reviewed this email exchange?  Had you

21 seen this email exchange before?

22 A    I can't recall.  I don't think I saw it before the

23 deposition.

24 Q    Okay.  You're aware that Betty Greif's deposition was

25 taken in this adversary proceeding subsequent to yours.  Are

Evans - Redirect                                    96

1  you aware of that?

2  A    No, I'm not aware -- I'm not sure.  When did she --

3  Q    Well, I'll represent that her deposition was conducted on

4  June 16, 2015, some almost three weeks subsequent to your

5  deposition of the adversary.

6          THE COURT:  I'm confused.  What is the point of that

7  representation?  It's not evidence.  You're not a sworn

8  witness.

9          MR. WOLF:  No.

10         THE COURT:  What is -- he doesn't know when she

11  testified.  What's the point of your representation?

12         MR. WOLF:  Well, tying in the sequence of events

13  here, Your Honor, as far as when the conversation with Mr.

14  Starr took place.

15         THE COURT:  His testimony is -- the sequence of

16  events means nothing if he says he doesn't know it, and he's

17  only saying that if you represent it, then counsel can --

18         MR. WOLF:  Well, then I'll just go with the date

19  that's shown here as the transmittal date of the email exchange

20  between Mr. Evans and Ms. Greif.

21  BY MR. WOLF:

22  Q    You would admit that that date of June 10th, 2015, was

23  subsequent to the conducting of your deposition in the

24  adversary proceeding, correct?

25  A    I'm not following the thread here.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Redirect                                    97

1  Q    All I'm asking for, am I correct that your deposition in

2  this adversary proceeding was taken prior to the time that

3  Betty Greif forwarded me on June 10, 2015, the email exchange

4  of March 23 to March 24, 2009?

5  A    Following Your Honor's instructions, I'm prepared to say

6  yes.

7  Q    Okay.

8  A    On these dates that you seem to have here.

9  Q    Right.  At some point subsequent to June 10, 2015, did you

10 see --

11 A    Wait a minute --

12 Q    -- this email exchange --

13 A    -- 2015 -- June the 10th, it says here.

14 Q    Yes.  Subsequent to June 10, 2015 --

15 A    Okay.

16 Q    -- did you have occasion to see this March 23 to March 24

17 email exchange between yourself and Ms. Greif?

18          MR. GANT:  Objection.  A, he's obviously seen it

19 today, so I don't know what Mr. Wolf is asking.

20          THE COURT:  No, I'll allow it.

21          THE WITNESS:  The question is --

22          THE COURT:  Go ahead.

23          THE WITNESS:  -- have I seen this since my

24 deposition?

25          THE COURT:  Yes.  That's a good enough question.

1            MR. WOLF:  Fine.

2            THE WITNESS:  Could you repeat the question?

3    BY MR. WOLF:

4    Q    Yes, that's the question.

5    A    Yes, I have.

6    Q    Okay.  When for the first time, subsequent to your

7    deposition, did you see this email exchange?

8    A    I can't recall besides now.

9    Q    Was it a month ago?

10   A    I can't remember.

11   Q    Was it in preparation for this trial?

12           MR. GANT:  Objection, Your Honor.  I'm willing to

13   allow an answer as long as there's no assertion that there's

14   going to be a waiver of attorney-client privilege --

15           MR. WOLF:  So stipulated.

16           MR. GANT:  -- and then we can take it one by one at

17   that point.  Obviously, if there's any more about the substance

18   of any preparation, I will be standing up.

19           THE COURT:  Okay.  I think that -- Mr. Evans, the

20   question was whether you saw this exhibit in preparing for the

21   trial.  You should answer that question, yes or no.

22           THE WITNESS:  I saw this exhibit before this trial

23   today.

24   BY MR. WOLF:

25   Q    I'm now going to ask you some questions about Defendants'

Evans - Redirect                                    99

1  Exhibit DX-I.

2  A    All right.

3  Q    This is your letter of August 17th, 2009, to Ken Starr.

4  Is that correct?

5  A    That's correct.

6  Q    Right.  And in this letter, you enclosed to him a proof

7  copy of your --

8  A    Memoir.

9  Q    -- memoir, My Paper Chase, that was getting ready to be

10 published.  Is that correct?

11 A    It's a proof copy.

12 Q    Uh-huh.

13 A    Not really published.

14 Q    Right.  But you mentioned in this first paragraph of the

15 letter, did you not, as to when you were anticipating it was

16 going to be available for purchase both in the United States

17 and in the U.K.  Is that correct?

18 A    Yes.

19 Q    And in conjunction with that impending publication, were

20 you anticipating receiving any advance or other form of

21 compensation from the publishing company or any other source in

22 connection with the book?

23 A    Yes.

24 Q    And when were you expecting that to happen?  Towards the

25 end of 2009?



1  A     Just a little second about publishing books, if I might.

2  The normal point is sign on delivery.  Sign on acceptance, sign

3  on delivery, you probably know this anyway.  And in March,

4  2009, correct, not 2008, in March, 2009, I had received a large

5  sum of money for delivering the manuscript.  In November, 2009,

6  I received another gratifying large sum of money on

7  publication.  This is an example, Mr. Wolf, if I might say so

8  --

9  Q     I understand.

10  A     -- of the capital flows, so that flowed to capital, and

11  was therefore available to the current account when I decided

12  to direct it there.

13  Q     Uh-huh.  So if I understand your answers correctly, you

14  were anticipating that sometime in the last quarter or so of

15  2009, you would be receiving another advance, or some other

16  source of compensation with respect to the book.  Is that

17  correct?

18  A     Yes.  And I was also hoping for royalties.  They seldom --

19  Q     Okay.  Okay.  And I note that in the second full paragraph

20  of the letter, you wrote -- one, two, three, four, fifth line

21  towards the end of that second full paragraph, you stated, "I

22  hope you would continue to oversee the taxes, but I do feel

23  uncomfortable having our taxes prepared" -- in quotes -- "'on

24  the house,' by your terrific Elaine.  It is hugely generous of

25  you, but maybe later in the year, we could come to some

Evans - Redirect                                    101

1  arrangement for remittances from me?"

2      You wrote that in your letter, correct?

3  A    Yes.

4  Q    Okay.  And did you at any time subsequent to August 17th

5  of 2009 pay -- there was any money paid on you and your wife's

6  behalf to Starr & Company for any services?

7  A    No.  May I add something?

8  Q    I'm sorry?

9  A    I would just like to add, I was still waiting for the

10  BLAMM money which he was holding on to.

11        MR. WOLF:  Your Honor, I move to strike that last

12  statement as unresponsive.

13        THE COURT:  It's stricken.

14        MR. WOLF:  Thank you.

15  BY MR. WOLF:

16  Q    You were looking at DX-M, which is in the binder

17  (indiscernible) Mr. Gant was questioning you about DX-M.

18  A    MM?

19  Q    M, like in "Mary."  That's the June 21, 2010 email from

20  Betty Greif to you that references the September 3, 2009

21  conversation.

22  A    This is the June the 22nd --

23  Q    June 21.

24  A    Oh.

25  Q    Exhibit M.



1  A    As per your request --

2  Q    Right.

3  A    -- I listened to the conversation.

4  Q    Okay.  So Ms. Greif was writing to you on June 21,

5  approximately nine and a half months subsequent to the date of

6  the September 3, 2009, conversation that she alludes to in the

7  email.

8      My question to you is, what occasioned her to write to you

9  this email on June 21, 2010, about a conversation that had

10  taken place some nine and a half months ago?

11  A    I wanted to show evidence of what happened, and

12  unfortunately, apparently she had misplaced the letter she

13  wrote -- the note she wrote.  What she sent to me was a piece

14  of typescript, which said I heard Ken Starr this morning, we

15  don't owe him anything and don't have to pay.  It's all on the

16  house.  And I wanted to get that piece of paper, which

17  unfortunately, she lost.  And she tried very hard to get it.  I

18  think in response to you she looked -- made a search for it.

19  Q    Well, why is it that she would -- was there something that

20  had occurred shortly prior to June 21, 2010, that occasioned

21  you to request of her the writing of this email?

22  A    What date?  I'm going by memory now.  I think I was aware

23  of the fact that in -- in a sense, Ken was the office -- that

24  I'd never received, to the best of my knowledge, ever received

25  anything in writing from Ken Starr.  Right?  So I wanted to

Evans - Redirect                                103

1  have evidence, documentation, that what I was saying was true,

2  which it was.  And after she had heard that conversation on

3  September the 3rd, she left me a note on my desk, a typewritten

4  note, not email.  And secondly, pinned something up -- I've

5  read her testimony, on her office board.  (Indiscernible)

6  papers, it seemed to have vanished, which is very irritating.

7  So that's the reason why I wrote to her, and said, can you

8  remember, and she replied, during that conversation, Ken Starr

9  affirmed you didn't have to pay him the monthly fees his firm

10 had billed.  Which I -- I didn't prompt her, that's what she

11 wrote.

12 Q    The typewritten note that you just referred to in your

13 answer, that's never been located, has it?

14 A    No.  Much to my regret.  I think she made a conscientious

15 search for it, because she told -- in her deposition, she said

16 she put a search engine.  Was thinking of putting "on the

17 house" and then she put "waiver," but nothing turned up,

18 apparently.

19         MR. WOLF:  If I could have one moment, Your Honor,

20 please?  I have no further questions, Your Honor.

21         THE COURT:  How much time do we have?  Should we

22 finish Mr. Evans before lunch?

23         MR. GANT:  I hope it'll be five, ten minutes at most,

24 Your Honor.

25         THE COURT:  Okay.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Recross                        104

1              MR. GANT:  And I assume --

2              THE COURT:  Are you holding up okay, Mr. Evans?  Do

3    you want to finish before we take a lunch break?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Okay.  We'll finish.

6              MR. GANT:  And my understanding is that Mr. Wolf

7    doesn't go again unless you decide to grant him permission.  Is

8    that right?  I'm just trying to gauge the time.

9              THE COURT:  That's correct.

10             MR. GANT:  It's obviously always in your discretion

11   to allow more time.

12             THE COURT:  You each only get to cover what was

13   covered in the --

14             MR. GANT:  That's --

15             THE COURT:  -- cross, recross, redirect.

16             MR. GANT:  I never know what to call it, but I

17   understand the instruction.

18             THE COURT:  All right.  Go ahead.

19             MR. GANT:  Yes, thank you.

20                         RECROSS-EXAMINATION

21   BY MR. GANT:

22   Q    If you could pull out Exhibit DX-I, which Mr. Wolf was

23   just asking you about?

24   A    DX-D, DX-E.  D --

25             MR. GANT:  May I approach and try --

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Recross                                    105

1              THE COURT:  Yes.

2              THE WITNESS:  DX-A -- wait a minute, is this --

3              MR. WOLF:  Is it at the bottom or (indiscernible) --

4              MR. GANT:  No, they fell, and I put them on the

5    outside.

6              THE WITNESS:  Sorry for the delay.

7    BY MR. GANT:

8    Q    Why don't I just take them back and hand them to you as we

9    need them?

10   A    Yes.  Sorry, Your Honor.  Thank you.  All right.

11   Q    Do you have Exhibit DX-I in front of you?

12   A    Yes.

13   Q    If you could look at the second full paragraph --

14   A    Yes.

15   Q    -- the last sentence to which Mr. Wolf directed your

16   attention.  It begins, "It is hugely generous."  Do you see

17   that?

18   A    Yes.

19   Q    You wrote to Mr. Starr, "It is hugely generous of you, but

20   maybe later in the year we could come to some arrangement for

21   remittances for me?"

22   A    Right.

23   Q    Do you see that?  Do you see that?

24   A    I see it.

25   Q    Subsequent to August 17, 2009, did you at any point enter

Evans - Recross                                   106

1   into an agreement with Mr. Starr to amend the on-the-house

2   arrangement?

3   A     No.

4           MR. WOLF:  Objection, Your Honor, to the word

5   "amend."

6           THE COURT:  I'll allow it.  I understand.

7   BY MR. GANT:

8   Q     Now, Mr. Evans, you were just testifying a few moments ago

9   in response to questions from Mr. Wolf about a note that Betty

10  Greif gave to you sometime after the September 3, 2009 call

11  with Mr. Starr.  Is that -- do you recall that testimony?

12  A     Yes.

13  Q     Is it your recollection that Ms. Greif sent you that note

14  close in time to the phone conversation?

15  A     What date again?

16  Q     The phone conversation was September 3rd, 2009.

17  A     Yes.

18  Q     The question is --

19  A     Yes.

20  Q     -- is it your recollection that Ms. Greif gave you that

21  note close in time to the call?

22  A     I'm certain the note was -- let me preface that, to the

23  best of my recollection, the very next day, it was on the left

24  of my computer, a typewritten thing from Betty, reaffirming

25  that that's one of the maddening pieces of paper which seems to

Evans - Recross                                        107

1  have slipped away.  She was always very good about being prompt

2  and efficient on these things.  Things within her own

3  (indiscernible) managing the current account, I left to her.

4  Thank you.

5  Q    I'm handing you what's been marked as Exhibit DX-L.  It

6  was a two-page letter on the letterhead of a law firm called

7  Troutman Sanders, dated June 15, 2010.  It's to the clients of

8  Starr Investment Advisers, LLC, and/or Starr & Company, LLC.

9  Do you see that?

10  A    Yes, I do.

11  Q    Have you ever seen this letter before?

12  A    I'd better read it.  Let me read it again, one minute.

13          THE COURT:  What exhibit number is this again?

14          MR. GANT:  DX-L, as in "Larry."

15          THE WITNESS:  Yes, I see it.

16  BY MR. GANT:

17  Q    Do you recall seeing this letter before?

18  A    I think yes, Dan Kesum (phonetic) I think mentioned it to

19  me.

