UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| KENNETH IRA STARR, *et al.*, | : | Case No. 11-10219 (MEW) |
| | : | |
| Debtors. | : | Jointly Administered |

-----------------------------------------------------------------x   Substantively Consolidated

| | | |
|---|---|---|
| ROBERT L. GELTZER, as Trustee of the | : | |
| Estate of Kenneth Ira Starr, *et al.,* | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 14-02395 (MEW) |
| | : | |
| v. | : | |
| | : | |
| HAROLD EVANS and TINA BROWN, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------x

## MEMORANDUM OPINION

APPEARANCES:

TARTER KRINSKY & DROGIN LLP
*Substitute Special Litigation Counsel to the Trustee*
1350 Broadway
New York, NY 10018
   By:   Robert A. Wolf, Esq.
         Gregory J. Skiff, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Defendants*
5301 Wisconsin Avenue NW
Washington, DC 20015

   -and-

26 South Main Street
Hanover, NH 03755
   By:   Scott E. Gant, Esq.
         Colleen A. Harrison, Esq.

The Court held a trial on October 28 and 29, 2015, and finds that Plaintiff Robert L. Geltzer, as chapter 7 trustee of Starr & Company, LLC, is entitled to judgment against Defendants Harold Evans and Tina Brown jointly and severally in the amount of $25,560.18, representing a debt in the amount of $20,343.36 plus prejudgment interest from September 9, 2013 through December 15, 2015 in the amount of $5,216.82.

## Nature of the Case

The Trustee contends that Defendants owe Starr & Co. $93,127.89 for professional services and out-of-pocket expenses for the period January 2009 through May 2010. The Trustee asserts: (a) a claim to recover an account stated, and (b) a claim for quantum meruit. The Trustee also seeks attorneys' fees and costs.

Evans and Brown contend that in late 2008 or early 2009 they informed Kenneth Starr that they intended to terminate the services of Starr & Co., and that in response Mr. Starr agreed to end some services and to perform other services "on the house," or free of charge. Defendants contend that Starr & Co. had no expectation of compensation for such services and that the Trustee's claims should be dismissed. Defendants also seek attorneys' fees and costs.

## Jurisdiction and Power to Issue Final Decisions

This Court has jurisdiction under 28 U.S.C. §§ 157(c) and 1334(b), and the parties have consented to a final decision by this Court. *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. ___ (2015); *see also Executive Benefits Ins. Agency v. Arkison*, 573 U.S. ___ (2014).

## The Evidence at Trial

Evans and Brown are husband and wife. They are well-known figures in the publishing industry. Starr & Co. provided services to Evans and Brown (and to entities they owned and

some of their family members) beginning some time before 2000.  Over the years Starr & Co.

provided three kinds of services:

> (a)    tax services, including the preparation of federal and state tax returns and
> other planning and filing advice;
>
> (b)    bookkeeping and accounting services; and
>
> (c)    financial advisory services.

During 2009 and early 2010 most tax services were provided by Elaine Lok, an employee of

Starr & Co.  Bookkeeping and accounting services were provided by Patricia Wright.  Financial

advisory services (when provided) were provided by Kenneth Starr himself.

It is not clear whether Starr & Co. ever entered into a written agreement with Evans and

Brown; the parties represented that they were unable to find one.  The evidence showed,

however, that Evans and Brown made regular payments for services provided by Starr & Co. for

periods beginning no later than January 2000 and continuing through and including December

2008.  Payments included monthly fixed fees, initially at $5,000 per month but increasing to

$5,250 per month at some time before December 2008.   Evans and Brown also regularly

reimbursed Starr & Co. for out-of-pocket expenses and charges.  (*See* DX-C, DX-D.[1])

The parties disagree, however, about the amount of work done after January 1, 2009 and

what amounts (if any) Evans and Brown are obligated to pay for that work.