20  Q    Okay.  You were a client of Starr & Company in or around

21  June 15, 2010.

22  A    Right.

23  Q    You had been -- strike that.

24      Starr & Company ceased operating at the end of May, 2010,

25  correct?

Evans - Recross                                    108

1  A    Right.

2  Q    At the time that Starr & Company ceased operating,

3  approximately one -- two weeks before this letter, you had been

4  a client of Starr & Company, correct?

5  A    Yes.

6  Q    Okay.  Do you have any reason to doubt that you received a

7  copy of this letter as a former client of Starr & Company?

8  A    It probably came to Dan Kesum, my accountant, but I've

9  read it now and it seems straightforward enough.

10 Q    Do you have any reason to doubt --

11 A    Huh?

12 Q    Do you have any reason to doubt that someone communicated

13 to you a copy of this letter?

14 A    Yes.  No reason to doubt, no.

15        MR. GANT:  Your Honor, I move for the admission into

16 evidence of DX-L.

17        MR. WOLF:  No objection, Your Honor.

18        THE COURT:  Okay.  L is in evidence.

19    (Defendants' Exhibit L admitted into evidence)

20 BY MR. GANT:

21 Q    If you could look at the second paragraph of the first

22 page of the letter, please?

23 A    Yes.

24 Q    If you look at the fourth line in the middle of the line,

25 there's a sentence that begins, "In order to obtain a copy of

                              Evans - Recross                        109

1  your files."  Do you see that?

2  A    Yes.

3  Q    It says:

4             "In order to obtain a copy of your files, you must

5             submit a written request to the undersigned counsel

6             either by mail or email through our website at

7             website address.  You will also be required to pay

8             any outstanding bills for services rendered by the

9             Star Companies.  A copy of your unpaid bills, if any,

10            will be enclosed with a copy of this letter, which

11            will be mailed to you or your designated

12            representative."

13       Do you see that?

14  A    Yes.

15  Q    Okay.  Is it your belief that receipt of the copy of the

16  letter marked as Exhibit DX-L was what prompted you to request

17  an email from Ms. Greif to you, set out in Exhibit DX-M?

18  A    Yes.

19            MR. WOLF:  Objection, Your Honor.  Overly leading.

20            THE COURT:  Sustained.

21  BY MR. GANT:

22  Q    Does looking at Exhibit DX-L refresh your recollection at

23  all about what prompted you to request that Ms. Greif send you

24  the email that is set out in Exhibit DX-M?

25  A    The -- my -- close to what I asked Betty Greif to respond

Evans - Recross                    110

1   to me, is that right?

2   Q    I couldn't hear your question.

3   A    No.  I'm sorry.  I remember this, and its outrageous

4   demand, and you were saying this was close to some other date?

5   Q    My question was -- I'll attempt to get it as close to

6   verbatim as possible.  Does looking at the letter --

7   A    Yes?

8   Q    -- marked DX-L --

9   A    Yes?

10  Q    -- refresh your recollection about what prompted you to

11  request an email from Ms. Greif --

12  A    Yes.

13  Q    -- that was set out in Exhibit DX-M?

14  A    Yes.  Yes.  I was alarmed, frankly.  This thing seemed to

15  me -- the whole affair was so astonishing to me, to be

16  absolutely honest.  The -- after all I'd been through, I was

17  now being asked to pre-judge the situation by paying bills that

18  were free.  So that was really -- I thought, this is getting

19  kind of highly serious, you see, which initially Dan Kesum

20  said, oh, it'll be -- it'll be -- go -- it's a mistake.  So

21  that's the reason I wrote -- one of the reasons.

22  Q    Did receipt and review of the letter marked as Exhibit DX-

23  L --

24  A    Yes?

25  Q    Strike that.



ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

                              Evans - Recross                    111

1       Was your review of the letter marked as Exhibit DX-L the

2   first time since your conversation with Mr. Starr on September

3   3, 2009, that you had any inkling that you -- someone might

4   claim that you owed money to Starr & Company?

5   A    Yes.

6   Q    Mr. Wolf asked you a number of questions about your

7   deposition testimony.

8   A    Yes?

9   Q    As it related a question of when your initial on the house

10  for shorthand conversation with Mr. Starr occurred.  Do you

11  remember those questions?

12  A    Yes.

13  Q    And he showed you some excerpts --

14  A    Yes.

15  Q    -- of your transcript where you had identified --

16  A    Yes.

17  Q    -- 2008.

18  A    Yes.

19  Q    When you were deposed, with respect to those questions and

20  all others you were asked during your deposition, did you do

21  your very best to give truthful answers?

22  A    I did, but I obviously screwed up.

23  Q    You made a mistake about the dates?

24  A    Yes.

25  Q    That's --



Evans - Recross                          112

1   A    Yes.

2   Q    Your current belief is that the initial conversation with

3   Mr. Starr was on or about March 24th, 2009?

4   A    Yes.  It was all in 2009 --

5            THE COURT:  Hold on.  The request is that we all be

6   careful not to speak at the same time.  That you wait for the

7   question to be finished before you answer.

8            THE WITNESS:  Sorry, Your Honor.

9            THE COURT:  It's all right.  Go ahead.

10           MR. GANT:  We -- would you mind hearing back the last

11  question or answer that was recorded, so I can try and pick up

12  where I --

13           THE COURT:  We have no playback.

14           MR. GANT:  Okay.  Thank you.  All right.  So I

15  apologize if I'm asking a question that I already asked or --

16           THE COURT:  Go ahead.

17  BY MR. GANT:

18  Q    Now, during your deposition testimony on May 27, 2015,

19  were you doing your best to provide truthful answers to the

20  questions?

21  A    Yes, I was, and I really concede I screwed up about 1998

22  and 1999, because all of these events were aligned in my

23  memory.  Now I'd know it in my sleep, backwards.

24  Q    You think you made a mistake by saying the initial

25  conversation with Mr. Starr was in 2008, when it was, in fact,

Evans - Recross                              113

1  in 2009?

2              MR. WOLF:  Objection, Your Honor, leading.

3              THE COURT:  Sustained.

4  BY MR. GANT:

5  Q    The reason I was following up is because you said 1998 and

6  1999.  I just want to make sure the testimony is clear.

7  Sitting here today, what is your best understanding of the

8  approximate date on which the initial conversation with

9  Mr. Starr occurred in which you testify he used the term "on

10  the house"?

11  A    March the 24th, 2009.

12  Q    That's your best approximation?

13  A    To the best of my ability and knowledge, that's the date

14  on which I had the initial call "on the house" with Ken Starr.

15  2009.

16  Q    If you could look at Exhibit PX-40 that Mr. Wolf asked you

17  about?

18  A    Yes.

19  Q    It's in the notebook.

20  A    Okay.

21  Q    PX-40.

22  A    DX-A.  DX-D.  Is it -- does it go alphabetically, then

23  numerically?  I mean, DX-D.

24  Q    PX-40.

25  A    Okay.  I'd better find the 40s, then.



Evans - Recross                              114

1          THE COURT:  Just find it for him, please.

2          MR. GANT:  Sure.

3          THE COURT:  Yeah, thanks.

4          THE WITNESS:  I can't find it.

5   BY MR. GANT:

6   Q    No, that's because they put them away.  If you'll allow

7   me?

8   A    Oh.

9          MR. GANT:  Do we have another copy?

10         MR. SKIFF:  Here you are.

11         MR. GANT:  Would you mind --

12         MR. SKIFF:  Sure.

13         THE COURT:  Thank you, Mr. Skiff.

14         MR. GANT:  I'm almost at the end, Your Honor, I

15  appreciate your patience.

16         THE WITNESS:  All right.  I've got DX-40 [sic] in

17  front of me.

18  BY MR. GANT:

19  Q    Okay.  Now, Mr. Wolf represented to you, and it's my

20  understanding as well, that you were not shown a copy of what's

21  marked as PX-40 during your deposition.

22  A    Right.

23  Q    Now I think you testified since your deposition, but

24  before taking the stand today, you had occasion to see the

25  email exchange set out in PX-40.  Is that right?

Evans - Recross                    115

1  A    Yes, I did.

2  Q    Since your deposition, have you seen documents that have

3  led you to the conclusion that the initial conversation between

4  Mr. Starr and yourself occurred in approximately late March,

5  2009?

6  A    I do.

7  Q    And is PX-40 one of the documents that you have, since

8  your deposition, reviewed that has led you to that conclusion?

9  A    Yes.  Yes.

10 Q    Could you turn to your deposition transcript?  Do you

11 still have that in front of you?

12 A    I don't.  I can (indiscernible) remember it.  Right.

13 Okay, thank you.

14 Q    I've handed you your deposition transcript, and pointed to

15 page 92, which is --

16 A    At 92, I've got 92.

17 Q    Okay.  Mr. Wolf asked you, beginning on line 3, "This

18 conversation that you related now, when did that conversation

19 take place"?

20 A    Yes.

21 Q    And you said, "In 2008.

22     "Do you recall what month?" is the next question.

23     Your answer, "I think it was sometime towards the end of

24 2008."

25 A    Right.



Evans - Recross                          116

1  Q    Sitting here today, is it your testimony that you were off

2  by approximately three months in terms of the date of the

3  conversation?

4  A    Yes.  Yes, it -- everything was allied [sic] in 2008,

5  2009.

6  Q    Okay.  And when testifying today about your best

7  approximation of the date of the initial conversation with

8  Mr. Starr, is your testimony that it occurred in late March,

9  truthfully?

10          MR. WOLF:  I'm sorry, late --

11          THE WITNESS:  March -- no, March the 24th --

12          MR. WOLF:  I didn't --

13          THE COURT:  I think that's about the 50th time he

14  will confirm that that's his current recollection.

15          MR. GANT:  Okay.  I mean, there was obviously --

16          THE COURT:  I don't really need it.

17          MR. GANT:  -- a lot of time spent trying to impugn

18  his credibility, and I'm --

19          THE COURT:  I understand, but --

20          MR. GANT:  I'm --

21          THE COURT:  -- I think the point's been made.

22          MR. GANT:  Okay.

23          THE COURT:  He's said innumerable times that he made

24  a mistake then, but his best recollection today is that it was

25  March 24th, 2009.

1    MR. GANT:  And with that, Your Honor, I have no

2  further questions.

3           THE COURT:  Okay.

4           MR. GANT:  Thank you, Mr. Evans.

5           THE COURT:  Anything further?

6           MR. WOLF:  Very quickly, Your Honor.

7                FURTHER REDIRECT EXAMINATION

8  BY MR. WOLF:

9  Q    Mr. Evans, if in fact this conversation with Mr. Starr

10 took place on March 24, 2009, the same date as your emails with

11 Betty Greif, which included an instruction to her to pay him

12 the three months worth of invoices that were then outstanding,

13 why were you authorizing Betty Greif to make those payments if

14 you had the conversation that you say you did with Mr. Starr on

15 the same day?

16 A    I gave her the authorization before I called Ken Starr.

17 Q    Before?

18 A    Yes.

19 Q    Well, then what time was the call to Mr. Starr on March

20 24?

21 A    March the 24th, 2009, was when I called Ken Starr.

22 Q    Yeah, but so were the dates of these emails --

23 A    When were the dates of the emails?

24 Q    -- to Ms. Greif when you told her to pay the three

25 outstanding invoices.

Evans - Further Redirect                              118

1   A      Uh-huh.

2   Q      What time of March 24th, 2009, did you have this supposed

3   conversation with Mr. Starr?

4   A      After I told her to pay his bills.

5   Q      After you talked -- so did you issue, if you had the

6   conversation with Mr. Starr on March 24, 2009, did you email

7   Betty Greif a retraction and say don't pay the bills?

8   A      No, no, no, no, no.  I wanted to get rid of these things.

9   I did not --

10  Q      But he told you the services were on the house.

11  A      Forgive me.  I'm sorry.  My counsel's on his feet.

12          MR. GANT:  I'll see what the next question is, but I

13  -- well -- go ahead.  I --

14          MR. WOLF:  Didn't he --

15          THE COURT:  Do you have an objection, or --

16          MR. GANT:  No.  I'll wait, Your Honor.

17  BY MR. WOLF:

18  Q      He told you, you claim, on March 24, the same day that you

19  wrote these emails, that the services were all on the house.

20  So why wouldn't you then retract what you had said to Betty

21  about paying the three outstanding bills?

22  A      My conviction and belief was that I was then absolutely

23  current with Ken Starr, so his on the house -- when he's

24  talking about the on the house, he's talking about the next few

25  years of our relationship, when I had relieved him of the

Evans - Further Redirect                    119

1  investment thing, and he said -- when he said, don't leave us,

2  we can look after everything on the house.  Right?  That was

3  the conversation.  A very important conversation, March the

4  24th.  I call him up, right?  And we have that conversation,

5  which had relayed that information.

6  Q    But isn't it a fact -- you've seen documents, and I

7  believe you testified earlier, that there was a payment of one

8  of the three outstanding invoices made by Betty Greif on your

9  and your wife's behalf to Starr & Company on March 27, 2009,

10 right?

11 A    Yes.

12 Q    So she made a payment of one of the outstanding invoices

13 three days subsequent to the date that you now claim Mr. Starr

14 told you that the services were on the house.  Isn't that

15 right?