**A.    The Work That Was Done**

Elaine Lok prepared tax returns and other tax forms, and gave advice to Evans and

Brown about upcoming tax obligations, from January 2009 through May 2010.  Copies of the tax

returns (redacted to eliminate irrelevant personal information) were submitted in evidence.  It is

---

[1]   Plaintiff's exhibits are cited as "PX-__," and Defendants' exhibits as "DX-__."

apparent that they required a fair amount of work.  Ms. Lok's time records also were submitted

in evidence.  (PX-37.)  The Trustee contends that they show that Ms. Lok billed 419 hours to

Evans, Brown and their families/companies from January 1, 2009 through May 31, 2010, and the

defendants did not challenge the accuracy of the Trustee's addition.  No information was offered

that would allow the Court to compare the time that Ms. Lok spent on tax work during 2009 and

2010 to the time spent on tax work during prior years.

Ms. Wright provided advice about accounting and bookkeeping issues from January 2009

through May 2010.  Her time records were also in evidence.  (PX-38.)  The Trustee contends that

they show a total of 196 hours of work for Evans and Brown from January 1, 2009 through May

31, 2010.  Again, the Defendants did not challenge the Trustee's arithmetic.  No information was

offered, however, that would allow the Court to compare these figures to the time spent on

bookkeeping and accounting services during prior periods.

The evidence at trial revealed very little as to financial advisory services provided by Mr.

Starr after January 1, 2009.  Evans testified that he terminated those services in March 2009 and

only received tax and accounting services thereafter.  The Trustee offered limited evidence of

three isolated instances in which Mr. Starr either made a referral to a mortgage broker or offered

recommendations regarding a potential real estate sale, but did not suggest (and certainly did not

prove) that Mr. Starr gave ongoing financial advice to Evans and Brown.  Nor was any evidence

offered as to the time spent by Mr. Starr, or how his services during 2009 and early 2010

compared with the services that he provided during prior years.

## B.    "Value" of the Work

The Trustee offered evidence of prior payments by Evans and Brown stretching over a

long period of time.  Those payments are some evidence of the parties' agreement as to the

4

overall value of all of the services provided in those prior years.  However, before January 2009

Evans and Brown were receiving financial advice from Mr. Starr in addition to the tax services

and accounting/bookkeeping services that Ms. Lok and Ms. Wright provided.  It seemed clear

from the evidence that Mr. Starr's financial advice essentially ceased no later than March 2009,

so that the services provided after March 2009 were not the same as the services provided in

earlier months.

As to value of the tax and accounting services: The Trustee alleged in the Joint Pretrial

Order that Ms. Lok's billable rate was $285 per hour, but no such evidence was offered at trial.

Similarly, no evidence was offered as to an ordinary billable rate for Ms. Wright's services.  The

Trustee elicited testimony showing that Evans and Brown hired another firm (BCRS) after May

2010 to complete their 2009 tax returns and to provide the accounting and bookkeeping work

that Starr & Co. had previously handled, and that Evans and Brown paid between $5,000 and

$6,000 per month for those services.  It is not clear how long the arrangement with BCRS

continued; at some point Evans hired another firm that provided the tax preparation services for

$3,500 per month.  No other evidence as to value was offered.

## C.    Agreements as to Payments/Expectation of Compensation

Starr & Co. sent invoices in arrears.  As of mid-March 2009 a number of invoices were

unpaid, covering the months of December 2008 through February 2009, as well as an additional

bill of $2,000 owed for brokerage services.  Evans exchanged emails with his assistant, Betty

Greif, about the unpaid invoices.  (PX-40.)  Evans and Greif acknowledged in the emails that the

invoiced payments were due and owing to Starr & Co., and Evans directed Greif to pay the

invoices.  For reasons that no witness could explain, Greif only paid the invoice for December

2008 plus $1,000 of the brokerage fee, leaving the invoices for January and February 2009 (and $1,000 of the brokerage fee) unpaid.

Evans testified that he had a conversation with Starr in March 2009 during which he reached a new agreement as to what the billing arrangements would be. This conversation and a later conversation that allegedly occurred in September 2009 are key to this case, but the evidence about them is hardly crystal clear. Neither party offered (or apparently sought) Starr's testimony on the subject. The evidence that was offered is summarized below.

1.     **Testimony of Harold Evans**

Evans testified that as early as 2007 he had considered terminating Starr's services as his investment advisor, and in March 2009 he told Starr that Evans would handle his own investments going forward. Starr agreed to send records to allow Evans to do so, but suggested that Evans should let Starr & Co. continue with other services "on the house." Based upon that exchange, Evans believed that the continuing services would be provided for no charge.