16 A    No.

17         THE COURT:  Mr. Wolf, he just told you that his

18 understanding of on the house was going forward from and after

19 March 24th.

20         MR. WOLF:  That's the first time we've heard that,

21 Your Honor, and I have some questions.

22         THE COURT:  He just said it, so I'm not sure why

23 you're questioning the fact that Ms. Greif paid the invoice for

24 the December, 2008 services.

25         MR. WOLF:  Well, if I may then pursue that line, Your

Evans - Further Redirect                    120

1  Honor.

2  BY MR. WOLF:

3  Q    Did Mr. Starr say in the conversation you have to pay the

4  invoices that are still outstanding, but the future invoices

5  you don't have to pay?

6  A    No.  No.

7  Q    Did he make the distinction -- yeah, that was it.  Did he

8  make the distinction as to what the dividing line or date was

9  as far as services that were to be rendered for free?

10 A    No, he did not.  I'd already instructed Betty to pay in

11 that email.  It says at the bottom, please pay him.  So I was

12 in the clear.  I'm now talking about a future relationship.  I

13 was normally in the clear.  I did not know we were three months

14 in arrears until Betty came to see me.  She always got the --

15 these invoices.  Okay?

16 Q    Okay.  So if that was the case, when Mr. Starr told you

17 that it was just the future services, why didn't you instruct

18 Betty, once you found out that there were still two months of

19 arrearages, to go ahead and pay those?

20 A    I'd already done that.

21      MR. GANT:  I'm sorry, Your Honor, objection, outside

22 the scope.

23      MR. WOLF:  But in fact, that never happened, did it?

24      THE COURT:  That's overruled, go ahead and continue.

25 BY MR. WOLF:

ACCESS TRANSCRIPTS, LLC  1-855-USE-ACCESS (873-2223)

Evans - Further Redirect                    121

1  Q     In fact, those two other outstanding invoices never got

2  paid, correct?

3  A     That was news to me.  In my email to her, I said please

4  pay him.

5  Q     I'm sorry, Mister --

6        MR. WOLF:  Your Honor.  Could the witness be directed

7  to answer my question?

8        THE COURT:  He is answering your question, and I

9  think you're interrupting him too much, so bring it back.

10        MR. WOLF:  Okay.

11        THE COURT:  Go ahead Mr. Evans.

12        THE WITNESS:  I said in my email to her, please pay

13  him.  I said it.  It was $18,000, please pay him.

14  BY MR. WOLF:

15  Q     All right.  Okay.  And once you ascertained that Betty

16  Greif had not paid the other two of the then outstanding

17  invoices, did you instruct her further to pay them?

18  A     I did not know she had not paid those two other invoices.

19  She was a very efficient woman.  When I said to her, please pay

20  him, I believed she would act expeditiously on it.

21  Q     Had you found out that she hadn't paid those two invoices,

22  would you have instructed her to do so?

23  A     After we'd had the March conversation, only so we got to

24  keep the connection, everything's on the house, I would have

25  called him up again and say, I now understand Betty's not paid

1  you for those two.  I would have called him up again and said,

2  I understand you have not been paid, I've just been -- if I had

3  just discovered that Betty had not followed my instructions

4  with the $18,000 -- I'd no reason to think why she shouldn't,

5  because she did everything so well.

6      If you're asking me the hypothetical question, if I'd

7  known when I spoke to Ken Starr that she had not paid, right,

8  my inclination would have been to ring him up and say, by the

9  way, there's two outstanding invoices, I understand, I'll pay

10 those.  Because we had our conversation on March the -- I'm not

11 trying to save cents here, I'm trying to establish the

12 principle.  We had a clear agreement.  March the 24th, 2009.

13 It's on the house.  That's what we had.  And soon -- seven

14 years, eight years, I've never wavered in that conviction,

15 because it was the truth.

16          MR. WOLF:  No further questions, Your Honor.  Thank

17 you.

18          MR. GANT:  May I have 60 seconds, Your Honor?

19               FURTHER RECROSS-EXAMINATION

20 BY MR. GANT:

21 Q   After Starr & Company went under, when Mr. Starr was

22 arrested, did anyone from Starr & Company -- strike that.

23     After your initial conversation with Mr. Starr in March,

24 2009, did anyone on behalf of Starr & Company, Mr. Starr or

25 anyone else, come to you and say that you were overdue in

Evans - Court Examination                    123

1 paying invoices for services provided in January, 2009 and

2 February, 2009?

3 A    No.

4 Q    Thank you, Mr. Evans.

5         THE COURT:  That's it?  All right.

6                     EXAMINATION

7 BY THE COURT:

8 Q    Mr. Evans, just a few things I want to be sure about.  The

9 invoices that have been marked include out-of-pocket expenses

10 that the Starr Firm incurred for messenger services and things

11 like that.  Did you have any conversation with Mr. Starr as to

12 whether you would pay the out of pocket expenses?

13 A    No, Your Honor.

14 Q    No conversation one way or the other?

15 A    No.

16 Q    So he didn't say, I'll forgive them, and you didn't say

17 you'll pay them?  It just didn't come up?

18 A    I had no conversations with him about any of the details.

19 Q    Okay.  After September of 2009, the conversation that you

20 asked Betty Greif to listen to, did she ever tell you after

21 that that she continued to receive invoices from Starr &

22 Company?

23 A    To the best of my recollection, no.

24 Q    Okay.  All right.  Now, when you sent the letter to Mr.

25 Starr that's marked as Exhibit I in which you said you were

Evans - Court Examination                    124

1  uncomfortable having the taxes prepared on the house, that

2  maybe later in the year you could come to some arrangement for

3  remittances, did you expect at that time that you would work

4  out an arrangement with Mr. Starr to make some kind of payment?

5  A    At -- my mood at that moment was that I would never want

6  to go back to Ken Starr for investments.

7  Q    I understand that.

8  A    Because -- and you understand that.  And I'm

9  (indiscernible).  So far as future ratings, I wouldn't have

10 minded -- when I was moving to the other financial advisers,

11 they may or may not have been unsatisfactory, I would never

12 have gone back to Mr. Starr for investment advice, never.

13     But I would have been quite happy to come to a new

14 arrangement, once we'd cleared things up, to employ Elaine

15 Locke, who I liked a lot.

16 Q    Right.  And when you sent the letter that you reviewed as

17 Exhibit I, Defendants' Exhibit I, in August of 2009, in which

18 you said, "perhaps at the end of the year we could come to some

19 arrangement," did you expect at that time that you would have

20 some further discussion with Mr. Starr, and reach some

21 arrangement as to what you would pay for the tax services that

22 it would provide?

23 A    Yes.  That was tax.  That was it.  He'd offered to do it

24 on the house.  I felt uncomfortable about this, and my wife had

25 started a new venture.  And he'd been very generous about that

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Evans - Court Examination                    125

1  thing, even though I was annoyed with him.  But I would have

2  been quite prepared to make a new arrangement for the tax

3  services to be supplied through Starr & Company.  There were --

4  at the moment, they were on the house.  But I was uneasy about

5  this on the house business.

6  Q    Well, when you had the subsequent call in September of

7  2009, did your comments about making a different arrangement to

8  pay for the taxes, was that discussed?

9  A    Discussed with whom, Your Honor?

10 Q    With Mr. Starr in September of 2009.

11 A    No.  No.  Never had any further discussions with Mr. Starr

12 about taxes or anything else.

13 Q    Ms. Greif, when she testified yesterday, said that in the

14 September call that she overheard, Mr. Starr made the comment

15 that, we had already worked -- we've always worked this out in

16 the past, we'll be able to work this out.  Do you recall him

17 making such a comment?

18 A    I do recall Betty saying that.

19 Q    And do you recall from your own recollection whether Mr.

20 Starr made such a comment in the conversation?

21 A    Your Honor, I do not recall it, and for me, this was a

22 matter of life and death.  And I recall it more crisply, I

23 think I'm entitled to say, than Betty can recall it.  Working

24 thing out, maybe to come to some other arrangement, but my

25 conversation with him in March, my conversation with Betty on

Evans - Court Examination                    126

1  the phone on September the 3rd, working things out was not a

2  phrase.   The phrases in my mind are clear.   That's not one of

3  the phrases.

4  Q    Okay.   The -- in August, in your letter, you suggest a

5  willingness to pay something for the tax services.

6  A    I --

7  Q    Did you change your mind by September?

8  A    Your Honor, yes.   I was changing my mind because I was

9  getting exasperated.   I have mentioned this before about BLAMM,

10  and the fact that I was due more than $100,000.   I would ring

11  up Pat Wright week after week, oh, Ron Starr's here; oh, Ken's

12  not here, nobody's here.   This was getting to a point -- so as

13  the months went by after my letter of -- as the months went by.

14  Q    You have to move just slightly away from the microphone.

15  A    Just then -- sorry.

16        MR. GANT:   May I adjust it?

17  BY THE COURT:

18  Q    Yeah.   No, that's all right.   I apologize for

19  interrupting.

20  A    I'm sorry.   And --

21  Q    That's good.

22  A    -- I complained that I didn't -- the same.   Okay.

23  Q    So you were exasperated over the BLAMM situation.

24  A    Yes.

25  Q    Please continue.

Evans - Court Examination                127

1   A    I don't like free services.

2   Q    Free services.

3   A    I know now why he'd been so generous.  But I thought -- at

4   the stage I wrote that letter in August, when it looked to me

5   as though this thing was going to get out of hand, I was going

6   to be pursued for money which had been agreed not to be paid.

7   All right.  I was getting increasingly worried about anything

8   to do with Ken Starr and his company, because of the way they

9   were behaving, including the (indiscernible) Ms. Wright, who

10  probably didn't know why they were not paying me the 100,000

11  plus that was due.  We never got it.  I'd ring up.  Pat, have

12  you spoken to Ken?  No, he's away.  What about -- oh, Ron

13  Starr's not in.  Oh, so and so's out.  Oh, so and so's out.  So

14  I became very disenchanted to the extreme of having anything to

15  do with Starr throughout the months of 2009, and felt kind of

16  vindicated when he was arrested in May, 2010.

17       So would I have gone back later?  If I -- would I have

18  gone back in December, 2009?  The answer is no.  When I wrote

19  the letter in August, there was a possibility, but as the

20  months went by, and I get this run around on my money, our

21  money -- the only reason I got to know how much money was in

22  there, was I rang up Blackstone, and by -- I got through to

23  Steve Schwartz and I said, what's happened to this residue of

24  my investment with you.  He said, we sent it to Ken Starr and

25  company.  That's the first time I'd heard the figure.  So I was

128

1  now dealing, in my view, if you don't mind, Your Honor, with a

2  pirate outfit.  Of whom there were very good people in it, like

3  Elaine Locke and Pat Wright.

4      And so my idea that I might go back to them, which I'd had

5  in August, because I'd felt sorry for Elaine Locke if she was

6  going to be doing all this work, I wouldn't have touched them

7  with a barge pole by December, 2009, because of this runaround.

8  It was so -- I can't get over the exasperation we've had.  And

9  this is of course the reason why he was so kind to me, because

10 he did not want to lose us -- me as a client, because of all

11 the friends I had who were connected.

12     And I never did say anything hostile to Ken Starr during

13 that period.  I was getting increasingly mad about the BLAMM

14 money.

15 Q    Thanks.

16 A    Thank you.

17     (Witness excused)

18         THE COURT:  All right.  We have a late lunch.  And I

19 take it that Ms. Brown -- is there still the attempt to call

20 Ms. Brown?

21         MR. WOLF:  Yes, we do, Your Honor.  I don't

22 anticipate we're going to be very long with her.

23         THE COURT:  Good.  Okay.  Let's resume at three,

24 then.

25         MR. WOLF:  Thank you, Your Honor.

ACCESS TRANSCRIPTS, LLC           1-855-USE-ACCESS (873-2223)

Brown - Direct                    129

1          THE COURT:  Thanks.

2       (Recess taken at 1:50 p.m.)

3       (Proceedings resume at 3:05 p.m.)

4          THE COURT:  Please be seated.  All right.  Are we

5   ready to resume?

6          MR. GANT:  Yes, Your Honor.

7          MR. SKIFF:  Yes, Your Honor.  Your Honor, the Trustee

8   calls defendant Tina Brown to the witness stand.

9          THE CLERK:  And (indiscernible) please raise your

10  right hand.

11              TINA BROWN, PLAINTIFF'S WITNESS, SWORN

12                     DIRECT EXAMINATION

13  BY MR. SKIFF:

14  Q    Good afternoon, Ms. Brown.

15  A    Afternoon.

16  Q    You're married to Harold Evans.  Is that correct?

17  A    Correct.

18  Q    And what do you do for a living?

19  A    I'm an editor and the CEO of Tina Brown Live Media.

20  Q    Okay.  And it's correct that you've also authored a few

21  books, right?

22  A    I have.

23  Q    Okay.  Ms. Brown, are you familiar with an individual

24  named Betty Greif?

25  A    I am.

Brown - Direct                        130

1  Q    And who is she?

2  A    She was the assistant who worked in our home accomplishing

3  administrative tasks for a period.

4  Q    Okay.  And she prepared check payments to vendors.  Is

5  that correct?

6  A    She did.

7  Q    And she maintained financial records for your husband and

8  yourself?

9  A    Yes.

10 Q    And she did a very accurate job in that regard?

11 A    Yes, she was -- performed those duties for us, yeah.

12 Q    And with respect to bill paying, Betty was the one who

13 would open up and review your and your husband's bills when

14 they first arrived at your home.  Is that correct?