The Trustee confronted Evans with portions of deposition testimony that Evans had provided earlier in 2015, at which time Evans testified that he thought the "on the house" conversation with Starr had taken place in late 2008. At the time of the deposition the parties apparently were not yet aware of the March 2009 email exchange between Evans and Greif about the unpaid invoices, copies of which were produced only later. At trial, Evans was firm in his belief that the conversation with Starr occurred in March 2009, just after his email exchanges with Greif. The Trustee has urged the Court to find that Evans' entire testimony about the conversation is not credible based on this inconsistency. The Court disagrees. More than six years have passed since March 2009, and the Court does not believe that the inconsistency in testimony about the date of the conversation is significant.

6

Evans confirmed that in the March 2009 conversation he and Starr had not specified a "starting date" for when "on the house" services would begin. Evans also acknowledged that he had no conversations with Starr about the out-of-pocket expenses that regularly had been included in invoices. As of March 2009, Evans thought that all of the unpaid invoices had been paid (based on his instructions to Greif) and that his account was paid in full.

Evans testified that in August 2009 he sent a letter to Mr. Starr that praised the tax services Ms. Lok had been providing and thanked Starr for foregoing his usual fees for the past several months. (The letter, DX-I, is described more fully below.) Evans also said in the letter that he was uncomfortable about continuing to receive services "on the house" and that perhaps later in the year he and Starr could reach agreement on a payment arrangement. Evans said he did not have any further conversation with Starr about making such a payment arrangement. While Evans would have been willing to consider such an arrangement in August, by September he was increasingly exasperated by Starr's unresponsiveness concerning funds owed to Evans from an investment that Starr had controlled, and no longer thought he should make such an arrangement.

In September 2009, Greif told Evans that Starr & Co. had continued to send monthly invoices. Evans testified that he was astounded and he called Starr the next day, with Greif listening to the conversation on another phone. Evans testified that in that telephone conversation, Starr stated that the sending of the invoices was an oversight, and reaffirmed that there was no obligation to pay for services provided by Starr & Co.

### 2.    Testimony of Betty Greif

Greif was the personal assistant to Evans and Brown; she paid bills and did other tasks. She testified that Evans told her at some point in 2009 that he had reached an arrangement with

Starr and that she no longer had to send payments to Starr & Co.  When invoices continued to

arrive she informed Evans, and Evans then asked her to listen in on a telephone conversation

with Starr.  The conversation occurred on September 3, 2009.  When first asked, Ms. Greif

described the conversation as follows:

> Well, they spoke, and Ken said something to the effect, oh, you know, you
> haven't paid me before, and then when you got the money, you paid me, and
> then the bottom line was that he said, no, you know, don't worry about it
> now, whatever.  I don't remember verbatim what he said.  It was a long time
> ago.

(October 28 Tr. 176–77.)  Greif said that following the conversation "I knew I didn't have to

write any [checks] for the time being, or, you know, that I didn't have to write any" because

"that conversation was, oh, you know, you've owed me money before and we've always worked

it out and you don't have to pay me now." (*Id*. at 186–87.)  However, when Ms. Greif was asked

to confirm that Mr. Starr had said "you don't have to pay me now," she said she was not sure if

that was what he said, or whether he said "you don't have to pay me forever," though she did not

think he said "forever." (*Id*. at 187.)

After the parties finished their questions the Court asked further questions of Ms. Greif to

try to determine whether (in her recollection) Mr. Starr had merely agreed that Evans and Brown

could defer their payments, or whether Mr. Starr had agreed that they did not have to pay the

invoices at all.  Ms. Greif said she could not recall, though she remembered that Starr had said

"you've owed me money before, we've worked it out." (October 28 Tr. 213–15.)

### 3.      Testimony of Tina Brown

Brown testified that Evans told her about his conversations with Starr.  Her testimony

was admitted as evidence of prior consistent statements by Evans pursuant to Rule

801(d)(1)(B)(i) of the Federal Rules of Evidence, made applicable by Bankruptcy Rule 9017.

However, it is otherwise of little weight, as Brown did not participate in the conversations and did not have separate conversations with Starr about the billing arrangements.