15 A    Correct.

16 Q    And then she would prepare checks for payment of those

17 bills and put them in a folder for you and your husband to

18 review?

19 A    Yes.

20 Q    And you're aware that Starr & Company, LLC, which I'll

21 refer to as "Starr & Company," prepared regular bills that were

22 sent to you and your husband?

23        MR. GANT:  Objection; foundation and compound, he

24 just asked if --

25        THE COURT:  Sustained.

 1              MR. GANT:  Thank you.

 2    BY MR. SKIFF:

 3    Q    Ms. Brown, are you aware of whether Starr & Company

 4    prepared regular bills?

 5              MR. GANT:  Objection; vague and foundation.  The

 6    question is about whether Starr & Company prepared bills.

 7    BY MR. SKIFF:

 8    Q    Ms. Brown, are you aware --

 9              THE COURT:  Sustained.

10              MR. SKIFF:  Oh, I'm sorry, Your Honor.

11              THE COURT:  Did you -- Ms. Brown, did you -- to your

12    knowledge, did Starr & Company ever send any bills directly to

13    you and your husband?

14              THE WITNESS:  What I would be shown, asked to sign,

15    would be the tax every year, the tax forms.  But I did not see

16    his bills to sign because they were not -- we had two different

17    folders, my husband's folder and my folder.

18    BY MR. SKIFF:

19    Q    Ms. Brown, do you remember taking a deposition in this

20    case?

21    A    Yes.

22    Q    Ms. Brown, I've just handed you a copy of your deposition

23    that was taken in this case, and it says that it's dated May

24    27th.  Is that -- do you have a recollection that that's when

25    your deposition was taken?

Brown - Direct                    132

1   A    I do.

2   Q    And you were sworn under oath during that deposition?  Did

3   you swear to tell the truth?

4   A    I'm must -- I don't remember.

5   Q    If you could turn to page 5 of the deposition.  It's

6   actually on the second page and then at the top of the first

7   box there's -- in the upper right-hand corner, it says "page

8   5."  Do you see that?

9   A    Page 5, upper right-hand box.  This is page 19.  Okay,

10  yes, uh-huh.  Thank you.

11  Q    So do you see where it says "page 5"?

12  A    Yes.

13  Q    And do you see line 1, it says, "Tina Brown called as a

14  witness, having been duly sworn by a notary public, was

15  examined and testified as follows"?  Do you see that?

16  A    Yes, I do.

17  Q    Does that refresh your recollection as to whether or not

18  you sworn to tell the truth during --

19  A    Yes.

20  Q    -- your deposition?

21  A    Yes.  Thank you.

22  Q    Okay.  If you could now turn, please, to page number 46 of

23  your deposition.

24  A    46, yes.

25  Q    Would you go down to line 20?  I believe my colleague

Brown - Direct                                    133

1  asked you the following question and you gave the following

2  answer:  He asked --

3          MR. GANT:  Your Honor, I'm sorry, I object.  And

4  maybe I misremember or misunderstood your prior rulings.  I

5  thought your prior rulings were that deposition testimony could

6  not be read into the record unless the transcript was in

7  evidence or for purposes of an impeachment and maybe some other

8  limited exceptions.  But for purposes of --

9          MR. SKIFF:  This is for purposes of impeachment.

10          THE COURT:  That's where I thought he was going.

11          MR. GANT:  Okay.  I didn't hear a question about

12  which there would be impeachment, but --

13          MR. SKIFF:  She said she didn't receive invoices.

14          MR. GANT:  Okay.  Thank you.  That was several

15  questions ago.  Now, I understand.  Thank you.

16  BY MR. SKIFF:

17  Q    So the question says, "Do you recall whether or not there

18  was a set up monthly amount he bills" -- "he" referring to Ken

19  Starr -- "you for doing" --" you for during any period of time

20  for services rendered by Starr & Company?"

21          And you --

22  A    I'm sorry, can you just show me where that is here,

23  please, sir?

24  Q    Sure.  It's right here, line number 20.

25  A    Okay.  Thank you.

1  Q    And then you responded, on line number 25, you say, "I

2  know that Ken Starr billed us on a regular basis."

3  A    Uh-huh.

4  Q    "Whether that was monthly or quarterly, I don't know."

5        MR. GANT:  Your Honor, I object to -- if that was

6  supposed to be the impeachment of the testimony about not

7  seeing the invoices, I respectfully submit one has nothing to

8  do with the other and, therefore, the reading of the testimony

9  was improper and should be stricken -- struck.

10        MR. SKIFF:  Your Honor, my original question to the

11  witness was whether she was aware whether -- if she was aware

12  that Starr & Company bills her on a regular basis.

13        MR. GANT:  I believe the question was -- and I

14  apologize if I misremember it -- whether she had seen invoices.

15        MR. SKIFF:  That was the latter question that Your

16  Honor posed to the witness.

17        MR. GANT:  I thought your questions were objected to

18  and the objections were sustained, so --

19        THE COURT:  Okay.  But I don't particularly see much

20  inconsistency between that prior testimony and what she said

21  here so far, but I don't -- also don't know why we're lingering

22  on it since Ms. Greif testified that she was a hundred percent

23  certain that she received the invoices, so.

24        MR. SKIFF:  Okay.  I'll leave it.

25        MR. WOLF:  I'm sorry, Your Honor.  I couldn't hear

Brown - Direct                          135

1  Your Honor's last sentence.

2           THE COURT:  Ms. Greif testified that she was 100

3  percent certain that she, Ms. Greif, received the invoices.  So

4  I'm not sure why we're lingering on the issue of whether this

5  witness knows or doesn't how often the witnesses were -- the

6  invoices were received.

7           MR. SKIFF:  I think it will become apparent in a

8  moment, Your Honor,

9           THE COURT:  Okay.

10 BY MR. SKIFF:

11 Q    Ms. Brown, I -- you have in front of you what's been

12 marked and admitted into evidence as PX Number 40.  It's a

13 chain of emails between your husband and Ms. Greif.  I'd like

14 to draw your attention down to the bottom email on page 1, and

15 it says -- it's a message on March 24th, 2009, at 10:24 a.m.

16 from Betty Greif at gmail.com.  Do you see that?

17 A    Uh-huh.

18 Q    And it starts -- it says, "Harry," and it goes on to the

19 next page, and it says, "I owe Starr three months of fees and

20 $2,000 from the contract he brokered."  Do you see that?

21 A    Yes, I do.

22 Q    What contract was Betty referring to in that email?

23 A    I can't recall.

24 Q    Okay.

25           (Counsel confer)

1        THE WITNESS:  Could I get my reading glasses if we're

2   going to do this, Counsel?  I left them in my bag.

3        THE COURT:  Sure.

4        THE WITNESS:  Thank you.

5        THE COURT:  Absolutely.

6        MR. GANT:  We'll bring you your bag.

7        THE WITNESS:  Thank you.

8        THE COURT:  All right.

9        THE WITNESS:  Thank you.

10        THE COURT:  Ms. Brown, the way that our record is

11   made here is by tape recording and I just need to ask you to be

12   a little closer to the microphone.

13        THE WITNESS:  Okay.  Like that, all right.  Yes,

14   okay, thank you.  Sorry, what am I supposed to be looking at

15   here?

16   BY MR. SKIFF:

17   Q    Okay.  Ms. Brown, you have in front of you what's been

18   admitted into --

19        (Counsel confer)

20   Q    You have -- Ms. Brown, you have in front of you what's

21   been admitted into evidence as DX D.

22   A    Uh-huh.

23   Q    If you look at the top line of this exhibit -- well, first

24   of all, do you know what this document is?

25   A    I have not seen this document before.

Brown - Direct                                          137

1  Q    Well, your husband testified earlier that this document

2  reflects payments made by your husband and you to Starr &

3  Company, and specifically, the first line evidences a check

4  that was made from you and your husband to Starr & Company in

5  the amount of $6,282.30.  Do you see that?

6  A    I do.

7  Q    First line?

8           MR. GANT:  Your Honor, we object to the

9  characterization of -- the attempt to describe, it sounds like

10 verbatim, what another witness testified about.  If there's --

11 unfortunately, we don't have a transcript.  I wouldn't have an

12 issue if he was actually reading from a transcript.  But

13 otherwise, what he is doing is characterizing and I would

14 respectfully submit that's not proper.

15          THE COURT:  What is the point of telling this witness

16 what the prior witness said?

17          MR. SKIFF:  I just am trying to establish through

18 this witness what she's looking at.  I just want her to

19 understand what this document is.  But I'm happy to just go

20 right to the point if that will help things.

21          THE COURT:  Well, her testimony is only useful to me

22 if she knows what the document is.

23          MR. SKIFF:  Well, I'm hope -- well, that's what I was

24 trying to give her some insight as to what this document is.  I

25 didn't think there was a dispute as to what --

Brown - Direct                    138

1          THE COURT:  That's just you telling her what to

2    think, you know.  I mean, it's only useful to me -- if there's

3    something you want to ask her about an item, that's fine.  If

4    you want to elicit testimony about the document, telling her

5    what to say doesn't -- isn't very persuasive.

6          MR. SKIFF:  I don't want her to talk about the

7    document.  I just want to ask her a question about a specific

8    line item in this document.

9          THE COURT:  Okay.  You can try.

10         MR. SKIFF:  Okay.

11         THE COURT:  Go ahead.

12   BY MR. SKIFF:

13   Q    Ms. Brown, do you see the first line of this document --

14   A    I do, yeah.

15   Q    -- that says "check," under the column "date" it says

16   "3/27/2009," under the column "number," it says "6846", and

17   then if you go over, under the column "memo," it says "fee

18   December, 2008 & $1,000 IACI contract."  Do you see that?

19   A    I do.

20   Q    That portion of the memo that says "IACI contract," does

21   that refresh your recollection as to what the contract is that

22   Betty was referring to in the email that I just showed you

23   earlier?

24   A    It must have been referring to the contract that I had

25   with IAC when I was working there.

Brown - Direct                                    139

1  Q    Okay.  And were you paying a monthly fee to Starr &

2  Company for $1,000 as a result of that contract?

3          MR. GANT:  Objection; vague as to time.

4  BY MR. SKIFF:

5  Q    Ms. Brown, if you look down further --

6          THE COURT:  You withdraw the prior question?

7          MR. SKIFF:  What's that?

8          THE COURT:  You withdraw the prior question?

9          MR. SKIFF:  I'll withdraw it.

10          THE COURT:  Okay.

11  BY MR. SKIFF:

12  Q    Ms. Brown, if you look down to the -- under the column

13  date, all the way down to where it says May 2009 [sic], 2008.

14  A    May -- yes.

15  Q    And then if you scroll over to the right, it's -- it has a

16  similar memo as you saw above.  It says "fee April 2008 &

17  $1,000 IACI contracts."  Do you see that?

18  A    Yes.

19  Q    Can you flip to the second page of this document?  Do you

20  see anywhere in any of the memos that same notation, IACI

21  contract?

22  A    No.

23  Q    Can you flip to the third page?  Do you see anywhere in

24  any of the memos on the third page reference to the IACI

25  contract?

Brown - Direct                          140

1   A    No.

2   Q    How about the fourth page?

3   A    No.

4   Q    How about the fifth page?

5   A    No.

6   Q    How about the sixth page?

7   A    No.

8   Q    And lastly, how about the seventh page?

9   A    No.

10  Q    Okay.  So turning back to the first page, is it true that

11  during the period of May, 2009 -- I mean, I'm sorry, May 09,

12  2008 through March of 2009, you paid Starr & Company $1,000 for

13  work he -- work his company did, he or his company did with

14  respect to the IACI contract?

15        MR. GANT:  Objection; foundation and compound.  If --

16  I'm happy to elaborate, Your Honor.

17        THE COURT:  No, that's all right.  Overruled.  Go

18  ahead.

19        THE WITNESS:  Yes.

20        MR. SKIFF:  Thank you.

21  BY MR. SKIFF:

22  Q    And could I just ask, Ms. Brown, what was the IACI

23  contract?

24  A    I began working at IAC editing The Daily Beast and I began

25  at that time.  And Ken Starr negotiated aspects of that

Brown - Direct                               141

1  contract for me.

2  Q    And this was the fee that you paid him?

3  A    Yes.  I was not aware it was being paid monthly at the

4  time, but, you know, there it is, so.

5  Q    Okay.  Ms. Brown, I've placed in front of you what's been

6  admitted into evidence as PX-44.  And this looks like -- do you

7  see at the top where it says "Greg Skiff"?  All the way at the

8  top of the page.

9  A    Greg Skiff, yeah.

10 Q    I'll just represent to you that that's me having printed

11 out this email, but we received this email, as you can see,

12 from Betty Greif on Wednesday, June two thousand -- June 10th,

13 2015 and it was sent to Bob Wolf.  Do you see that at the top?

14 A    Yes.

15 Q    And then underneath that, what she was doing was she --

16 looks like she was forwarding a message from

17 tbofficeny@aol.com.

18 A    Uh-huh.

19 Q    Do you see that?

20 A    I do.

21 Q    Is that your email address?

22 A    It was, yes, at that time.

23 Q    And so was this an email from you to Ms. Greif on

24 September 2nd, 2009, at 6:26 p.m.?

25 A    It looks like it, yes.

Brown - Direct                              142

1  Q    Okay.  And it says -- the message says, "Betty, the note

2  or call - if not made yet - say you are puzzled to be getting

3  invoices because in a conversation a few 'momths' ago, Mr.