**4.      Documents**

Evans wrote a letter to Starr in August 2009, in which he praised the services being provided by Ms. Lok and thanked Starr for foregoing his usual fees, but also said that he was becoming comfortable at the fact that the services were being provided "on the house." He suggested that perhaps some payment arrangement could be made at year-end under which Evans would make some payment for the services. As noted above, Evans testified that he had no further conversations with Starr about this suggestion and that Evans later changed his mind about offering any payment for the services.

It is difficult to know precisely what to make of this letter. On the one hand, it could support an inference that Starr expected some form of compensation for the services, though the amount was still to be determined. However, no testimony or other evidence was offered as to how Starr understood the letter, or even to show that Starr read it.

The Trustee introduced into evidence copies of monthly invoices that Starr & Co. continued to send through May 2010 (though a few were missing), and Greif testified that she was absolutely certain that she received invoices from Starr & Co. every month. The Trustee also elicited testimony from Evans and Grief confirming that they made no further complaints to Starr after the September 2009 conversation. However, the invoices were not paid, and there is also no evidence that Starr (or any of his employees) ever complained about the nonpayment.

Starr was arrested in May 2010 and his business shut down. In June 2010 Evans asked Greif to send an email summarizing what she recalled from the September 2009 conversation, and she did so. The email is dated June 21, 2010, and it states: "Harry, As per your request I

9

listened in on a telephone conversation you had with Ken Starr on September 3, 2009.  During

that conversation Ken Starr affirmed that you didn't have to pay him the monthly fee his firm

had been billing you. Betty." (DX-M.)  However, the email was not written at the time of the

conversation and was written at Evans' direction, apparently for the purpose of memorializing

helpful information following the collapse of Starr's business.  It is of little weight.

## Discussion

The evidence is not completely clear and could be interpreted in different ways, but after

considering it (and the demeanor of the witnesses) the Court finds Evans' testimony to be

credible and finds that Starr did in fact agree to continue to provide services after March 2009

"on the house," meaning for no charge.  The Court rejects the Trustee's contention that Evans'

testimony either was fabricated or is otherwise unreliable.  Evans may have had difficulty

recalling (at his deposition in 2015) exactly when his conversations with Starr took place, but

that is hardly surprising given the amount of time that passed.  At trial, Evans openly

acknowledged his debt for services provided prior to March 2009 (though his counsel had

previously disputed that liability); openly acknowledged the limitations of his agreement with

Mr. Starr (for example, that they had not discussed out-of-pocket expenses); was open and

credible in describing the August 2009 letter that he sent to Mr. Starr; and did not appear evasive

or self-serving in any way.

Greif's testimony was equivocal and standing by itself could be interpreted as an

indication that Starr had merely agreed to defer payments rather than agreeing to waive them.

However, Greif was not clear in her own recollection of the conversation.  It is also unusual for a

firm to agree to provide services at no cost.  However, it is not unthinkable that Starr would

agree to do so (in the hope of bringing Evans and Brown "back into the fold" in the future,

perhaps), and the fact that Starr & Co. made no apparent effort to collect on the unpaid invoices

is support for Evans' account of the parties' agreement.

The Trustee argued at trial that evidence of the oral agreement should have been excluded

as "hearsay," but that objection was ill-founded.  Statements made that constitute oral

agreements are not hearsay; they are what courts used to refer to as "verbal acts," meaning

statements that have legal significance merely because they are made, and not because of the

truth or falsity of any separate facts that they assert.  *See State of N.Y. v. Hendrickson Bros., Inc.*,

840 F.2d 1065, 1075 (2d Cir. 1988) ("The hearsay rule does not exclude relevant testimony as to

what the contracting parties said with respect to the making or the terms of an oral agreement.");

*see also* Fed. R. Evid. 801(c) advisory committee's note ("the entire category of 'verbal acts' and

'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a

circumstance bearing on conduct affecting their rights" is excluded from the category of

hearsay); McCormick on Evidence § 249 (7th ed. 2013) ("proof of oral utterances by the parties

in a contract suit constituting the offer and acceptance which brought the contract into being are

not evidence of assertions offered testimonially but rather verbal conduct to which the law

attaches duties and liabilities").  Similarly, the Trustee disputed Mr. Evans' credibility at trial,

and evidence of prior statements that he made about his conversations with Mr. Starr were

admissible as a result.  Fed. R. Evid. 801(d)(1)(B)(i) (prior consistent statements are not hearsay

when declarant testifies and is subject to cross-examination about the statement, and the

statement is offered to rebut a charge of fabrication or improper influence or motive).