4  Starr told Sir Harold he was waiving charges."

5  A    Uh-huh.

6  Q    Do you see that?

7  A    I do.

8  Q    I want to bring your attention to the word "momths".  Do

9  you see that?

10 A    Yes.

11 Q    It said -- it's spelled M-O-M-T-H-S.

12 A    Yes.

13 Q    That's a typographical error, right?

14 A    Uh-huh.

15 Q    You meant to say "months"?

16 A    Yes.

17 Q    Okay.  Is it fair to say that maybe you made that error

18 because the M key on a keyboard is right next to the N key?

19 A    Well, I'm a bad typist anyway.

20 Q    I'm sorry?

21 A    I said I'm a pretty bad typist.

22 Q    Okay.  Ms. Brown, do you see where it says -- at the

23 beginning of the statement, it says "the note or call - if not

24 made yet."  Do you see that part?

25 A    I do.

Brown - Direct                                    143

1  Q    The part that says "if not made yet," you were referring

2  to the note.  Is that right?

3  A    Not sure what that means actually.

4  Q    Well, in the next part of the sentence, you say you are

5  puzzled to be getting invoices.

6  A    Uh-huh.

7  Q    So when you say if "not made yet," aren't you asking Betty

8  about the note she's supposed to make?

9  A    I really can't remember the context of what this must have

10 been.  She must have asked me something.  I'm not sure what it

11 means actually.

12 Q    I think your husband testified earlier that Betty was to

13 listen in on the call that was to be made to Ken Starr, and

14 then she was supposed to memorialize that conversation in a

15 note.  Are you aware of that task that was assigned to Betty?

16          MR. GANT:  I object to the part of the question that

17 offers a characterization of testimony or purported testimony.

18          MR. SKIFF:  Okay.  I'll -- I can rephrase, Your

19 Honor.

20          THE COURT:  Please.

21 BY MR. SKIFF:

22 Q    Ms. Brown, are you aware of whether your husband asked Ms.

23 Greif to listen in on a call with Ben [sic] Starr?

24 A    I can't recall at the time.

25 Q    You can't recall now or your couldn't recall at the time?

Brown - Direct                    144

1   A    I can't recall whether I knew at the time.

2   Q    Okay.  Sitting here today, are you aware of whether Ms.

3   Greif did, in fact, sit in on a call with Ken Starr?

4   A    I am aware of it today, correct.

5   Q    Okay.  And do you know when that call happened?

6   A    It was in March of 2009, sometime during March, late in

7   March.

8   Q    That Betty Greif -- your testimony is that in March of

9   2009, Betty Greif listened in on a call between your husband

10  and Ken Starr.  Is that right?

11  A    As I recall.

12  Q    Okay.  Ms. Brown, isn't the "or" in the "note or call,"

13  that part of the sentence, isn't that or -- should that really

14  be an "of"?  Did you maybe have a slip of the fingers there as

15  well?

16  A    You know, I really don't remember writing this note, so,

17  you know, I'm -- I just don't know what the context of it is.

18  Q    Well, let me just ask you, why are you asking Betty to say

19  that she's puzzled to be getting invoices?

20  A    Because I was puzzled.  I assume she's puzzled, too.

21  Q    Well, if she felt like -- if she was puzzled, why would

22  you have to tell her to say that she's puzzled?

23  A    Well, she obviously asked me something, so I'm not sure

24  because I don't know what she asked me.

25  Q    Was there an email to you prior to this email?

Brown - Direct                                   145

1  A    I don't recall.

2  Q    Do you recall ever seeing such an email?

3  A    I don't recall it; no, I do not.

4  Q    Ms. Brown, weren't you telling Betty to say she was

5  puzzled to be getting the invoices because, in fact, she wasn't

6  puzzled at all?

7  A    No.  I assume she was puzzled because I was puzzled.  I

8  didn't see the invoices when they came in.

9  Q    Okay.  By the way, you -- I think you testified earlier

10 that this conversation that happened where Betty listened in --

11 A    Uh-huh.

12 Q    -- on the call, it occurred in March of 2009.  Is that

13 right?

14 A    I think -- I did not testify that.  I think I said at the

15 end of 2008, but I think that's not correct.  I think

16 subsequently I've realized that it was in March.  But we -- my

17 husband and I had been talking about it in -- of moving away

18 from Starr in 2008, which is why I got confused.  The call, in

19 fact, didn't happen until sometime in March, late in March.

20 Q    Which call?

21 A    The call in which my husband told Ken Starr that he was

22 now moving away from using his services.

23 Q    Well, isn't that a different call than the one that I

24 thought you were talking about where Betty listened in?

25 A    I'm sorry, I'm confused.  I don't know what we're talking

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Brown - Direct                                146

1  about now actually.

2  Q    Okay.  So correct me if I'm wrong.  The conversation we

3  were just talking about where Betty listened in --

4  A    Yes.

5  Q    -- she -- you were puzzled -- you testified you were

6  puzzled that you guys were getting invoices.  Is that right?

7  A    Yes.

8  Q    Okay.  And you assumed Betty was also puzzled --

9  A    Yes.

10 Q    -- that you were getting invoices.  And isn't it true that

11 you were puzzled that you were getting invoices because before

12 that time, there was a conversation in which -- or an alleged

13 conversation in which Ken Starr said the services are going to

14 be for free, correct?

15 A    "On the house" were the words he used, yeah.

16 Q    Right.  And so here where you saying "the note or call if

17 not made yet," aren't you referring to a second call that was

18 going to happen?

19 A    No, I wasn't.  I don't -- I don't recall.  I'm confused.

20 I cannot tell you what all this is about because I don't recall

21 writing the email, nor do I recall getting the email.

22 Q    Isn't it true, Ms. Brown, that the conversation between

23 your husband and Ken Starr where Ken Starr allegedly told your

24 husband that the services would be for free occurred at the end

25 of 2008?

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Brown - Direct                          147

1    A    They happened in March in 2009.

2         (Pause)

3    Q    Ms. Brown, I have just placed in front of you your

4    deposition transcript.  And it should be at page 27 and 28, do

5    you see that on the --

6    A    I do.

7    Q    -- right-hand side?

8    A    I do.

9    Q    Okay.  And I think you testified earlier that you were

10   under oath during this deposition?

11   A    Yes.

12   Q    Okay.  And you also had an opportunity after the

13   deposition was taken to review it.  Is that right?

14   A    I don't remember that.

15   Q    Have you ever reviewed this deposition --

16   A    I have --

17   Q    -- this transcript?  When?

18   A    Before this occasion.

19   Q    Okay.  And did you see anything in the deposition that was

20   inaccurate?

21   A    I did, yes.

22   Q    And did you ask your counsel or tell myself or Mr. Wolf

23   about any of those inaccuracies?

24        MR. GANT:  I'm just going to object to the part of

25   the question about communications with counsel.  The rest --

1              THE COURT:  Sustained.

2    BY MR. SKIFF:

3    Q    Did you direct --

4              MR. SKIFF:  I'll withdraw the question.

5    BY MR. SKIFF:

6    Q    Ms. Brown, if you'll look at page 27, line 18.  You were

7    asked a question that says, "What did he tell you" -- "he,"

8    talking about your husband -- "what did he tell you as to when

9    the conversation took place in which Ken Starr indicated that

10   he would provide these tax preparation services on the house,

11   to use the words from your prior answer?"

12        And you said, "He told me that it happened in the same

13   conversation in which -- the end of 1998 -- wait a minute,

14   2008."

15        And then you were asked the question, "At the end of

16   2008?"

17        And you said, "2008, that he called Ken Starr to end the

18   relationship.  And it was in that conversation that Ken Starr

19   said he would continue to do our tax" --

20   A    Right.

21   Q    -- "preparation, quote, 'on the house.'  So it was in the

22   same conversation, I am sure.  It was not a different

23   conversation."

24        Do you see that?

25   A    I do, yes.

Brown - Cross                           149

1          MR. SKIFF:  I have no further questions, Your Honor.

2                         CROSS-EXAMINATION

3  BY MR. GANT:

4  Q    Do you recall when you started work at The Daily Beast?

5  A    2008.

6  Q    Do you recall what month?

7  A    I don't.

8  Q    Do you recall over what period of time there were contract

9  negotiations, how many months?

10 A    It would have taken two to -- two months about.

11 Q    Do you have Exhibit DX-D in front of you?

12 A    DX-D?  Where is that located?  Thank you.

13 Q    Mr. Skiff was asking you questions about the first page of

14 the Exhibit --

15 A    Yes.

16 Q    -- DX-D, and in particular the line entries in the memo

17 column that refer to an IACI contract.  Do you see that?

18 A    Yes.

19 Q    And do you see that according to this document, there were

20 charges from Starr & Company for work on an IACI contract from

21 the period of April, 2008 through December, 2008.  Do you see

22 that?

23 A    I do, yes.

24 Q    And as best you recall, was work being done by Starr &

25 Company on the IACI contract during that entire period of time?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1    A    I don't know whether he was actually doing the contract

2    work then or whether he was charging us then.

3    Q    Do you have PX-44 still in front of you, the last exhibit

4    that Mr. Skiff asked you about?

5    A    Is that the deposition?

6    Q    It's -- no, it's the one-page document.

7    A    It's in here somewhere, but I don't know where it's

8    located.

9          MR. GANT:  May I help the witness locate it, Your

10   Honor?

11         THE COURT:  Yes.

12    (Counsel and clerk confer)

13   BY MR. GANT:

14   Q    PX-44.  I have another copy.

15   A    Thank you.  Thank you very much.  Yes.

16   Q    Mr. Skiff directed your attention to language in this

17   email which, although you don't remember it, you don't deny

18   writing this email, do you?

19   A    I just don't recall writing it.

20   Q    Did you on or about September 2, 2009, instruct or ask

21   Betty Greif to pretend anything?

22   A    No.

23         MR. SKIFF:  Objection, Your Honor.

24         THE COURT:  What's the objection?

25         MR. SKIFF:  First of all, this question was asked and

1  answered.  She already testified that she didn't do that.  She

2  doesn't recall anything.  So I don't see how she can answer

3  this question.

4          THE COURT:  I'll allow it.

5          MR. GANT:  I believe the witness said no.

6  BY MR. GANT:

7  Q    Did you say no?

8  A    I said no, yes.

9  Q    Thank you.  Did you at any time ask Betty Greif to lie?

10 A    No.

11         MR. SKIFF:  Objection, Your Honor.

12         THE COURT:  Yes?

13         MR. SKIFF:  She was never asked the question on

14 direct about whether or not she told Betty Greif to lie.

15         THE COURT:  Then what was the point of all those

16 questions you asked?

17         MR. SKIFF:  Well, my point was --

18         THE COURT:  The clear indication in your questions

19 was that she was telling Betty to lie.  So he's entitled to ask

20 if that's what she was doing.

21         MR. SKIFF:  Fair enough.

22 BY MR. GANT:

23 Q    I believe I heard an answer, but just so the record is

24 clear, what was the answer to my question about whether you

25 asked Betty Greif to lie at any time.

1  A    I did not ask her to lie.

2  Q    Mr. Skiff drew your attention to a passage in your

3  deposition transcript in which you identified 2008 as the year

4  in which you recall the original discussion between Mr. Starr

5  and your husband occurring.  Sitting here today, what is your

6  best recollection of the date on which there was an initial

7  conversation between your husband and Mr. Starr in which Mr.

8  Starr, as you understand it, conveyed that future Starr &

9  Company services would be on the house?

10  A    That was in --

11        MR. SKIFF:  Objection, Your Honor.  How could she

12  possibly know the answer to this question?  She wasn't a party

13  to that.

14        THE COURT:  Well, I don't know if she was or wasn't,

15  but it's true that there's no foundation as to what her

16  recollection is based on.  So maybe you should ask that first.

17        MR. GANT:  Sure.

18  BY MR. GANT:

19  Q    After you testified in your deposition on May 27, 2015,

20  did you see any documents that helped refresh your recollection

21  about the day when your husband and Mr. Starr had an initial

22  conversation about whether --

23  A    Yes.

24  Q    -- you would continue to use Starr --

25  A    Yes.

                              Brown - Cross                    153

1  Q    -- & Company services?

2  A    Yes.  I --

3          THE COURT:  Ms. Brown, did you participate in any

4  conversations with Mr. Starr about whether or not he would be

5  entitled to payment for any services in 2009 and early 2010?

6          THE WITNESS:  I did not, Your Honor.  I did not speak

7  to him about it.

8          THE COURT:  And to the extent you have any knowledge

9  of such conversations, where does it come from?

10          THE WITNESS:  From my husband telling me after he had

11  made the call that he had done so.

12          THE COURT:  Okay.

13          MR. GANT:  My -- thank you, Your Honor --

14          THE COURT:  Sure.

15          MR. GANT:  -- for helping clarify testimony.

16  BY MR. GANT:

17  Q    What I'd like to make clear is, sitting here today, what

18  is your best recollection of when your husband communicated to

19  you that he had spoken with Ken Starr and that Mr. Starr had

20  told him that Starr & Company would no longer be charging and

21  the services would be free?

22  A    Late March --

23          MR. SKIFF:  Objection, Your Honor.

24          THE WITNESS:  -- 2009.

25          MR. SKIFF:  This is -- it's hearsay.  That's --

Brown - Cross                    154

1          THE COURT:  It would be except to the extent you have

2  challenged the credibility and reliability of Mr. Evans'

3  recollection on this point.  It's not hearsay anymore under the

4  Federal Rules of Evidence because it's a prior inconsistent

5  statement designed to show his reliability and credibility and

6  his memory as to that claim.