The Trustee also argued that the oral agreement between Mr. Starr and Mr. Evans

violates the statute of frauds and cannot be enforced.  The New York statute of frauds is codified

in section 5-701 of the General Obligations Law and states, in relevant part, that an agreement

must be in writing if "[b]y its terms [it] is not to be performed within one year from the making

thereof or the performance of which is not to be completed before the end of a lifetime." N.Y.

Gen. Oblig. Law § 5-701(a)(1). In this case, there was no specified duration to the agreement

that Evans and Starr made. It could have been terminated by Starr at any time, either by his

refusal to continue to provide services or by his insistence that Evans and Brown would need to

pay for services going forward. It is well settled law that the New York statute of frauds does

not apply (even where an agreement has an indefinite duration) unless the agreement has

"absolutely no possibility in fact and law of full performance within one year." *Cron v. Hargro*

*Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998) (quoting *D & N Boening v. Kirsch Beverages*, 472

N.E.2d 992, 993 (N.Y. 1984)) (noting that at-will employment relationships are typically not

within the one-year time proscription of the statute of frauds). Here, it was entirely within the

ability of the parties to terminate the agreement at any time, so that it was entirely possible for

the agreement to be fully performed within one year.

However, the Court finds that the agreement between Evans and Starr only had a

prospective effect (that is, it would only apply to services rendered after March 2009) and that

there was no waiver of the need to reimburse Starr & Co. for out-of-pocket expenses. The

support for the out-of-pocket expenses was somewhat thin (and no testimony about them was

offered), but defendants did not challenge the out-of-pocket expenses at trial, other than to

contend that there was no obligation to reimburse them (which the Court rejects). The Court

therefore finds based on the evidence that: (a) Evans and Brown are obligated to pay the invoices

sent for the months of January, February and March of 2009; and (b) Evans and Brown are

obligated to pay the "out of pocket" expenses identified on the invoices sent for April 2009 and

later months.

The Trustee's claim for an "account stated" fails as to the remaining portions of the

unpaid invoices.  Under New York law, an "account stated" is an agreement, express or implied,

between parties to an account based upon prior transactions between them with respect to the

correctness of the account items and balance due.  *Jim-Mar Corp. v. Aquatic Const. Ltd.*, 600

N.Y.S.d 790, 791 (N.Y. App. Div. 1993) (citing *Interman Indus. Prods. v. R.S.M. Electron

Power*, 323 N.E.2d 859 (N.Y. 1975)) (other citations omitted); *see also Consolidated Energy

Design Inc. v. Princeton Club of New York*, 590 Fed. Appx. 115 (2d Cir. 2015) (applying New

York law and finding three elements for "account stated" cause of action: (1) an account was

presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated).

Here, the invoices merely summarized the monthly charges and did not state any accrued

"unpaid balances" or otherwise purport to set forth a running "account."  Most importantly, there

was no evidence that the invoices represented an "agreed" statement of account or that the

defendants acknowledged their accuracy.  To the contrary: Evans and Greif provided credible

evidence that they objected to the continuing invoices in September 2009, and that Starr told

them to ignore any further fee invoices that they received.  *See Abbott, Duncan & Weiner v.

Ragusa*, 625 N.Y.S.2d 178 (N.Y. App. Div. 1995) (citing *Waldman v. Englishtown Sportswear*,

460 N.Y.S.2d 552 (N.Y. App. Div. 1983)) ("There can be no account stated where no account

was presented or where any dispute about the account is shown to have existed.").