7          Did we have an answer?  I don't know that I heard it.

8          MR. GANT:  Yes, I guess we can't get a read-back.

9          THE COURT:  Why don't you repeat the question.  Let's

10 go.

11         MR. GANT:  Well, may I say what I heard as the answer

12 and ask her to confirm it if she --

13         THE COURT:  No, just re-ask the question.

14         MR. GANT:  Sure.  Thank you, Your Honor.

15 BY MR. GANT:

16 Q    Sitting here today, what is your best recollection of when

17 your husband, Harold Evans, told you that he had spoken with

18 Mr. Starr and that Mr. Starr had offered to provide services of

19 Starr & Company on the house?

20 A    Late March, 2009.

21 Q    And if you said anything arguably inconsistent at your

22 deposition, what is the reason for that?

23 A    For the inconsistency?  Because during 2008, I had been

24 urging my husband to move away from Ken Starr.

25         MR. GANT:  Thank you, Your Honor.  No questions -- no

1  further questions at this time.

2           THE COURT:  Okay.

3                    REDIRECT EXAMINATION

4  BY MR. SKIFF:

5  Q    Ms. Brown, what is it that you saw that refreshed your

6  recollection as to when your husband told you about this

7  conversation?

8  A    The -- some of the emails.  The emails I think were shown

9  to me of the date.

10 Q    Ms. Brown, I've just placed in front of you PX-40.

11 A    Correct.

12 Q    Is -- are you referring to these emails when you said that

13 you saw something that refreshed your recollection?

14 A    This -- yes.

15 Q    And what about those emails reminded you that the

16 conversation happened in the end of March, 2009?

17 A    That she was asking him about Ken Starr, so, you know, he

18 was -- that's why.

19 Q    Was it the fact that he was prepared to pay the invoices

20 in these emails?

21          MR. GANT:  Objection; characterizing the document

22 which speaks for itself.

23          THE WITNESS:  Some of them were discussing Ken Starr.

24          THE COURT:  Just wait a second.  The objection is

25 overruled.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Brown - Redirect                    156

1        But, Ms. Brown, did your husband tell you more

2  recently than your deposition that the conversation had

3  actually been in March rather than in 2008?

4        THE WITNESS:  No, I was just -- it was hard for me to

5  remember when this conversation happened because he took longer

6  than I realized to get -- to move away from Ken Starr.  I'd

7  been wanting to get -- you know, to move away from Ken Starr

8  all the way through 2008.  And then it took him longer to do

9  so, so it wasn't actually until March that he did.

10        THE COURT:  But how do you know that from looking at

11  this email?

12        THE WITNESS:  I'm assuming it's the email that made

13  me -- it was their talking about Ken Starr, so I'm thinking,

14  well, Ken Starr, you know, that's still talking about Ken

15  Starr, so it must have been later than I thought.

16  BY MR. SKIFF:

17  Q   Ms. Brown, just one last question.  Would you agree with

18  me that there's nothing in those emails in PX-40 that indicate

19  the date of a conversation between your husband and Mr. Starr?

20  And you can have a minute to look through.

21  A   There's no reference to that here.

22  Q   I'm sorry?

23  A   There is no reference to that here.

24        MR. SKIFF:  Okay.  Thank you, Ms. Brown.

25        I have no further questions, Your Honor.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Brown - Recross                              157

1          MR. GANT:  I'm sorry, I'm -- did you ask --

2          THE COURT:  She said there was no reference to it.

3          MR. GANT:  Okay.  I couldn't hear if she was asking a

4     question.  Thank you.  One quick thing, Your Honor.

5          THE COURT:  Yep.

6          MR. GANT:  Do you have -- is PX-44 in there?

7          MR. SKIFF:  Yes.

8          MR. GANT:  Would you mind opening it?

9          MR. SKIFF:  It's not (indiscernible).

10         MR. GANT:  Thank you.

11                        RECROSS-EXAMINATION

12    BY MR. GANT:

13    Q    Ms. Brown, we have in front of you again an email, but you

14    don't remember it, dated September 2nd, 2009.  Do you see that?

15    A    I do.

16    Q    Okay.  And it says it's from you to Betty Greif, correct?

17    A    Yeah.

18    Q    Now, you testified several times a few moments ago that

19    your best recollection is you were told by your husband the

20    initial conversation with Ken Starr was in late March, 2009.  I

21    direct your attention to the text of the email to Betty, which

22    says, "The note or call, if not made yet, say you were puzzled

23    to be getting invoices because in a conversation a few months,

24    Mr. Starr told Sir Harold he was waiving charges."

25         Can you re-read this and tell me if you think there  --

1  whether, in your view, there's a word missing after "months"?

2  A    A few months ago.

3  Q    Was -- on September 2nd, 2009, in your view, was late

4  March, 2009 a few months ago?

5  A    Yes.

6         MR. SKIFF:  Objection, Your Honor; it calls for

7  speculation.

8         THE WITNESS:  Clearly.

9         THE COURT:  I don't think it calls for speculation.

10  I think --

11        MR. GANT:  This is my last question if that helps

12  encourage you to allow me, Your Honor.

13        THE COURT:  Well, overruled.

14        MR. GANT:  You may answer.

15        THE WITNESS:  Clearly, yeah, a few months ago would

16  be.  From September to March, is a few months ago.

17        MR. GANT:  Thank you.  No further questions, Your

18  Honor.

19        THE COURT:  Okay.  All right, thank you, Ms Brown.

20        THE WITNESS:  Thank you.

21        THE COURT:  You are excused.

22        THE WITNESS:  Thank you very much.

23     (Witness excused)

24        THE COURT:  Okay.  Is the trustee finished with his

25  case?

159

 1           MR. SKIFF:  We are, Your Honor.

 2           THE COURT:  Okay.  Any additional witnesses or

 3  evidence for the defendants?

 4           MR. WOLF:  No, Your Honor.

 5           THE COURT:  Okay.  I'll hear closing arguments after

 6  a brief break.

 7           MR. WOLF:  Thank you, Your Honor.

 8       (Recess taken at 3:51 p.m.)

 9       (Proceedings resume at 4:06 p.m.)

10           THE COURT:  All right.  Are we ready?

11           MR. WOLF:  Yes, Your Honor.

12           MR. GANT:  Yes, Your Honor.

13           THE COURT:  Okay.  Please proceed.

14           MR. WOLF:  You want to hear plaintiff first, Your

15  Honor?

16           THE COURT:  Yes.

17           MR. WOLF:  Your Honor, I submit to you that the

18  testimony and documentary evidence that's been proffered at

19  trial confirms what I mentioned in my opening statement, namely

20  that there is no dispute that during the 17-month period at

21  issue, Starr & Company rendered a multitude of services on

22  behalf of the defendants, including tax return preparation

23  services, accounting services, assistance in defendants'

24  possible refinancing efforts, and tax projections for

25  defendants' 2009 returns, all of which were of substantial

1  benefit to the defendants.

2        And the testimony and the documentary evidence in the

3  record also shows that there is no dispute that the last

4  payment made by the defendants to Starr & Company is the one

5  for $6,282.30 made on March 27, 2009, for services that were

6  rendered in December of 2008.  Defendants cannot dispute that

7  they never paid a cent for any of the extensive services

8  performed on their behalf by Elaine Locke and the other

9  employees of Starr & Company during the 17-month period.

10        So what this adversary proceeding, Your Honor, comes

11  down to is was there this supposed oral agreement by which Ken

12  Starr told Harold Evans that these services were being provided

13  for free supposedly?

14        THE COURT:  If there was such an agreement, then I

15  take it you would agree that nothing is owed.

16        MR. WOLF:  If there was such an agreement and it were

17  enforceable legally and not barred by the statute of frauds or

18  any other legal theory, then yes.  But I think those are big

19  ifs, in our estimation.

20        And with regard to this alleged oral agreement, there

21  is contradictory testimony on the part of the defendants as to

22  the date when the alleged conversation took place.

23        THE COURT:  What is the significance of that?  You

24  both made a big deal out of their recollections on that point,

25  but I take it you're not contending that the conversation

1  actually occurred and just occurred at an earlier date, you

2  deny that the conversation happened, so.

3          MR. WOLF:  Well, there apparently was a conversation.

4  What was said in the conversation is an issue of dispute.  In

5  fact, there's a dispute as to what was said in each of the two

6  conversations that have been at issue in this proceeding.  But

7  the fact that the dates -- the testimony in the depositions of

8  both defendants as to when the conversation took place and

9  their testimony now as to when that it took place, which in our

10  view has conveniently changed in an attempt to buttress their

11  argument that it did, in fact, take place and that the

12  conversation included Mr. Starr's alleged statement that the

13  services were henceforth to be on the house, entirely free

14  forever, I believe it significantly undermines the veracity of

15  those set of allegations.

16          THE COURT:  Well, it shows that there's -- there was

17  some failure of memory in May and June of 2015 as to when a

18  conversation that happened six years or more earlier had

19  exactly taken place.  But as to whether it suggests that the

20  conversation didn't happen at all, it seems to me that Exhibit

21  I is the best evidence that there was some such conversation

22  because it's a letter that Mr. Evans sent to Mr. Starr where he

23  references Starr's agreement to forego his fees for the past

24  several months.

25          MR. WOLF:  But --

1          THE COURT:  So -- and that's in, I believe without

2   any objection.

3          MR. WOLF:  It went in without any objection, Your

4   Honor, but it is in its own way quite self-serving.

5          THE COURT:  Well, it may be.  It may be and I may not

6   be absolutely required as a matter of law to believe in its

7   veracity, but it seems pretty reliable to me.  And --

8          MR. WOLF:  Well, but, Your --

9          THE COURT:  -- why would he have said in a letter

10  that -- there's no suggestion that the letter was made up later

11  or that it wasn't sent in August of 2009, right in the middle

12  of all of this.  So why would he have referenced that if in

13  fact that wasn't the agreement with Mr. Starr?

14         MR. WOLF:  Because (indiscernible) that he didn't

15  want to pay for the services for whatever reason.  There's been

16  a lot of testimony, there's documentary evidence about the cash

17  flow problems that the defendants continually had throughout

18  2009, continuing into 2010.  They seemed to be very, very

19  concerned, particularly Mr. Evans, all along about how much he

20  was paying his respective accountants.

21         There was testimony by Ms. Greif that the amount paid

22  to BCRS for rendering basically the same scope of services the

23  defendants -- I'm sorry, that Starr & Company was providing

24  during 2009 and the first five months of 2010 was quite

25  comparable.  And yet -- and Mr. Evans conceded, both on the

1   stand and in documents, that he was very, very happy with

2   Elaine Locke's services, both while she was she was at Starr &

3   Company and while she was at BCRS; and nevertheless, he and his

4   wife decided, well, we're still paying too much and they went

5   with the Marks Paneth firm, which apparently made a bid to do

6   the work for somewhat less.

7           So this seems to be a common pattern and practice on

8   the part of the defendants, so the significance, Your Honor,

9   with regard to questions as to whether or not Mr. Starr said

10  it's on the house is that there's a single piece of paper

11  memorializing a record of that alleged conversation in which

12  the words on the house appear.

13          Mr. Evans conceded, he never took any notes during

14  the course of the conversation itself, nor did he write a

15  little memo shortly -- he asked Betty Greif to make a memo

16  after the conversation on September 3rd of 2009.  You would

17  think that this was a critical issue even then.  He keeps

18  saying it on the stand, it was -- it's in his mind, it's in his

19  mind, he'll never forget those words, "on the house."  There's

20  not a single piece of paper that's been produced, the request

21  in our document demand, to evidence --

22          THE COURT:  Is it your theory --

23          MR. WOLF:  -- that those words were said.

24          THE COURT:  Is it your theory that his recollection

25  is mistaken or that he has made it up?

1          MR. WOLF:  I think it's in part both, quite frankly,

2    Your Honor.  I think part of it is fabricated and part of it, I

3    think he is mistaken on what he heard and what the scope or the

4    period of time applicable to what he heard, because you did

5    hear Ms. Greif on the stand yesterday in response to both my

6    questions and I believe in response to Your Honor's questions

7    saying not just once but at least a couple of times, and she

8    also testified to it in her deposition, that what was said in

9    the September 3 conversation was not "it's on the house."  She

10   was specifically asked that.  She said she didn't recall those

11   words.  But she did recall twice that Mr. Starr said "don't

12   worry, don't worry, we've always worked this out."

13          "We've always worked this out" is a lot different

14   than telling someone my services are free forever more.  Big

15   distinction.  Working it out -- and as supported then by the

16   letter that Mr. Evans sent to Mr. Starr in August, the August

17   17th, 2009, indicating he's feeling uneasy about the fact he's

18   not paying for the services, services supposedly are for free,

19   he'd like to make some arrangement.

20          It undermines the contention that this is an

21   arrangement or agreement that the services were going to be

22   absolutely free from the beginning of 2009 to forever more.

23   And let's not forget --

24          THE COURT:  Well, it may well be the case that Mr.

25   Starr had the right at any time to call Mr. Evans and say, you

1  know what?  I'm not happy to live with those arrangement --

2  with that arrangement any more, if you want me to continue to

3  do the services, you have to pay for them.  And I didn't hear

4  anything about the testimony that suggested that Mr. Starr was

5  barred from doing that or that suggested that he had somehow

6  bound himself, even if he changed his mind, to provide free

7  services for life, for eternity, even if the circumstances

8  changed or anything.  I think what he said was, let me continue

9  to do it, I'll do it on the house.