The Trustee's quantum meruit claim also fails as to the remaining portions of the unpaid

invoices.  The Court notes that it would have been very difficult, based on the evidence at trial,

to determine a value for the services that Ms. Lok and Ms. Wright provided.  Given the evidence,

however, it is not necessary to do so.  Proof of a quantum meruit claim required proof that Starr

& Co. had a legitimate expectation that it would be compensated for its work.  *Soumayah v.*

13

*Minnelli*, 839 N.Y.S.2d 79, 81 (N.Y. App. Div. 2007) (elements of New York quantum meruit

claim are: (1) the performance of services in good faith; (2) the acceptance of the services by the

person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the

reasonable value of the services).  Given Starr's agreement to waive further fees, Starr & Co.

could not have had any such legitimate expectation.  The parties stipulated that Starr had the

authority to make such an agreement on behalf of Starr & Co., (Joint Pretrial Order ¶ III(3)), and

the Court finds that Starr did so.

The remaining contentions put forth by both parties in the Joint Pretrial Order in support

of their respective positions were either abandoned at trial or are without merit.  In their post-trial

submission, Evans and Brown contend that Starr & Co. is barred from collection of any of the

amounts demanded because Starr & Co. never sent any overdue or unpaid balance invoices

subsequent to January 1, 2009.  This contention relies upon theories of (i) waiver, (ii) assumption

of the risk of nonpayment, and (iii) failure of loss mitigation. The Court finds these theories

unpersuasive or inapplicable to this case.  To the extent Evans and Brown's waiver argument is

merely another assertion that Starr agreed to provide services "on the house," that argument is

dealt with above.  To the extent it contends that there was waiver through other conduct, the

evidence at trial did not support that contention.  With regards to the assumption of the risk

argument, Evans and Brown cited *Favour Mind Ltd. v. Pac. Shores, Inc.*, No. 98 CIV. 7038

(GBD), 2004 WL 97649, at *7 (S.D.N.Y. Jan. 20, 2004), a case holding that a creditor-plaintiff

had assumed the risk of non-payment by the debtor-defendant such that the creditor-plaintiff was

barred from attempting to collect from the debtor's director under a veil piercing theory.  This

case and this theory are completely irrelevant to this case.  As to the failure of Starr & Co. to

mitigate losses, it is unclear what Evans and Brown believe could have been done to effectuate

14

such mitigation.  Moreover, the doctrine of loss mitigation relates to recovery of "additional damages" which accrued as a result of the plaintiff's failure to mitigate; Evans and Brown have pointed to no "additional damages" they seek to avoid.

Based on the foregoing, the Court finds that Evans and Brown are liable (jointly and severally) to pay the principal amount of $20,343.36, representing the total of the invoices for January through March 2009, the remaining $1,000 owed for the brokerage fee, and the out-of-pocket expenses billed on the later invoices through May 2010.  The Trustee demanded payment of unpaid amounts on September 9, 2013 (Compl. ¶ 16) and it is appropriate to accrue prejudgment interest from that date.  New York law mandates prejudgment interest at a rate of 9% in non-equitable contract and property cases.  N.Y. C.P.L.R. 5001(a), 5004 (McKinney 2015); *J. D'Addario & Co., Inc. v. Embassy Industries, Inc.*, 980 N.E.2d 940, 942 (N.Y. 2012) (emphasizing mandatory nature of statute).  The statute provides that prejudgment interest applies from "the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred" or "from a single reasonable intermediate date."  N.Y. C.P.L.R. 5001(b) (MicKinney 2015).  Given the past practices of Starr & Co. to allow delayed payment upon its invoices, the date of the Trustee's first demand for payment is the appropriate "earliest ascertainable date the cause of action existed."  *See Music Sales Corp. v. Mark Music Serv.*, 599 N.Y.S.2d 280 (N.Y. App. Div. 1993) (in an action for goods sold and delivered and on an account stated, the plaintiff-seller could recover prejudgment interest only from the date it first demanded payment from the defendant-buyer, as that was the "earliest ascertainable date the cause of action existed," rather than from the date of invoices).  Interest from September 9, 2013 through December 15, 2015, at the simple interest rate of 9% mandated by New York State law, is $5,216.82, resulting in an accrued

judgment as of December 15, 2015 in the amount of $25,560.18.  The Clerk will be directed to

enter judgment in that amount.

Dated: New York, New York
December 16, 2015

s/Michael E. Wiles
UNITED STATES BANKRUPTCY JUDGE