10       I don't think there was any suggestion that that had

11  to be a lifetime commitment or that it wasn't terminable at any

12  time, just a suggestion that that's what he said and he never

13  rescinded it.

14       MR. WOLF:  Well, but that, with all due respect, begs

15  the question as whether or not it was portrayed that way by Mr.

16  Starr at the outset, and we submit that there are a lot of

17  question marks as to whether or not --

18       THE COURT:  But all you've got --

19       MR. WOLF:  -- he, in fact, said that.

20       THE COURT:  All you've got is your doubt of what the

21  witness said.  You have no contrary testimony.

22       MR. WOLF:  Well --

23       THE COURT:  You have nothing but the fact that

24  somebody sent invoices and you don't even have testimony from

25  who sent the invoices.

1            MR. WOLF:  Who sent the invoices?

2            THE COURT:  No, I said you have nothing to show that

3   the conversation didn't happen or that money was owed except

4   for the fact that somebody sent invoices.  I don't have any

5   testimony from anybody who actually sent the invoices or why

6   they were generated or how they were generated, or anything.

7            MR. WOLF:  No, but there is an admission by Ms.

8   Greif, at the very least, that the invoices were sent from

9   Starr & Company.

10           THE COURT:  Yeah, but in terms of the evidence before

11  me as to was there a conversation between Mr. Starr and Mr.

12  Evans, the effect of which was I'll do these tax services for

13  free, I have Mr. Evans' testimony.  He states that he has a

14  clear recollection on it, is quite definite about it.  I have

15  Ms. Greif's testimony which basically came out to, I really

16  don't remember, is what her testimony was.

17           MR. WOLF:  I really don't remember and I never heard

18  him say on the house.  That we always work it out.

19           THE COURT:  Yeah.  And Ms. Brown's testimony, which

20  is basically that she doesn't know anything except what her

21  husband told her --

22           MR. WOLF:  Right.

23           THE COURT:  -- not even sure why she was forced to

24  come here this afternoon, to tell --

25           MR. WOLF:  Well --

1        THE COURT:  -- you the truth.  But in contrast to

2   that, all I have is the fact that somebody at Starr & Company

3   sent invoices.  I have no idea who.  I have no idea why.  I

4   have no idea if they ever talked to Starr, if Starr knew that

5   they were being sent.  I have Kenneth Starr as a participant in

6   these conversations that both parties have elected to ignore

7   and not to call as a witness, not to ask him what his

8   recollection is.

9        I don't know what he would have said.  I don't know

10  if I would have found it credible.  You each made your kind of

11  own tactical judgments about that and now I have to decide

12  based on that evidence what do I think happened.  So other than

13  the fact that it's definitely in Mr. Evans' self-interest for

14  the agreement to work that way, or for your suggestions that

15  his memory could be faulty, I don't really have much from you

16  to suggest -- other than your own skepticism, any other

17  evidence to suggest that it's (indiscernible), except for Ms.

18  Greif's testimony.  I have to weigh those two.

19        I have to weigh Ms. Greif's testimony that she

20  doesn't really remember what was said, but that she was pretty

21  sure that it was something to the effect of we've always been

22  able to work this out --

23        MR. WOLF:  That's right.

24        THE COURT:  -- we'll be able to work this out.

25        MR. WOLF:  Which respectfully, Your Honor, is --

1          THE COURT:  And then I have Mr. Evans saying no,

2     absolute, positively it was different from that.

3          MR. WOLF:  Respectfully, Your Honor, I believe that

4     Greif's testimony about Mr. Starr saying we've always worked

5     things out does enable the Court to come to a conclusion, based

6     on that testimony, that it wasn't a perpetual it's-on-the-house

7     arrangement, but that it was simply a deferral of the

8     obligation of the defendants to make payments or to make

9     current payments until such time that they had sufficient cash

10    with them -- with which to make payment.

11         THE COURT:  But let me ask you, also, on your quantum

12    meruit claim.  I mean, the gist of your claim is you want the

13    same compensation as the -- as Mr. Evans and Ms. Brown were

14    paying prior to 2009, the same monthly fee that's reflected in

15    the invoices.

16         MR. WOLF:  I'm sorry, prior to 2009?

17         THE COURT:  Yeah, you want the monthly-invoiced fee

18    of 5,250 per month, which is what they were paying -- same

19    amount that they were paying prior to 2009, right?

20         MR. WOLF:  Yes, I look at it going forward.  The

21    testimony is that BCRS to which Elaine Locke moved.

22         THE COURT:  Yeah, but the testimony also is that

23    services that Mr. Starr and his company were providing prior to

24    2009 were different from what he was doing after March of 2009.

25         MR. WOLF:  That is correct, Your Honor, but the

169

1 testimony --

2          THE COURT:  So from a quantum meruit point of view,

3 how do I award the same fee when the nature of the services and

4 amount of services has changed?

5          MR. WOLF:  Because the same --

6          THE COURT:  The uncontradicted testimony is that Mr.

7 Starr backed away from being the investment adviser except for

8 a few vague reference to some help he was in making an

9 introduction for potential financing in an isolated real estate

10 deal.  So if he was being paid a fixed fee of 5,250 for

11 providing financial advice and for providing accounting help

12 and tax returns, and then one of those legs is cut off and he's

13 no longer providing the investment advice, how do I, as a

14 matter of quantum meruit, say, well, yeah, it's the same thing?

15          MR. WOLF:  Well, I would submit, Your Honor, that

16 they -- defendants were getting a great savings in only having

17 to pay 5,200 a month prior to 2009 for all these services

18 because the testimony is that once Starr & Company closed shop

19 and Ms. Locke went to BCRS, BCRS was not rendering financial

20 advisory services to the defendants.  Nevertheless, same person

21 there doing the tax preparation.

22          THE COURT:  Yeah, and the -- and Mr. Evans --

23          MR. WOLF:  And they're charging the same amount that

24 Starr & Company did.

25          THE COURT:  Right, and they paid it for a few months

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

1  to get their 2009 returns finalized, and then went somewhere

2  else that charged them less.

3            MR. WOLF:  Okay, but the testimony --

4            THE COURT:  I'm not sure --

5            MR. WOLF:  I believe it was for as much as a year.

6            THE COURT:  I'm not sure how that proves that the

7  fair market value of these services is really the amount that

8  was invoiced in the invoices that Starr sent.

9            MR. WOLF:  But they didn't have Elaine Locke at the

10  Marks Paneth group; Elaine Locke who Mr. Evans greatly valued.

11  That's our position.  It -- you know, I think the best

12  measurement is what BCRS was charging since Ms. Locke provided

13  probably the most services of any Starr & Company employee

14  during the 2009 to May, 2010 period, moved then to BCRS and

15  then was the prime person there rendering same services.  The

16  charges of the two firms and the comparable services should be

17  taken into consideration.

18            But certainly, Your Honor, as a backup, what Marks

19  Paneth was charging for similar services, which didn't include

20  financial advisers, the services would be a back -- you know,

21  wouldn't be obviously our prime choice, but certainly that can

22  be used as a measurement which has the same basic scope of

23  services being rendered on behalf of the defendants that Starr

24  & Company did during the 17-month period at issue.

25            Could I also -- just one last thing, Your Honor.

1  With regard to account stated, should Your Honor deem it

2  necessary and/or appropriate to address that issue depending on

3  Your Honor's -- I mean, obviously the quantum meruit claim that

4  we have is -- it's our position that that's our primary claim.

5         With regard to account stated, should it be necessary

6  for Your Honor to address it, I do want to mention that we are

7  aware of the case law that stands for the proposition that

8  account stated does require I'll call it a running balance of

9  accounts.  Conceded, don't necessarily agree with it, but it is

10 the case law.  It's what governs.

11        But I do want to say that based on the testimony, I

12 believe we do have an account stated claim for at least,

13 underscore, at least those two months of the February 1, 2009

14 invoice covering the January, 2009 services, and the March 1,

15 2009 invoice covering the February, 2009 services.  If I did my

16 math correctly, the aggregate of those two invoices is

17 $11,720.62, because Mr. Evans himself admitted on the stand

18 today that he knew about those invoices, he explicitly told

19 Betty Greif in the March 24 email, pay them, pay them all.  And

20 he found out later that only the earlier of the three invoices,

21 the one dated January 1, 2009 for services rendered December,

22 2008, was paid.  I think, based on his testimony and the

23 documentary evidence, at the very least we have an account

24 stated claim for those two months.

25        Thank you, Your Honor.

1             THE COURT:  Okay.  Thanks.

2             MR. GANT:  Thank you, Your Honor.

3             THE COURT:  Counsel, would you agree at a minimum,

4 based on the testimony, that the fees for January and February

5 of 2009 are owed?

6             MR. GANT:  I always want to be very responsive to a

7 question from a judge.  The truthful answer is I'm not sure.  I

8 didn't anticipate the testimony that Mr. Evans gave about that

9 and he -- it is my understanding of the evidence that the

10 agreement was that there would be no further payment

11 obligations.  And --

12             THE COURT:  Actually, the evidence is that there are

13 emails in which he says -- both he and Ms. Greif confirmed that

14 the amounts are owed.  He believed that it had actually been

15 paid.  He instructed her to pay them.  It was only recently

16 that he found out that they weren't paid, and that he never had

17 a conversation with Mr. Starr about them.  He would have had

18 such a conversation, he says, if he'd realized that they hadn't

19 been paid, but he didn't have a conversation.  The conversation

20 he had was going forward only.

21             So I have an admission by the defendant that they're

22 owed.  I have an admission that there was no waiver of them at

23 any time or a discussion of them at any time with Mr. Starr.

24 Why doesn't that end it?

25             MR. GANT:  I think that's -- that is probably right

1   Your Honor.

2            THE COURT:  Okay.  If you're -- would that also cover

3   the month of March since the alleged conversation only happened

4   in March?

5            MR. GANT:  No, I don't believe so, Your Honor.  I

6   think it's different.  And if you assume and credit the

7   testimony that the discussion occurred somewhere in late March,

8   then I --

9            THE COURT:  How about the out-of-pocket expenses?

10  Mr. Evans admitted that there was no discussion.

11           MR. GANT:  No, there I don't think so, Your Honor,

12  either.  I think the evidence shows that --

13           THE COURT:  But the --

14           MR. GANT:  -- what the agreement was that they

15  wouldn't have to pay anything else to Starr & Company going

16  forward, and that that was for -- it was for all the services

17  and the accompanying charges.  And I believe that corroborating

18  that is the fact that the evidence does not demonstrate that

19  anybody from Starr & Company ever came and said you owe us

20  money.

21           In that regard, Your Honor, admitted Exhibit DX-D is

22  the spreadsheet of all the payments that were made, some in

23  early in 2000 until March of 2008.  And if you go through them

24  and you look about the time span between the receive of the

25  invoices or the time the service was performed and the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  payments, you see -- and, of course, Mr. Evans testified --

2  they paid over $600,000 over the years.  But if you look at the

3  intervals of the payments --

4        THE COURT:  Your own theory as to why Mr. Starr

5  allegedly was willing to do this -- or your client's own theory

6  which is that Mr. Starr owed other money and didn't want to

7  prompt a big to-do over it.

8        MR. GANT:  What Mr. -- I think that was either

9  expressly or implicitly offered by our client, but there was

10 another separate and I thought clearer reason that Mr. Evans

11 believed and understood, which was that -- and maybe it was Ms.

12 Brown.  It was one or both of them.  But that it was -- they

13 knew a lot of clients of Mr. Starr.

14       THE COURT:  Right.  But let me --

15       MR. GANT:  And Mr. Starr was concerned about --

16       THE COURT:  Let me finish my question.

17       MR. GANT:  I apologize.  I thought you were finished.

18       THE COURT:  The -- Mr. Evans' theory was that Mr.

19 Starr made the agreement he alleged because he didn't want to

20 cause a big stink over the other money he hadn't paid.  That

21 would also be a perfect reason why he just wouldn't push the

22 issue of dunning them for the payments while he continued to

23 send the invoices.

24       MR. GANT:  If the other evidence supported that as an

25 explanation for what was going on, I think you are right, that

1  would be consistent with it.  But I respectfully submit, in

2  part for the reasons you identified in your colloquy with Mr.

3  Wolf, that there is evidence of an agreement.  The documents

4  just make no sense if there wasn't an agreement.

5        THE COURT:  So, you know, the position of the trustee

6  is that there wasn't any agreement, all the old charges

7  continued to apply.  That's hard to square with the evidence

8  that I've actually been given.  On the other hand, your theory

9  that it wasn't just that a flat fee wouldn't apply anymore, but

10  that nothing would be done --

11        MR. GANT:  Well, I apologize.

12        THE COURT:  Let me finish.

13        MR. GANT:  Yes.

14        THE COURT:  That's Mr. Evans' testimony.  It's not

15  the way Ms. Greif remembered the September call.  It's not

16  really consistent with what Mr. Evans said in DX-I, with his

17  admission on my question that at the time he wrote that, he did

18  have an explanation, that he would pay something, and that he

19  would work it out in the future with Mr. Starr.

20        And I have to decide, well, when did he change his

21  mind about that?  Did he change his mind and did he square that

22  away with Mr. Starr in September, or do I believe Ms. Greif's

23  recollection about, well, this is something we will work out,

24  which is actually pretty much what he said in Exhibit I?

25        MR. GANT:  May I now?

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1      THE COURT:  Yeah.

2      MR. GANT:  Okay.  I have both the benefit and the

3 burden, of course, of having many conversations with Mr. Evans

4 outside of the courtroom, and I'm doing my very best to

5 separate very expressly -- explicitly what was said here versus

6 what I know.  But having -- attempting to accomplish that

7 distinction, I understood what Mr. Evans to say today to be

8 different slightly from what you have described.

9      What I understood him to say, and we'll have to --

10 you'll have to look at the transcript obviously, Your Honor,

11 make your assessment of it, is that Mr. Evans, I think it was

12 in response to your questions, was responding about the

13 possibility of altering the existing, if you will, on-the-house

14 arrangement, and that he was responding to questions about his

15 willingness to make new arrangements, which is part of the

16 reason -- I believe I asked the follow-up question about

17 whether you ever did alter the existing arrangement in sum and

18 substance.  I believe that was the question I asked.

19      But I understood Mr. Evans' testimony to not suggest

20 that -- in fact, I asked him quite directly, did you understand

21 on the house to be a deferred payment agreement, and he said

22 unequivocally, no.  So my understanding of both the August 17,

23 2009 letter and the testimony related to that issue today was

24 would he consider changing the arrangement.  I think he even

25 said make a new arrangement.

1          And he said, my recollection is, in August, I might

2    have been willing to make a new arrangement.  By the end of

3    2009, I'd had it with Starr and I would not have considered it.

4    And so that is how I understood the testimony you just referred

5    to.

6          With respect to Ms. Greif, what I understood her to

7    say on these issues was, one, I think she confirmed the

8    accuracy of her email of June 21, 2000 [sic], that it was

9    accurately represented what was said; that she was very clear

10   that there was an agreement.  Her behavior after the call

11   confirmed what she described as her understanding, that there

12   were no requirements to pay.

13         She equivocated, and I think ultimately came out as

14   saying she didn't know whether he said you don't have to pay me

15   now.  And if you will, I respectfully submit her testimony

16   about whether it was -- that the September call suggested that

17   it was going to be deferred payment going forward or was --

18         THE COURT:  I think she said three times that Mr.

19   Starr said, you don't have to pay me now, and then when I was

20   -- when I asked her directly, is that what he said, now, or

21   ever, she said she wasn't sure.

22         MR. GANT:  And I took the last response --

23         THE COURT:  I have to decide what to do.

24         MR. GANT:  I understand.  For a variety of reasons,

25   but because it was last and because of who asked the question,

1 I respectfully submit that the last answer is probably the one

2 which is most compelling.  But obviously, you'll have to make

3 that judgment.

4         So my view was that she confirmed there -- that Starr

5 said you don't have to pay.  She acted consistent with that

6 afterwards, until the end of the time in question.  And I

7 viewed her testimony as not inconsistent with Mr. Evans; that

8 it was just a narrower -- she heard you don't have to pay,

9 unclear about whether he'd have to pay ever.  And his was more

10 specific.

11         THE COURT:  Then let me ask you a question.  If

12 that's what she heard, and then she continued to get monthly

13 invoices from October of 2009 through May of 2010, why wasn't

14 she raising a stink?  Why wasn't she calling somebody at Starr

15 and saying what the heck is this, I was on the phone call where

16 you said --

17         MR. GANT:  I mean, the honest answer is --

18         THE COURT:  Let me finish.

19         MR. GANT:  I'm sorry.  I apologize again.

20         THE COURT:  I was on a phone call --

21         MR. GANT:  I'm so eager to answer your questions.

22         THE COURT:  -- where you said no such thing.  Or why

23 wasn't she going to Mr. Evans saying, you know, can you believe

24 this?  Even after your call he's still doing it.  Why do we

25 have invoices continuing to be sent on a monthly basis with

1  apparently no reaction?

2          MR. GANT:  What I recall of her testimony, she

3  clearly said -- I think she addressed this, Your Honor, which

4  was -- at least with respect to the pre-September 3rd, 2009

5  invoices that arrived, I just had assumed there was some issue

6  in the office that either they didn't know or for whatever

7  reason they were sending them.  The testimony of Ms. Brown and

8  Mr. Evans is they didn't -- Betty wasn't showing them the

9  invoices.  So she says she was receiving them.  She was

10  obviously putting them aside.

11          THE COURT:  But Mr. Evans' testimony is essentially

12  that he scolded her for not having told him that she is getting

13  these invoices and that it was a matter of sufficient

14  importance to make it clear to Mr. Evans that he get on the

15  phone immediately --

16          MR. GANT:  Yes.

17          THE COURT:  -- with Mr. Starr to clear it up.  So if

18  she then continued to get invoices and that was contrary to

19  what they had just cleared up, and she'd already been scolded

20  for not telling you about the invoices, why on earth wouldn't

21  she have --

22          MR. GANT:  Well, I believe --

23          THE COURT:  -- raised it?

24          MR. SKIFF:  I believe one or both testified -- Mr.

25  Evans testified, I believe, that what Ken said was you can

1 ignore them, it's a mistake.  And I don't remember testimony on

2 this point, but if you're asking for my interpretation of why

3 Ms. Greif would continue to receive these, why wasn't she

4 perplexed, I assume she had the same assumption she testified

5 about earlier, which was that it was a mistake and she

6 speculated that perhaps Ken didn't tell anyone.

7         So I didn't hear any testimony from her addressing

8 your direct question, but what I take from her behavior was

9 that she made an assumption that the same reasons they'd been

10 sent even though there were no charges between the on-the-house

11 agreement and the September 3rd call were the same reasons why

12 they were being sent before, perhaps by the same people.

13        So I respectfully submit I don't see anything about

14 the fact that the invoices continued to be received as

15 suggesting that there wasn't an agreement, or suggesting that

16 it was simply a deferred payment arrangement.  And if she had

17 thought that there was something in this, presumably she would

18 have told Mr. Evans a second time, hey, we keep getting these,

19 and there's no evidence that that happened.  To the contrary,

20 there's evidence that it didn't happen.

21        THE COURT:  All right.  Anything else?

22        MR. GANT:  Would you like me to address the issue of

23 quantum meruit at all?

24        THE COURT:  If -- go ahead.  I think I understand

25 both the legal and the factual arguments about it.

 1          MR. GANT:  I appreciate that, Your Honor.  I guess

 2  the only observation I would make is I don't think the

 3  plaintiff, who obviously has the burden of proof with respect

 4  to all of the elements of quantum meruit, has established the

 5  element of the reasonable value of the services.  They never

 6  called an expert or used an expert in the case, and all we have

 7  is hodgepodge anecdotes about how much may have been paid

 8  without having an ability to compare apples to apples.

 9          THE COURT:  Right.  But it's fair to assume they

10  weren't worthless.

11          MR. GANT:  I think that is a fair assumption.

12          THE COURT:  Okay.

13          MR. GANT:  Thank you.

14          THE COURT:  So while I may have to figure out what

15  they were worth, if I agree with the other elements of the

16  cause of action --

17          MR. GANT:  I suppose, Your Honor, I mean, I guess I

18  would reserve our right to claim that because the plaintiff

19  carried the burden on the issue, if they didn't give you

20  sufficient evidence of how in which to draw a conclusion, that

21  that's a failure of proof.

22          THE COURT:  Okay.  Anything else?

23          MR. GANT:  No, Your Honor, just to thank you and your

24  staff for your time.

25          THE COURT:  All right.  Do either of you feel the

1  need to make any post-trial submissions on any of these points

2  or shall we close the record?

3          MR. GANT:  The only issue about that, Your Honor --

4  well, I was so busy responding to your questions, I --

5  obviously Mr. Wolf made a concession during his closing that if

6  there was, in fact, an agreement and it was enforceable, they

7  would -- there would be no ability to collect damages.

8          MR. WOLF:  I'm sorry, there would be what?

9          MR. GANT:  There would be no damages.  That was the

10 question and you -- I understood you to agree with that.  You

11 said if there was an agreement and if it was enforceable, then

12 there would be no damages or no --

13         MR. WOLF:  No, not in this.

14         MR. GANT:  Well, that's what I heard.  Obviously,

15 there was a statute of fraud issue raised in the pretrial order

16 and we had prepared a very short bench memorandum in case there

17 was a need to submit it on the question of whether or not the

18 statute of frauds argument was valid.

19         THE COURT:  Haven't you already submitted it?  I

20 thought in the pretrial order, you already summarized your

21 conclusions on that point, didn't you?

22         MR. GANT:  It was a paragraph.  We have, I think, a

23 three-page bench memo if you'd like to see it.

24         THE COURT:  I'd be happy to let you submit it.  Do

25 you want to submit something on the same issue?

 1              MR. WOLF:  Yes, Your Honor.  What's contemplated are

 2  -- is a simultaneous exchange in filing?

 3              THE COURT:  Right, just additional points and

 4  authorities.

 5              MR. WOLF:  Yes.

 6              THE COURT:  I don't want wordy briefs.  I don't want

 7  lengthy things, just --

 8              MR. WOLF:  Well, may I ask, is Your Honor

 9  contemplating at all the submission by each side of proposed

10  findings of fact and conclusions of law?

11              THE COURT:  While that would save me some time, I

12  don't think it's needed.  I think I can do this without --

13              MR. WOLF:  You do not?

14              THE COURT:  I don't need them, no.

15              MR. GANT:  May I, just to confirm, Your Honor, the --

16              THE COURT:  Okay.  If the two of you would prefer to

17  submit them, that's fine, but I won't impose that requirement.

18              MR. GANT:  My view would be, Your Honor, if you are

19  ready, willing, and able to do them yourself, that that's the

20  best course, most judicious course.  With respect to the -- oh,

21  I'm sorry.

22              MR. WOLF:  If we could have a little bit of time, to

23  next week, Your Honor, to let Your Honor know --

24              THE COURT:  Okay.

25              MR. WOLF:  -- whether we would like that.  I'd like

1  to speak to my client --

2          THE COURT:  Okay.

3          MR. WOLF:  -- with regard to that issue.

4          THE COURT:  That's fine.

5          MR. WOLF:  Thank you.

6          THE COURT:  I certainly won't foreclose it, and I'm

7  sure if they submit, you're going to want to submit, so that

8  would be fine.

9          MR. GANT:  Okay.

10          THE COURT:  You just let me know.

11          MR. GANT:  Very well, Your Honor.  On the statute of

12  frauds submission, if you would just confirm, it's limited to

13  that one issue?

14          THE COURT:  Well, I think if you have points and

15  authorities that haven't already been cited in your pretrial

16  papers in any of the legal issues, go ahead and give them to

17  me.  But I literally mean points and authorities, like a bare-

18  bone statement of what the legal proposition is and these are

19  the cases for it.  I don't want --

20          MR. GANT:  Okay.

21          THE COURT:  -- or need long briefs or wordy briefs or

22  summaries of the evidence.

23          MR. GANT:  Would you like to impose any formal

24  limitation on length on us or are you --

25          THE COURT:  I think that's --

185

1          MR. GANT:  Enough guidance.

2          THE COURT:  That comment is enough -- should be

3     enough guidance.

4          MR. GANT:  It is taken to heart, Your Honor.  I hope

5     we complied with that with respect to the evidentiary

6     submissions.

7          THE COURT:  Your colleague obviously has an obvious

8     question.

9          MS. HARRISON:  When?

10         MR. GANT:  My colleague, Ms. Harrison, asked a very

11    good question, which is when you would like these submissions?

12         THE COURT:  Yes, she just wanted to ask me because

13    she's going to be the one doing it, yes.

14         MR. GANT:  I do my share, too, but she has been --

15         MR. WOLF:  I join in --

16         MR. GANT:  She has been invaluable.

17         MR. WOLF:  -- in Ms. Harrison's question.

18         THE COURT:  How much time do you need?

19         MR. GANT:  Well, ours is largely written.  I guess if

20    we're extending it to other legal issues, we could --

21         MR. WOLF:  Well, if I could make a suggestion, Your

22    Honor, because my response will be somewhat dependent whether,

23    after speaking to my client, we're going to want to do a post-

24    submission of proposed findings of fact and conclusions of law.

25    If that answer to that ends up being in the affirmative, I

1    would respectfully submit that it might make sense to have

2    those legal submissions --

3                  THE COURT:  Okay.

4                  MR. WOLF:  -- on the statute of fraud at the same

5    time.

6                  THE COURT:  Then let us know by next Wednesday --

7                  MR. WOLF:  That's fine.

8                  THE COURT:  -- what you would want to do.

9                  MR. WOLF:  Sure, sure.

10                 THE COURT:  And at that time, we'll decide whether

11   you're submitting full-blown findings of fact and conclusions

12   of law or just additional points and authorities.

13                 MR. WOLF:  Which one.  Thank you, Your Honor.

14                 MR. GANT:  How would you like us to communicate that

15   to you?

16                 THE COURT:  Just call my staff.

17                 MR. GANT:  Okay.

18                 THE COURT:  I will actually be out of town, but just

19   call and let them know.  Okay?

20                 MR. GANT:  Okay.  Thank you, Your Honor.

21                 MR. WOLF:  Thank you very much for your time and

22   attention, Your Honor.  Greatly appreciate it.

23                 THE COURT:  Okay.

24                 MR. WOLF:  Oh, one logistical question.

25                 THE COURT:  Yeah.

1          MR. WOLF:  Is it possible, Your Honor, that we would

2     be able to leave some of these things and pick them up

3     tomorrow?

4          THE COURT:  Yeah.

5        (Concluded at 4:44 p.m.)

6                         * * * * *

1          **C E R T I F I C A T I O N**

2

3          I, Lisa Luciano, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____

10  LISA LUCIANO, AAERT NO. 327      DATE:  November 12, 2015

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

